## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TRACY MIKSELL-BRANCH, and on behalf of the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, WASHINGTON, WISCONSIN, the Commonwealths of MASSACHUSETTS and VIRGINIA, and the DISTRICT OF COLUMBIA, | Case No. 10-cv-154-SLR <br><br> <u>JURY TRIAL DEMANDED</u> |
| Plaintiffs, | |
| v. | |
| ASTRAZENECA PHARMACEUTICALS LP, and ASTRAZENECA LP, | |
| Defendants. | |

## THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729 *ET SEQ.*, AND STATE LAW COUNTERPARTS

David A. Dorey (DE I.D. No. 5283)
Steven L. Caponi (DE I.D. No. 3484)
Elizabeth A. Sloan (DE I.D. No. 5045)
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Dorey@BlankRome.com

W. Scott Simmer (*admitted pro hac vice*)
Paul M. Honigberg (*admitted pro hac vice*)
BLANK ROME LLP
600 New Hampshire Ave., NW
Washington DC 20037
Telephone:  (202) 772-5800
Simmer@BlankRome.com

*Counsel for Relator*

# TABLE OF CONTENTS

**Page**

I.  SUMMARY .................................................................................................2

II.  JURISDICTION AND VENUE ...................................................................7

III.  PARTIES ......................................................................................................7

    A.  Relator Tracy Miksell-Branch .........................................................7

    B.  Defendants .......................................................................................10

IV.  BACKGROUND: REGULATION OF PRESCRIPTION DRUG
    MARKETING ...........................................................................................12

    A.  The FDA Regulatory System ..........................................................12

        1.  The FDA Regulates What Drugs May Be Marketed, and
            the Uses For Which They May Be Marketed. ...........................12

        2.  FDA Regulations Prohibit Off-Label Marketing and False
            and Misleading Statements about a Drug's Use. .......................13

    B.  The Limited Role of the FDA in Regulating Off-Label Promotion
       of Drugs ...........................................................................................19

        1.  The FDA Relies on Information Provided by Drug
            Manufacturers for New Drug Approvals ..................................19

        2.  DDMAC's Limited Ability to Regulate Drug Maker
            Marketing and Promotion. ........................................................20

V.  PRESCRIPTION DRUG PAYMENT UNDER GOVERNMENT
    HEALTH CARE PROGRAMS ...................................................................22

    A.  The Medicaid Program ...................................................................22

        1.  Medicaid Only Reimburses Drugs Used for Medically
            Accepted Indications ................................................................22

        2.  Off-Label Use of Seroquel IR Was Ineligible for Medicaid
            Reimbursement .........................................................................23

        3.  Off-Label Use of Seroquel XR Was Ineligible for Medicaid
            Reimbursement .........................................................................23

    B.  The Medicare Program ...................................................................24

|  | 1. | Off-Label Use of Seroquel IR Was Ineligible for Medicare Reimbursement | 24 |

|  | 2. | Off-Label Use of Seroquel XR Was Ineligible for Medicare Reimbursement | 25 |

| C. | Reimbursement Under Other Federal Health Care Programs | 25 |

| VI. | BACKGROUND: SEROQUEL IR AND SEROQUEL XR | 27 |

| A. | Atypical Antipsychotics and Associated Safety Risks | 27 |

| B. | FDA Approval of Seroquel IR | 30 |

| C. | FDA Approval of Seroquel XR | 31 |

| VII. | ASTRAZENECA'S FRAUDULENT MARKETING SCHEME | 32 |

| A. | Concealment of Off-Label Promotion of Seroquel IR and Seroquel XR | 34 |

| B. | Quotas and Credits Forced Sales Representatives to Promote Off-Label | 42 |

| C. | Misleading Minimization of Safety Risks | 46 |

|  | 1. | Misrepresentation of Risk of Weight Gain | 48 |

|  | 2. | Misrepresentation of Association with Diabetes | 50 |

|  | 3. | Misrepresentation of Risk of Akathisia | 51 |

|  | 4. | Misrepresentation of Risk of Somnolence | 53 |

|  | 5. | Continued Use of False Safety Claims with Respect to Seroquel IR; Extension to Seroquel XR | 55 |

| D. | Off-Label Promotion of Seroquel IR and Seroquel XR for Non-Medically Accepted Uses | 57 |

|  | 1. | Major Depressive Disorder and Symptoms of Depression | 57 |

|  |  | (a) | FDA Advisory Committee Concluded Seroquel XR Was Not Sufficiently Safe for Treatment of MDD | 58 |

|  |  | (b) | Off-Label Promotion for Frontline and Monotherapy Treatment of MDD and Symptoms of Depression | 60 |

ii

(c)  Head-to-Head Promotion versus SSRI and SNRI Antidepressants ..............................................................69

(d)  Physician Information Requests to Promote Seroquel XR for MDD ........................................................75

(e)  Paid Speakers ...........................................................77

(f)  Samples to Facilitate Off-Label Promotion for MDD ..................81

(g)  AstraZeneca's Off-Label Promotion for MDD Was Successful .....................................................................82

2.  Generalized Anxiety Disorder and Symptoms of Anxiety ......................83

3.  Behavioral Symptoms in Elderly Patients with Dementia.........................91

4.  Behavioral Disturbances and Developmental Disorders in Children and Adolescents ........................................................101

5.  Post Traumatic Stress Disorder ("PTSD")..................................118

6.  Sleep Disturbances .........................................................121

E.  Promotion of Seroquel XR Based on Unsubstantiated Superiority Claims ...........................................................................125

1.  Unsubstantiated Superiority Claims Versus Seroquel IR .......................125

2.  Unsubstantiated Superiority Claims Versus Abilify...............................129

F.  Off-Label Promotion of Seroquel XR Caused Physicians to Prescribe Seroquel IR ......................................................133

G.  Use of Paid Speakers to Promote Seroquel XR Off-Label ...................135

H.  Co-Opting CME Programs as Tools for Off-Label Promotion ...........141

I.  Kickbacks to Prescribe Seroquel IR and Seroquel XR ........................144

1.  Speaker Fees ...........................................................146

2.  Kickbacks Paid to Dr. Manmohan Singh..................................147

3.  Tutorials, Preceptorships, and Visiting Professorships............................149

4.  Lavish Meals ............................................................152

J.     Falsification of Prior Authorization Requests and Evasion of Step-Edit Controls ..................................................................................153

K.     Off-Label Marketing and Kickbacks Caused Broadlawns Hospital to Adopt Seroquel XR on Its In-Patient Formulary ............................155

VIII.  ASTRAZENECA VIOLATED ITS CORPORATE INTEGRITY AGREEMENT ..................................................................................162

A.     The CIA Established AstraZeneca's Monitoring and Reporting Obligations .......................................................................................163

B.     AstraZeneca Continued Its Illegal Conduct Even While Negotiating the Terms of Its Corporate Integrity Agreement .............................165

C.     AstraZeneca Concealed Its Off-Label Promotion of Seroquel IR and Seroquel XR and Thus Made False and Misleading Statements In Its Reports To the OIG ...................................................................165

D.     AstraZeneca Violated Its CIA By Not Reporting to the Government the Illegal Kickbacks It Paid To Physicians ...................165

E.     AstraZeneca's Violation of the Terms of the CIA Caused It to Submit False Records and/or Statements Material to An Obligation to Pay or Transmit Money or Property to the Government .................166

IX.  ASTRAZENECA VIOLATED THE FALSE CLAIMS ACT .......................................167

A.     AstraZeneca's Off-Label Promotion Caused the Submission of False Claims and Making of Material False Statements to Government Programs ......................................................................168

1.     Submission of False Claims to Medicaid.................................170

2.     Submission of False Claims to Medicare Part D .....................173

B.     AstraZeneca's Payment of Kickbacks Caused the Submission of False Claims and Making of Material False Statements to Government Programs ......................................................................174

X.  ASTRAZENECA RETALIATED AGAINST RELATOR FOR BLOWING THE WHISTLE ................................................................176

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))................................................................180

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))................................................................181

iv

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31
      U.S.C. § 3729(a)(1)(C)) ...................................................................182

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31
      U.S.C. § 3729(a)(1)(G) ...................................................................182

COUNT V (Violation of False Claims Act, 31 U.S.C. § 3730(h)) ...........................183

COUNT VI (Violation of California False Claims Act).........................................184

COUNT VII (Violation of Colorado Medicaid False Claims Act) ...........................185

COUNT VIII (Violation of Connecticut False Claims Act for Medical
      Assistance Programs).......................................................................186

COUNT IX (Violation of Delaware False Claims and Reporting Act)....................188

COUNT X (Violation of District of Columbia False Claims Act) ...........................189

COUNT XI (Violation of Florida False Claims Act) .............................................190

COUNT XII (Violation of Georgia False Medicaid Claims Act) ............................191

COUNT XIII (Violation of Hawaii False Claims Act) ...........................................193

COUNT XIV (Violation of Illinois False Claims Act)............................................194

COUNT XV (Violation of Indiana False Claims and Whistleblower
      Protection Act)...............................................................................195

COUNT XVI (Violation of Iowa False Claims Act) ..............................................196

COUNT XVII (Violation of Louisiana Medical Assistance Programs
      Integrity Law) ...............................................................................198

COUNT XVIII (Violation of Massachusetts False Claims Act)..............................199

COUNT XIX (Violation of Michigan Medicaid False Claims Act).........................200

COUNT XX (Violation of Minnesota False Claims Act)........................................202

COUNT XXI (Violation of Montana False Claims Act).........................................203

COUNT XXII (Violation of Nevada False Claims Act) .........................................205

COUNT XXIII (Violation of New Jersey False Claims Act) ..................................206

COUNT XXIV (Violation of New York False Claims Act) ....................................207

133568.00601/36388526v.8

COUNT XXV (Violation of North Carolina False Claims Act)...................................................208

COUNT XXVI (Violation of Oklahoma Medicaid False Claims Act) .......................................210

COUNT XXVII (Violation of Rhode Island False Claims Act) ................................................211

COUNT XXVIII (Violation of Tennessee Medicaid False Claims Act) ...................................212

COUNT XXIX (Violation of Virginia Fraud Against Taxpayers Act) ......................................213

COUNT XXX (Violation of Washington Medicaid False Claims Act) .....................................215

COUNT XXXI (Violation of Wisconsin False Claims for Medical Assistance
        Law) .............................................................................................................................216

133568.00601/36388526v.8

**THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
UNDER 31 U.S.C. § 3729 *ET SEQ.*, AND STATE LAW COUNTERPARTS**

This action is brought on behalf of the United States of America and the following states

by Tracy Miksell-Branch ("Relator"), by and through her attorneys, against Defendants

AstraZeneca Pharmaceuticals LP and AstraZeneca LP ("Defendants," "AstraZeneca," or the

"Company") pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C.

§ 3729 *et seq.*, and pursuant to the *qui tam* provisions of the following state statutes: the

California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (Deering 2000); the Colorado

Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq.* (2010); the Connecticut False

Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq.* (2010); the

Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* (2000); the

District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* (2000); the Florida False

Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the Georgia False Medicaid Claims Act, Ga. Code

Ann. § 49-4-168 *et seq.* (2007); the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

(2006); the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the Indiana

False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Iowa

False Claims Act, Iowa Code § 685.1 *et seq.* (2010); the Louisiana Medical Assistance Programs

Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.* (2006); the Massachusetts False Claims

Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* (2007); the Michigan Medicaid False Claims Act,

Mich. Comp. Laws § 400.601 *et seq.* (2007); the Minnesota False Claims Act, Minn. Stat.

§ 15C.01 *et seq.* (2011); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

(1999); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey

False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); the New York False Claims

Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act,

N.C. Gen. Stat. § 1-605 *et seq.* (2010); the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.* (2007); the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011); the Washington Medicaid False Claims Act, S. 5978, 62nd Cong. § 201 *et seq.* (2012); and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (2007) ("State *Qui Tam* Statutes" ; the states will be referred to collectively as the "*Qui Tam* States").

I.      **SUMMARY**

1.      In April 2010, AstraZeneca agreed to pay $520 million to the federal government and state Medicaid programs to settle allegations that it had promoted immediate-release Seroquel (subsequently "Seroquel IR") as safe and effective for numerous off-label uses, and in doing so caused the submission of false and fraudulent claims to the Government.   In conjunction with that settlement, AstraZeneca pledged both to the Government, with whom it entered into a Corporate Integrity Agreement ("CIA"), and to its own employees, that moving forward it would change its business practices to comply with federal and state statutes and regulations.

2.      AstraZeneca's promises of reform, however, belied its actual conduct.   Even while negotiating the settlement agreement, AstraZeneca not only continued its illegal off-label promotional scheme, but expanded it.   AstraZeneca continued to promote Seroquel IR for the very same off-label uses that were the subject of that settlement, and following the launch of extended-release Seroquel XR in 2007, AstraZeneca began to promote Seroquel XR as safe and effective for the same off-label uses for which it had previously promoted Seroquel IR.

3.      The Government's investigation and subsequent settlement did not spur AstraZeneca to change its illegal promotional practices, but only to conceal them more

2

diligently. While the Company paid lip service to its compliance obligations by purging off-label content from official promotional materials, slide decks, and national sales meetings – and even included admonitions against off-label promotion – during district meetings AstraZeneca managers continued to train sales representatives to promote Seroquel IR and Seroquel XR by making the same illegal, false, and misleading claims that they had made previously.

4.      Indeed, during one presentation to sales representatives, Ray McDermott, Compliance and Ethics Leader at AstraZeneca, announced that (rather than reporting fraud) they were to make sure not to communicate their activity in writing in e-mails or call notes, and were to avoid leaving any trace of their ongoing fraud in voice-mails. Thus, the reality of AstraZeneca's off-label promotion was concealed behind a veneer of compliance – a veneer that AstraZeneca strengthened by instructing sales representatives not to discuss off-label promotion in e-mail, voice-mail, or call notes.

5.      The off-label uses for which AstraZeneca promoted Seroquel IR and Seroquel XR included treatment of behavioral disturbances in the elderly, including psychosis, anxiety, and sundowning; unipolar depression, including major depressive disorder ("MDD"), as frontline and monotherapy; generalized anxiety disorder ("GAD"), post-traumatic stress disorder ("PTSD"), particularly in veterans returning from the wars in Iraq and Afghanistan; sleep disturbances; and a litany of pediatric uses, including treatment of behavioral symptoms. Neither Seroquel IR nor Seroquel XR has been demonstrated to be safe and effective for any of these uses. In fact, for every one of these uses, clinical trials have either failed to demonstrate an efficacy benefit, or found that the safety risks accompanying use of the drug were too great to justify whatever efficacy was observed.

133568.00601/36388526v.8

6.      In order to convince health care professionals to prescribe Seroquel IR and Seroquel XR for these off-label uses, AstraZeneca continually concealed and distorted evidence concerning not only the efficacy, but also the safety, of both drugs.  Seroquel IR and Seroquel XR are atypical antipsychotics and their use is accompanied by risk of adverse events, including hyperglycemia and diabetes, hyperlipidemia, tardive dyskinesia, weight gain, and somnolence. For on-label uses of Seroquel IR and Seroquel XR, assumption of these risks is frequently warranted by the accompanying efficacy benefit.  The assumption of Seroquel IR and Seroquel XR's significant safety risks, however, was not warranted for the off-label uses for which AstraZeneca promoted both drugs, either because Seroquel IR and Seroquel XR did not effectively treat those uses, or because those uses were more effectively treated by safer and much cheaper alternatives.  By misleading health care professionals regarding Seroquel IR and Seroquel XR's true safety and efficacy profiles, AstraZeneca exposed patients to unnecessary risk of serious harm.

7.      "Truth is Irrelevant"—the heading from a slide deck given by AstraZeneca to sales representatives in September 2008—aptly summarized the Company's approach to marketing of Seroquel IR and Seroquel XR.  That approach was "not to create something new and different. But to manipulate what's already up there in the mind. To retie the connections that already exist."  AstraZeneca ignored the drugs' labeled indications, including their safety warnings, and instead sought to create "perceptions that exist in [doctors'] mind[s]" because "perceptions are reality."  It then "restructure[d] those perceptions" in the minds of physicians "to create the position [it] desire[d]."

8.      As a result of AstraZeneca's off-label promotion, health care professionals wrote, and Government programs in turn reimbursed, prescriptions of Seroquel IR and Seroquel XR for

4

off-label uses that were ineligible for reimbursement under Government health care programs. As such, these claims were false and fraudulent, and AstraZeneca is liable under the federal False Claims Act and state law counterparts for causing their submission.

9.      AstraZeneca also illegally, falsely, and misleadingly promoted Seroquel XR as superior to competing drugs without substantial evidence to support its claims.  Atypical antipsychotics from competing manufacturers, including Abilify, Zyprexa, and Risperdal, were frequent targets of AstraZeneca's misleading superiority claims.  The most frequent target of AstraZeneca's claims regarding Seroquel XR, however, was its superiority to Seroquel IR, as AstraZeneca sought to convert existing patients from Seroquel IR to its new formulation in advance of the patent expiry of Seroquel IR.  Such superiority claims bolstered the effectiveness of AstraZeneca's off-label promotion, and caused an even greater number of health care professionals to prescribe Seroquel XR for the off-label uses that AstraZeneca promoted, thereby causing the submission of false and fraudulent claims to Government health care programs.  In addition, because AstraZeneca's unsubstantiated promotions violated the Food Drug and Cosmetic Act and accompanying regulations, they misbranded Seroquel XR and rendered subsequently submitted claims false and fraudulent.

10.      AstraZeneca coupled its off-label and misleading promotional claims to health care professionals with the payment of kickbacks, which it used to induce health care professionals to prescribe Seroquel IR and Seroquel XR.  (The off-label marketing and kickback schemes will be collectively referred to herein as the "Fraudulent Marketing Schemes.")  These kickbacks included speaking and consulting fees, preceptorships, professorships, and expensive dinners, and were provided to physicians and other health care professionals as an incentive to prescribe, or as a reward for prescribing, Seroquel IR or Seroquel XR.  Kickbacks paid by

133568.00601/36388526v.8

AstraZeneca caused health care professionals to prescribe Seroquel IR and Seroquel XR for both on- and off-label uses and caused Government programs to make reimbursements for the resulting claims, which were false and fraudulent because the underlying transactions were tainted by kickbacks.

11.     Even after AstraZeneca turned the focus of its off-label and kickback schemes from Seroquel IR to Seroquel XR, AstraZeneca continued to cause the submission of false and fraudulent claims for Seroquel IR.   Due to payor plan limitations on Seroquel XR, many prescriptions of Seroquel XR that were written as the result of AstraZeneca's off-label promotion and kickbacks were instead converted and dispensed as Seroquel IR.   In other instances, health care professionals who foresaw payor resistance to Seroquel XR, but still sought the efficacy and safety that AstraZeneca promised in its off-label promotion, prescribed Seroquel IR instead.   In each instance, AstraZeneca is liable for the false and fraudulent claims for Seroquel IR that were submitted to Government programs as the foreseeable result of its promotion of Seroquel XR.

12.     AstraZeneca's false statements regarding Seroquel IR and Seroquel XR include its quarterly reports filed with the OIG as part of the obligations under the CIA, which caused it to submit false records and/or statements material to an obligation to pay or transmit money or property to the Government.

13.     AstraZeneca's conduct had a material effect on the federal and state Governments' decisions to pay for Seroquel IR and Seroquel XR.   Had the Governments known that claims for both drugs were submitted as the result of AstraZeneca's illegal off-label and misleading promotion and payment of kickbacks, they would not have made those reimbursements.

6

14.     The United States and *Qui Tam* States have suffered substantial harm as the result of AstraZeneca's off-label and misleading promotion and payment of kickbacks.  From 2007 through 2012, Medicaid reimbursements for Seroquel XR totaled more than $894.4 million for some 3.3 million prescriptions.  Over the same period, Medicaid reimbursements for Seroquel IR totaled $5.47 billion for 21.6 million prescriptions. Medicare reimbursements for both Seroquel XR and Seroquel IR were likewise substantial.  In each case, a substantial portion of these reimbursements were made as the result of AstraZeneca's fraudulent marketing scheme.

## II.     JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.  The Court has personal jurisdiction over the Defendants because, among other things, the Defendants' U.S. headquarters are in this district, and the Defendants engaged in wrongdoing in this district.

16.     Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  Defendants' principal place of business in the United States is within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this district.

17.     The claims for relief alleged herein are timely brought because, among other things, the Defendants sought to conceal from the United States and the *Qui Tam* States their wrongdoing in connection with the allegations made herein.

## III.    PARTIES

### A.     Relator Tracy Miksell-Branch

18.     Relator Tracy Miksell-Branch ("Relator") is a resident of Grimes, Iowa.  Since receiving a Bachelor of Arts degree in psychology in 1988, Relator has worked in the health care field continuously.  She received the degree of Master of Social Work from Adelphi University in 1990 and completed her coursework for a Doctor of Social Work from New York University,

later finishing her doctorate degree at the International University for Graduate Studies in 2005. She is a licensed independent social worker in the state of Iowa.

19.     From November 2000 until May 2010, Relator worked as an Executive Specialty Pharmaceutical Sales Representative in AstraZeneca's Central Nervous System ("CNS") division, where her primary duties and responsibilities entailed marketing Seroquel IR and, later, Seroquel XR.  From November 2000 until December 2002, Relator was responsible for a sales territory in and around Atlanta, Georgia.  In December 2002, she was reassigned to a territory covering the central portion of Iowa, where she worked until she was constructively discharged from AstraZeneca in May 2010.

20.     During her tenure at AstraZeneca, Relator received numerous honors and awards in recognition of her outstanding job performance.  A national selection committee chose her as a Field Training Associate, a position for which only a small percentage of the Company's workforce was selected, and over the years both peers and managers nominated her for thirteen "Sales Value Awards."  Her District Sales Manager, Regional Sales Director, and Area Sales Director chose her five times for the "Being the Best Award," and she received awards both for largest market share growth and largest growth in average daily dose. She ranked in the top 10% of the CNS sales team for two consecutive years and was chosen as a "Customer Solutions Champion" by her district manager.  As a result of her outstanding performance, Relator earned a promotion to "Executive Level Sales Representative."

21.     In addition to these awards, Relator's regional sales director selected her to sit on a "Directors' Council," which was a committee of the most highly regarded sales representatives, tasked with making recommendations to improve the training and management of their colleagues.  A different regional sales director also selected her to sit on a panel at a national

8

sales meeting to answer questions regarding a new, computerized sales promotional aide. AstraZeneca selected Relator as a member of a national training committee to write training modules regarding the competing atypical antipsychotic Abilify, and several different District Sales Managers chose her to mentor new hires and primary care sales representatives.

22.     Relator resigned from AstraZeneca on May 10, 2010, as a result of threats, harassment, and other retaliation that she suffered after AstraZeneca disclosed to her regional and district managers, as well as to sales representatives in her district, that Relator had reported the Company's ongoing illegal, off-label promotion of Seroquel IR and Seroquel XR to AstraZeneca's compliance department.   Relator also wished to dissociate herself from AstraZeneca's continuing illegal conduct.  She presently works as a social worker and counselor in private practice in Grimes, Iowa.

23.     Through her employment at AstraZeneca as an Executive Specialty Pharmaceutical Sales Representative, Relator gained a wealth of direct and independent knowledge of the fraudulent schemes perpetrated by the Defendants.  Relator was involved in meetings and discussions related to AstraZeneca's schemes to maximize sales of Seroquel IR and Seroquel XR through means that included influencing, manipulating, and making misrepresentations to psychiatrists, pharmacists, and other health care professionals to prescribe Seroquel IR and Seroquel XR for uses that had not been approved by the FDA or otherwise established as safe and effective.

24.     Relator is the original source of the allegations in this Third Amended Complaint, and the allegations are not based upon publicly disclosed information.  She has voluntarily provided the federal Government and the *Qui Tam* States with information and documents prior to the filing of her original Complaint in accordance with 31 U.S.C. § 3730(b)(2).  Prior to filing

her original Complaint, Relator brought the wrongdoing described in this Third Amended Complaint to the attention of AstraZeneca.

**B.**     Defendants

25.     Defendant AstraZeneca Pharmaceuticals LP is a Delaware Limited Partnership with its headquarters located at 1800 Concord Pike, Wilmington Delaware 19850.  AstraZeneca Pharmaceuticals LP's general and limited partners include:  (1) AstraZeneca AB, a Swedish corporation with its corporate headquarters in Sweden; (2) Zeneca Inc., a Delaware corporation with its corporate headquarters in Delaware; (3) Astra USA, a New York corporation with its principal place of business in Delaware; and (4) Astra US Holdings Corporation, a Delaware corporation with its corporate headquarters in Delaware.

26.     During the relevant time period, AstraZeneca Pharmaceuticals LP designed, produced, marketed and promoted mental health prescription medications, including Seroquel IR and Seroquel XR, nationwide. AstraZeneca Pharmaceuticals LP is a subsidiary of AstraZeneca PLC.  At all relevant times, AstraZeneca Pharmaceuticals LP acted by and through its agents, servants, workers, employees, officers and directors, all acting through the course and scope of their actual and apparent authority, agency, duties or employment.

27.     Throughout the relevant period, AstraZeneca Pharmaceuticals LP marketed and sold substantial quantities of its drug products (including Seroquel IR and Seroquel XR) in Delaware and throughout the rest of the United States, including within this judicial district.

28.     Defendant AstraZeneca LP is a limited partnership organized under the laws of Delaware and conducts business nationwide.  AstraZeneca LP's general and limited partners include: (1) Defendant AZ Pharm; and (2) KBI Sub Inc., a Delaware corporation with its principal place of business in New Jersey.  AstraZeneca LP is a United States subsidiary of AstraZeneca PLC.

10

29.     AstraZeneca Pharmaceuticals LP and AstraZeneca LP (jointly herein "AstraZeneca" or "Defendants") are engaged in the development, manufacture, distribution, and sale of pharmaceutical and health care products (including Seroquel IR and Seroquel XR) throughout the United States.  Throughout the relevant period, AstraZeneca employed as many as 15,000 sales representatives and sales managers, located across the United States, to promote, market or otherwise sell AstraZeneca drugs, including Seroquel IR and Seroquel XR.

30.     Defendants market and sell brand-name prescription drug products (including Seroquel IR and Seroquel XR) that are paid for or reimbursed by various governmental programs, including health benefit carriers offering benefits under the Federal Employees Health Benefits ("FEHB") program under a prime contract with the Blue Cross Blue Shield Association ("BCBSA"); the Health Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq.*, via Medicare Part C, also known as Medicare+ Choice; Medicare Part D; the Indian Health Service; Medicaid; the Mail Handler's Health Benefit Plan ("MHHBP"); the U.S. Secret Service Employees Health Association ("SSEH") Health Benefit Plan; the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE"); and the Veteran's Health Administration ("VHA") (collectively, the "federal programs").

31.     As a result of AstraZeneca's actions, the *Qui Tam* States and federal programs have suffered financial harm.

133568.00601/36388526v.8

IV.     **BACKGROUND: REGULATION OF PRESCRIPTION DRUG MARKETING**

A.     **The FDA Regulatory System**

1.     **The FDA Regulates What Drugs May Be Marketed, and the Uses For Which They May Be Marketed.**

32.     Under the FDCA, 21 U.S.C. §§ 301-97, new drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses.  21 U.S.C. § 355(a), (d).  Approval of the drug by the FDA is the final step in a multi-year process of study and testing.  The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices and guidance documents.

33.     To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself.  Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use."  21 U.S.C. § 355(b)(1)(A).

34.     The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness.  *See* 21 U.S.C. § 355(d)(7).  The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use.  *See* 21 U.S.C. § 355(d)(5).

35.     The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with:  (1) clear objectives; (2) adequate design to permit a valid comparison with a control group; (3) adequate selection of study subjects; (4) adequate measures to minimize bias;

12

and (5) well defined and reliable methods of assessing subjects' responses to treatment. *See* 21 C.F.R. § 314.26.

36.     After a drug is approved, the FDA continues to exercise control over the product labeling.   To ensure or promote safety, the FDA may require a label change to reflect the increased risk of various side effects or interactions, restrict a drug's indications, or, in extreme cases, force a withdrawal from the market.  *See* 21 C.F.R. § 201.57(3).

37.     The FDA determines the requirements for package inserts or prescribing information that is provided with a prescription medication, which provides information about that drug.

38.     The FDA may require that the package insert contain a "black box" warning. A black box warning means that medical studies indicate that the drug carries a significant risk of serious or even life-threatening adverse effects.

2.      **FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements about a Drug's Use.**

39.     The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA.  *See* 21 U.S.C. § 355(d)(1) & (2).  Indications for use that are not listed in a drug's labeling have not been approved by the FDA.  *See* 37 Fed. Reg. 16,503 (1972).

40.     FDA regulations restrict how drug companies may market and promote approved drugs.  *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81.  Drug labels – including all marketing and promotional materials relating to the drug – may not describe intended uses for the drug that have not been approved by the FDA.  21 U.S.C. §§ 331, 352.  Illegal "misbranding" can result in criminal penalties.  *See* 21 U.S.C. § 333.

13

41.     The same general requirements governing the promotion of prescription drugs apply to both professional and consumer-oriented marketing.   In particular, promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional claims and materials.   Federal regulations require that the risks as well as the benefits be clearly identified and given appropriate prominence.   Promotional materials must be consistent with the FDA-approved product labeling.   This restriction pertains to the clinical indications for which the drug has been approved as well as the dosing regimen that is supported by the clinical trials that were undertaken to establish safety and efficacy.

42.     A manufacturer wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval.  *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq.*  A supplemental New Drug Application ("sNDA") must be filed in order to seek approval of the new indication. Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

43.     "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling.   Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population – *e.g.,* treating a child when the drug is approved to treat adults.

14

44.     Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine.  Once a drug is approved for a particular use, the FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA.

45.     When considering off-label prescribing, physicians depend on the patient-specific evidence available to them.  This includes the particular patient's symptoms and medical history, the severity of his or her problems, the success of prior treatment, and the risks of not treating.  Whether contemplating on- or off-label use, physicians also rely on personal experience, recommendations from colleagues and academics, educational seminars, and clinical trials evidence.  Much of what physicians rely on is information (or, as the case may be, misinformation) provided by sales representatives from drug makers.

46.     Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved, or for a patient group that is unapproved.  Specifically, a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA.  21 U.S.C. §§ 331, 352.  The statute, 21 U.S.C. § 331(d), and its implementing regulations, and 21 C.F.R. § 202.1(e)(4)(i)(a), prohibit any advertising that recommends or suggests an off-label use for an approved drug, and the FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising.  *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074, 64,076 (Dec. 3, 1997).  The FDA "interprets the term 'advertisement' to include

15

information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product." *Id.*

47.     Any manufacturer speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing contained in 21 C.F.R. § 202.1, as well as the FDA's "fair balance" requirement, described below.

48.     FDA regulations provide that an advertisement may not use "literature, quotations, or references for the purpose of recommending or suggesting conditions of drug use that are not approved or permitted in the drug package labeling."  21 C.F.R. § 202.1(e)(6)(xi); *see also* 21 U.S.C. § 331(d) (prohibiting distribution of a drug for non-approved uses); *id.* § 331(a) (prohibiting distribution of a misbranded drug); *id.* § 360aaa (permitting dissemination of material on off-label uses only if the manufacturer meets certain stringent requirements).

49.     These regulations ban advertisements that are false, lacking in fair balance, or otherwise misleading.  Thus, the use of unsubstantiated comparative claims also is prohibited by law.  *See* 21 U.S.C. § 352; 21 C.F.R. § 202.1(e)(6).

50.     The regulations also prohibit an advertisement that "contains a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated."  *See* 21 C.F.R. § 202.1(e)(6)(iv).

51.     The regulations require drug companies to present a "true statement" of information relating to the side effects, contraindications and effectiveness of the drug use.

16

*See* 21 C.F.R. § 202.1(e)(5) *et seq*.   A company violates this regulation if it presents "false or misleading" information about a drug's side effects or does not "fair[ly] balance" information relating to the safety and efficacy of the drug use against information about its side effects and contraindications.  *Id.*

52.    FDA Regulations broadly describe "labeling" of a drug as including any material accompanying a drug product that is supplied and disseminated by the manufacturer, packer or distributor of the drug.    21 C.F.R. § 202.1(1)(2).    The FDA has interpreted oral communications as falling under the umbrella of "labeling."

53.    FDA regulations require labeling to be "informative and accurate and neither promotional in tone nor false and misleading in any particular," to "contain a summary of the essential scientific information needed for the safe and effective use of the drug," and prohibit "implied claims or suggestions of drug use if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness."  21 C.F.R. § 201.56

54.    These regulations also lay out the stringent requirements that must be met by a manufacturer before it may disseminate any materials on unapproved or new uses of marketed drugs.   This material must be in the form of an unabridged reprint or copy of a published, peer-reviewed article that is considered "scientifically sound" by experts qualified to evaluate the safety or effectiveness of the drug involved.   *See* 21 C.F.R. § 99.101(a)(2).  The FDA does not consider abstracts of publications to be "scientifically sound." *Id*. § 99.101(b).   Unabridged reprints or copies of articles shall not be disseminated with any information that is promotional in nature.  *Id*. § 99.101(b)(2).

55.    Furthermore, the manufacturer must not disseminate materials that are "false and misleading," such as those that only present favorable information when unfavorable

17

publications exist, exclude mandatory information about the safety and efficacy of the drug use, or present conclusions that "clearly cannot be supported by the results of the study."  21 C.F.R. § 99.101(a)(4).

56.     Off-label information may be disseminated only in response to an "unsolicited request from a healthcare practitioner."  21 U.S.C. § 360aaa-6.  In any other circumstance, a manufacturer may disseminate information concerning off-label use only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use; has provided the materials to the FDA prior to dissemination; and the materials themselves are submitted in unabridged form and are neither false nor misleading.  21 U.S.C. §§ 360aaa(b) & (c); 360aaa-1.

57.     Companies such as AstraZeneca may not promote their approved drugs through unsubstantiated comparative claims that exalt their drugs as safer as or more efficacious than competitor drugs.  Such promotion renders a drug "misbranded" and no longer eligible for reimbursement by federal programs, including Medicaid.

58.     In sum, the off-label regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body – the FDA.   Moreover, the prohibition on unsubstantiated comparative claims protects patients and consumers by ensuring that the prescription and use of approved drugs is not based on misleading marketing tactics.

**B.       The Limited Role of the FDA in Regulating Off-Label Promotion of Drugs**

      1.       **The FDA Relies on Information Provided by Drug Manufacturers for New Drug Approvals**

59.       FDA approval of prescription drugs is wholly dependent on the accuracy of information provided by drug manufacturers.  *See generally* Wayne A. Ray & Michael Stein, "Reform of Drug Regulation—Beyond an Independent Drug-Safety Board," 354 *New England Journal of Medicine* 194 (Jan. 12, 2006).

60.       FDA approval does not require that a new drug be more effective or safer than other drugs approved to treat the same condition, or that the new drug is cost-effective.  A drug need only be shown to be more effective than a placebo in treating a particular condition, without any statistically significant safety findings.  Comparative data showing performance as compared to existing drugs is not required; the FDA has no basis for determining that one drug is better than another drug.

61.       Because short-term studies are accepted, drug applications often do not contain long-term data on the safety or efficacy of the drug.  Approval of a new drug generally contains a requirement that the manufacturers pursue further long-term studies, but two-thirds of the promised studies never materialize and the FDA lacks any enforcement authority to require the manufacturer to complete these studies.

62.       Many of the effects of newly approved drugs could not possibly be known at the time of FDA approval, particularly the long-term effects of taking a medication, given the short length of and relatively few participants in the clinical trials conducted for approval.  *See* "AP Analysis: How a Drug's Risks Emerge," *New York Times*, May 23, 2007.   There is no systematic provision requiring drug companies to conduct—or provide results from—post-marketing studies.

63.     The FDA often finds itself in a quandary:  "Safety and speed are the yin and yang of drug regulation.  Patients want immediate access to breakthrough medicines but also want to believe the drugs are safe.  These goals can be incompatible."  Gardiner Harris, "Potentially Incompatible Goals at F.D.A.: Critics Say a Push to Approve Drugs Is Compromising Safety," *New York Times*, June 11, 2007, at A14.

### 2.     DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion.

64.     The FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") is charged with overseeing the marketing and promotion of approved drugs to ensure that advertisements are:  (a) not false or misleading; (b) provide a fair balance between the benefits and risks of the drug; and (c) do not promote off-label uses.  *See* Statement by Janet Woodcock, M.D., Director Center for Drug Evaluation and Research, FDA, Before the Senate Special Committee on Aging (July 22, 2003).

65.     DDMAC's ability to regulate off-label promotion is limited.  In 2003, its entire staff consisted of 40 members, with 25 reviewers responsible for reviewing all drug advertisements and promotional materials.

66.     Moreover, materials promoting pharmaceutical products do not have to be pre-approved.  FDA review of promotional materials occurs, if it does at all, after the materials have already appeared in public.  *See* Woodcock Statement, *supra*.  Upon finding a violation, DDMAC generally requests, but does not require, the company to stop using the promotional materials.  *Id*. DDMAC occasionally requires sponsors to correct publicly product misimpressions created by false, misleading, or unbalanced materials.  *Id*.

67.     Once a drug has been approved, the FDA's statutory authority is limited to requesting label changes, negotiating with the manufacturer restrictions on distribution,

and petitioning for the withdrawal of the drug from the marketplace. Title 21 of the Code of Federal Regulations requires that "as soon as there is reasonable evidence of a serious hazard with a drug," the "Warnings" section of the label should be revised to reflect this hazard.

68.     FDA's inability to police off-label promotion effectively was confirmed in a July 28, 2008 U.S. Government Accountability Office Report, which found that the FDA took an average of seven months to issue letters in response to off-label promotions. *See* Drugs: FDA's Oversight of the Promotion of Drugs for Off-Label Uses (GAO 08-835), http://www.gao.gov/new.items/d08835.pdf.

69.     Among the Report's findings:  (1) FDA does not have separate oversight capability sufficient to capture off-label promotion; (2) FDA is unable to review all promotional submissions because of the volume of materials it receives; instead, the FDA must prioritize its reviews in order to attempt to examine those with the greatest potential impact on human health; (3) FDA is hampered by the lack of a system to consistently tracks the receipt and review of submitted materials; (4) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material—for instance, discussions between doctors and sales representatives; and (5) during calendar years 2003 through 2007, FDA issued 42 regulatory letters requesting drug companies to stop dissemination of promotional material promoting off-label uses of their pharmaceutical products.

70.     AstraZeneca is among the companies cited in the GAO Report, cited for Merrum I.V., which had been approved only for treatment of intra-abdominal infections and bacterial meningitis caused by specific pathogens that are not drug-resistant.  Despite the limited indication, AstraZeneca was warned that it was improperly marketing Merrum I.V. for treatment of infections caused by particular bacteria and drug-resistant pathogens.

21

V.   **PRESCRIPTION DRUG PAYMENT UNDER GOVERNMENT HEALTH CARE PROGRAMS**

71.     Whether a drug is FDA approved for a particular indication (i.e., use) and whether that indication is recommended in one or more of the statutorily named drug Compendia determines whether a prescription for that use may be reimbursed under Medicare, Medicaid and other federal health care programs.

A.     **The Medicaid Program**

1.     Medicaid Only Reimburses Drugs Used for Medically Accepted Indications

72.     Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients.  Funding for Medicaid is shared between the federal and state governments.  Prior to the advent of Medicare Part D in 2006, the Medicaid program subsidized the purchase of more prescription drugs than any other program in the United States.

73.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the Federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."  42 U.S.C. §§ 1396b(I)(10), 1396r-8(k)(2)-(3).  Covered outpatient drugs are drugs that are used for "a medically accepted indication."  42 U.S.C. § 1396r-8(k)(3).

74.     A medically-accepted indication, in turn, is a use that is listed in the labeling approved by the FDA, or that is included in one of the drug Compendia identified in the Medicaid statute.  42 U.S.C. § 1396r-8(k)(6).  The three statutorily named Compendia are the American Hospital Service Formulary Drug Information ("AHFS"), United States Pharmacopeia-Drug Information or its successor publications ("USP-DI"), and the DRUGDEX

22

Information System ("Drugdex"). *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i).  The USP-DI ceased publication in 2007 and has no successor publications recognized by CMS.

75.     During the time period relevant to this Third Amended Complaint, AstraZeneca caused the submission of claims for off-label uses of Seroquel and Seroquel XR that were ineligible for Medicaid reimbursement because the uses were neither FDA-approved nor supported by any of the statutorily named compendia.

76.     From 2007 through 2012, Medicaid reimbursements totaled more than $894.4 million for Seroquel XR and $5.47 billion for Seroquel IR.

2.     Off-Label Use of Seroquel IR Was Ineligible for Medicaid Reimbursement

77.     From the launch of Seroquel IR until at least September 8, 2014, none of the statutorily named Compendia supported the use of Seroquel IR for any uses beyond its limited FDA-approved indications.

78.     Accordingly, from the approval of Seroquel IR until at least September 8, 2014, any off-label use of Seroquel IR was therefore not a medically accepted indication under the Medicaid program, and Seroquel IR was therefore ineligible for reimbursement for such uses. Any claims submitted to Medicaid for payment of Seroquel IR used to treat any off-label conditions were therefore false as a matter of law.

3.     Off-Label Use of Seroquel XR Was Ineligible for Medicaid Reimbursement

79.     From the launch of Seroquel XR until at least September 8, 2014, none of the statutorily named Compendia supported the use of Seroquel XR for any uses beyond its limited FDA-approved indications.

80.     Accordingly, from the approval of Seroquel XR until at least September 8, 2014, any off-label use of Seroquel XR was therefore not a medically accepted indication under the

23

Medicaid program, and Seroquel XR was therefore ineligible for reimbursement for such uses. Any claims submitted to Medicaid for payment of Seroquel XR used to treat any off-label conditions were therefore false as a matter of law.

### B.    The Medicare Program

81.    Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases.  The program is administered by third party contractors known as "carriers," which have some discretion to make coverage determinations, but must so within statutory and regulatory confines.

82.    Pharmacy-dispensed outpatient drugs are covered by Medicare Part D, which also requires that a "covered Part D drug" be used for a "medically accepted indication (as defined in paragraph (4)."  42 U.S.C. § 1395w–102(e)(1).  Paragraph 4 in turn refers to the Medicaid definition of medically accepted indication under 42 U.S.C. § 1396r8 (k)(6), which specifies that medically accepted off-label uses are those "supported by one or more citations included or approved for inclusion in" AHFS, Drugdex, or USP-DI.  Thus, in order to be reimbursable by Medicare Part D, the off-label use of a drug must be supported by one or more of AHFS, Drugdex, or USP-DI.

83.    During the time period relevant to this Third Amended Complaint, AstraZeneca caused the submission of claims for off-label uses of Seroquel IR and Seroquel XR that were ineligible for Medicare reimbursement because the uses were neither FDA-approved nor supported by the applicable compendia.

###       1.    Off-Label Use of Seroquel IR Was Ineligible for Medicare Reimbursement

84.    From the approval of Seroquel IR until at least September 8, 2014, none of the statutorily named Compendia supported the use of Seroquel IR for any uses beyond its limited

24

FDA-approved indications. From the approval of Seroquel IR until at least September 8, 2014, any off-label use of Seroquel IR was not a medically accepted indication under the Medicare program, and Seroquel IR was therefore ineligible for reimbursement for such uses.  Any claims submitted to Medicare for payment of Seroquel IR used to treat <u>any</u> off-label conditions were therefore false as a matter of law.

> 2.    Off-Label Use of Seroquel XR Was Ineligible for Medicare Reimbursement

85.    From the approval of Seroquel XR until at least September 8, 2014, none of the statutorily named Compendia supported the use of Seroquel XR for any uses beyond its limited FDA-approved indications. From the approval of Seroquel XR until at least September 8, 2014, any off-label use of Seroquel XR was not a medically accepted indication under the Medicare program, and Seroquel XR was therefore ineligible for reimbursement for such uses.  Any claims submitted to Medicare for payment of Seroquel XR used to treat <u>any</u> off-label conditions were therefore false as a matter of law.

**C.    Reimbursement Under Other Federal Health Care Programs**

86.    In addition to Medicaid and Medicare, the Federal Government reimburses a portion of the cost of prescription drugs under several other federal health care programs.  For example:

- CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependants affiliated with the armed forces;

- CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities; and

25

- The Federal Employee Health Benefit Program provides health insurance for federal employees, retirees and survivors, and is administered by the Office of Personnel Management.

87. Coverage of off-label drug use under these programs is similar to the coverage provided by the Medicaid program. *See, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

88. During the time period relevant to this Third Amended Complaint, none of the statutorily named compendia recommended Seroquel IR or Seroquel XR for the treatment of GAD, behavioral disturbances in the elderly, behavioral disturbances in children and adolescents, PTSD, or sleep disturbances. Further, until at least September 2009, none of the statutorily named compendia recommended Seroquel XR for frontline or monotherapy treatment of major depressive disorder or other forms of unipolar depression, and prior to its FDA approval in October 2008, none of the statutorily named compendia recommended Seroquel XR for treatment of bipolar depression. The statutorily named compendia have never recommended Seroquel IR for frontline or monotherapy treatment of major depressive disorder or other forms of unipolar depression.

89. Claims for Seroquel IR and Seroquel XR submitted to Government health care programs, including Medicare and Medicaid, for the treatment of GAD, behavioral disturbances in the elderly, behavioral disturbances in children and adolescents, PTSD, and sleep disturbances were ineligible for reimbursement and therefore false during all times relevant to this Third Amended Complaint. Claims for Seroquel XR submitted to Government health care programs, including Medicare and Medicaid, for frontline or monotherapy treatment of major depressive

26

disorder or other forms of unipolar depression were ineligible for reimbursement and therefore false until at least September 2009, as were Seroquel XR claims for treatment of bipolar depression until October 8, 2008. Claims for Seroquel IR submitted to Government health care programs, including Medicare and Medicaid, for frontline or monotherapy treatment of major depressive disorder or other forms of unipolar depression were ineligible for reimbursement and therefore false during all times relevant to this Third Amended Complaint.

VI.     BACKGROUND: SEROQUEL IR AND SEROQUEL XR

        A.     **Atypical Antipsychotics and Associated Safety Risks**

        90.     Second-generation antipsychotics, more commonly referred to as atypical antipsychotics, were developed in the early 1990s as alternatives to first-generation psychotics for the treatment of serious mental disorders, such as schizophrenia and bipolar disorder. Schizophrenia is a severe, debilitating, and difficult-to-treat mental illness afflicting around 1% of the U.S. population and characterized by disorganized and bizarre thoughts, delusions, hallucinations, impaired psycho-social functioning, cognitive dysfunction, and profound mood disorders. *See* DSM-IV-TR 298-302. Bipolar disorder, which according to the National Institutes of Mental Health affects around 2.6% of the U.S. population, is likewise a serious mental illness marked by dramatic shifts in moods between depressive phases and manic phases, the latter of which are characterized by abnormal grandiosity, expansiveness, or irritability. Bipolar disorder is subdivided into bipolar I, which entails both a depressive phase as well as at least one manic or mixed phase; and bipolar II, which also entails a depressive phase, but rather than a manic phase is defined by a hypomanic phase that but falls short of the criteria for a full manic phase. *See* DSM-IV-TR 382-92.

        91.     Beginning in the 1950s, the primary treatments for schizophrenia and bipolar disorder were first-generation antipsychotics such as haloperidol, thioridazine, and

chlorpromazine, which function by blocking dopamine receptors in the brain.   Although effective, first-generation antipsychotics share serious adverse events, among the most serious of which are extrapyramidal motor control disabilities such as unsteady, Parkinsonian-type movements and akathisia, where the patient is unable to remain still.   Long-term use may also lead to tardive dyskinesia, characterized by repetitive, involuntary tics and movements, which in many cases continue permanently even following the patient's discontinuation of the drug.

92.     Seroquel IR and Seroquel XR are among the second-generation or atypical antipsychotics, which were developed in the 1990s in an attempt to achieve the efficacy benefit of typical antipsychotics while lessening their safety burden.   In doing so, atypical antipsychotics were at least partly successful.   Second-generation antipsychotics are generally perceived as safer than first-generation drugs, in large part due to the decreased incidence of extrapyramidal side effects, and as a result second-generation antipsychotics now account for about 90% of all prescribed antipsychotics.

93.     That atypical antipsychotics are considered safer than typical antipsychotics, however, does not imply that atypical antipsychotics are safe.   On the contrary, use of atypicals including Seroquel IR and Seroquel XR is accompanied by the risk of numerous adverse events, among the most serious of which are metabolic abnormalities that regularly lead to diabetes and weight gain; cardiac disorders; extrapyramidal side effects; and cognitive impairment.   In addition, use of each drug is accompanied by significant risks of hypotension, elevated liver enzymes (an indicator of liver damage), abdominal pain, constipation, dizziness, somnolence, and a litany of other cardiac, digestive, musculoskeletal, and nervous system adverse events. The Prescribing Information for both Seroquel IR and Seroquel XR also contains a black box

133568.00601/36388526v.8

warning that elderly patients with dementia-related psychosis who take either drug are at an increased risk for death.

94.     In January 2009, a study published in the New England Journal of Medicine found that patients taking Seroquel and other atypical antipsychotics experienced a risk of sudden cardiac death that was more than double that of the ordinary population. Ray, et al., *Atypical Antipsychotic Drugs and the Risk of Sudden Cardiac Death*, 360 New Eng. J. Med. 225 (2009).  In fact, the risk of sudden cardiac death for patients on atypical antipsychotics exceeded even that for patients on typical antipsychotics.  *Id.*

95.     As an FDA Advisory Committee that convened to consider expanding the approved uses of Seroquel XR recognized, whether a patient's assumption of Seroquel XR's significant risks is justified depends both on the seriousness of the disease being treated as well as the availability of alternative, safer therapies.  For patients with serious psychiatric diseases such as schizophrenia and bipolar disorder, for which there are not safer alternate treatments, the risks of these adverse events are frequently worth taking.  For many other conditions, however, the efficacy benefit is too small or uncertain to justify the risks.  Seroquel XR's safety profile was critical to the FDA's determination not to approve Seroquel XR to treat GAD and as monotherapy to treat MDD, even though Seroquel XR had demonstrated efficacy for these uses. The FDA thus concluded that the demonstrated efficacy benefit was insufficient to outweigh Seroquel XR's risks, particularly given the availability of other, safer treatments for these indications.

96.     Nonetheless, the perception that SGAs are safe—more so than they actually are— has been a major contributor to the dramatic increase in prescribing of atypical antipsychotics for a litany of off-label conditions, including agitation; aggression; anxiety and GAD; behavioral

disorders, including ones related to dementia; psychotic episodes; obsessive behavior; unipolar depression; MDD; obsessive compulsive disorder; post-traumatic stress disorder ("PTSD"); personality disorders; and Tourette's Syndrome.

97. The use of SGAs in children and adolescents, both on- and off-label, is also large and continues to grow. From 2004 to 2008, pediatric prescriptions of atypical antipsychotics dispensed by retail pharmacies increased from 3.94 to 4.8 million and accounted for 9% of all Seroquel prescriptions. L. Governale and H. Mehta, *Outpatient use of Atypical Antipsychotic Agents in the Pediatric Population Years 2004 – 2008*, FDA's Division of Epidemiology, Office of Surveillance and Epidemiology 5 (Dec. 8, 2009), *available at* http://www.fda.gov/ downloads/AdvisoryCommittees/CommitteesMeetingMaterials/PediatricAdvisoryCommittee/U CM193204.pdf. Over the same period, Seroquel prescriptions for 13-17 year olds increased 26.7%. *Id.* at 11. A substantial portion of these atypical antipsychotic prescriptions, including those for Seroquel, were for off-label uses, including autism (4-7%, depending on age group), attention deficit disorder (9-15%), and unspecified behavioral disturbances (3-9%).

98. As described below, AstraZeneca sales representatives' misleading minimization of Seroquel IR and Seroquel XR's safety risks in their promotions to physicians was an integral driver of physicians' unjustified assessment of the safety of both drugs and those physicians' subsequent prescribing of Seroquel IR and Seroquel XR for off-label conditions for which neither drug was safe and effective.

### B.     FDA Approval of Seroquel IR

99. Seroquel IR is an atypical antipsychotic originally approved by the FDA in 1997 for acute treatment of schizophrenia in adult patients.

30

100.     In January 2004, the FDA approved Seroquel for "short-term treatment of acute manic episodes associated with bipolar I disorder, as either monotherapy or adjunct therapy to lithium or divalproex" in adult patients.

101.     On October 23, 2006, the FDA approved Seroquel for the treatment of depressive episodes associated with bipolar disorder in adult patients.

102.     On December 4, 2009, the FDA approved Seroquel as treatment for schizophrenia in 13- to 17-year-old adolescents, and for the acute treatment of manic episodes associated with bipolar I disorder in 10- to 17-year-old children and adolescents.  These limited approvals were the only indications that Seroquel IR received for the treatment of children and adolescents.

### C.     FDA Approval of Seroquel XR

103.     On May 17, 2007, the FDA approved Seroquel XR for the acute treatment of schizophrenia in adult patients.  AstraZeneca launched Seroquel XR for sale in the United States shortly thereafter in July 2007.  On November 16, 2007, the FDA extended Seroquel XR's approval for maintenance treatment of schizophrenia in adult patients.

104.     On October 8, 2008, the FDA approved Seroquel XR in adult patients as monotherapy for the acute treatment of the depressive episodes associated with bipolar I and bipolar II disorders; as monotherapy for acute treatment of manic and mixed episodes associated with bipolar I disorder; and as maintenance treatment for bipolar I disorder as adjunctive therapy to lithium or Depakote (divalproex sodium).

105.     In February 2008, AstraZeneca submitted an sNDA to the FDA seeking approval of Seroquel XR to treat MDD as monotherapy, adjunct therapy, and maintenance therapy. Following the recommendation of its Advisory Committee that determined Seroquel XR was insufficiently safe for most of these uses, on December 2, 2009, the FDA refused to approve Seroquel XR for broad use in treating MDD and limited its approval to adjunctive use with

antidepressants, based on clinical trials in patients who had an inadequate response to antidepressants alone.

106.   In May 2008, AstraZeneca submitted an sNDA seeking approval of Seroquel XR to treat GAD.  The same FDA Advisory Committee that considered the MDD application also considered the GAD application and concluded that Seroquel XR was not safe for the treatment of GAD.  The FDA followed its recommendation and refused to approve Seroquel XR for the treatment of GAD.

107.   On April 30, 2013, the FDA approved an sNDA for Seroquel XR for the treatment of schizophrenia in 13- to 17-year-old adolescents, and for the acute treatment of manic episodes associated with bipolar I disorder in 10- to 17-year-old children and adolescents, based on extrapolation from clinical trials of Seroquel IR.

## VII.   ASTRAZENECA'S FRAUDULENT MARKETING SCHEME

108.   After paying $520 million fine to settle allegations stemming from its illegal off-label promotion of Seroquel IR and entering into a CIA to protect against its continued engagement in such illegal conduct, AstraZeneca pledged that it had changed its ways and that its promotional activities were then, and moving forward would continue to be, conducted in accordance with all applicable laws, including those that prohibit off-label promotion and the payment of kickbacks to induce prescribing of its drug products.

109.   In actuality, however, the only change that AstraZeneca made to its promotion of Seroquel IR was to erect a façade of legal compliance, which was specifically designed to allow AstraZeneca to continue, with impunity, the very same illegal promotional practices upon which the settlement had been based.  To maintain this façade, AstraZeneca ensured that all official promotional materials, such as visual sales aids and printed training materials, were on-label, and instructed sales representatives not to discuss off-label uses in e-mails, call notes, or even voice-

mail, thereby preventing the creation of documentary evidence of its illegal conduct. During district meetings and ride-alongs between sales representatives and managers, however, —and essentially in any forum in which AstraZeneca could do so surreptitiously—AstraZeneca continued to train and instruct sales representatives to promote Seroquel IR for off-label use, and as a result sales representatives continued to promote Seroquel IR off-label just as they had previously. Likewise, while promotional speaker slide decks were scrubbed of off-label information, the actual narrative presentations given by paid speakers continued to promote Seroquel IR for off-label use.

110. Following the launch of Seroquel XR, AstraZeneca expanded its illegal scheme by promoting Seroquel XR for the same off-label uses for which it had already been promoting Seroquel IR, with a particular emphasis on MDD and GAD. An integral part of AstraZeneca's promotion of Seroquel XR for these off-label uses was its false and misleading minimizing of Seroquel XR's safety risks, which AstraZeneca recognized were physicians' primary objections to prescribing Seroquel XR for the off-label uses for which AstraZeneca promoted it. Although minimization of safety concerns had been, and continued to be, part of AstraZeneca's promotion of Seroquel IR, misrepresentation of adverse events became increasingly important as AstraZeneca sought to increase sales of Seroquel XR for MDD and GAD, for which alternative safer (and cheaper) therapies were available.

111. AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR caused physicians to prescribe both drugs for non-medically accepted uses, and as a result caused the submission of false claims to Government Programs. Even after AstraZeneca ceased promoting Seroquel IR in 2008 and began exclusively promoting Seroquel XR, its off-label promotion of Seroquel XR continued to cause the submission of false claims for Seroquel IR because of

33

Seroquel XR's unfavorable formulary status, which caused pharmacists and physicians to convert many declined Seroquel XR prescriptions instead to Seroquel IR.  As the foreseeable result of AstraZeneca's illegal conduct, Government Programs paid substantial reimbursements for Seroquel IR and Seroquel XR claims that were ineligible for reimbursement and therefore false.

### A.      Concealment of Off-Label Promotion of Seroquel IR and Seroquel XR

112.     On October 29, 2009, AstraZeneca announced its payment of $520 million to settle allegations that it had promoted Seroquel IR for a litany of off-label uses, causing claims to be submitted to Government Programs for uses of Seroquel IR that were ineligible for reimbursement.  Specifically, the United States alleged that from 2001 through 2006, AstraZeneca illegally promoted Seroquel IR for off-label uses, "including aggression, Alzheimer's disease, anger management, anxiety, attention deficit hyperactivity disorder, bipolar maintenance, dementia, depression, mood disorder, post-traumatic stress disorder, and sleeplessness."  Settlement Agreement at 3, *United States ex rel. Wetta v. AstraZeneca Corp.*, No. 2:04-cv-03479 (E.D. Pa. May 21, 2010), ECF 76-1.  In order to promote Seroquel IR for these off-label uses, AstraZeneca

> improperly and unduly influenced the content of and speakers in company-sponsored Continuing Medical Education programs; engaged doctors to give promotional speaker programs it controlled on unapproved uses for Seroquel; engaged doctors to conduct studies on unapproved uses of Seroquel; recruited doctors to serve as authors of articles largely prepared by medical literature companies about studies they did not conduct on unapproved uses of Seroquel; and, used those studies and articles as the basis for promotional messages about unapproved uses of Seroquel.

*Id*.

113.     The United States also contended that AstraZeneca paid illegal remuneration to physicians to induce them to prescribe Seroquel IR in violation of the federal Anti-Kickback Act:

34

> AstraZeneca offered and paid illegal remuneration to doctors: (a) it recruited to conduct studies for unapproved uses, (b) it recruited to serve as authors of articles written by AstraZeneca and its agents about these unapproved uses of Seroquel, (c) to travel to resort locations to "advise" AstraZeneca about marketing messages for unapproved uses of Seroquel, and (d) it recruited to give promotional lectures to other health care professionals about unapproved and unaccepted uses of Seroquel. The United States contends that these payments were intended to induce the doctors to promote and/or prescribe Seroquel for unapproved uses in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b).

*Id.*

114.    When Relator began working at AstraZeneca in 2000, she was trained to promote Seroquel IR for each of the aforementioned off-label uses.  This occurred during promotional speaker events, CME programs, and on sales calls to physicians, Relator witnessed the Company promote Seroquel IR for these off-label uses and observed those physicians' increased prescribing of Seroquel IR for off-label uses as a result.

115.    Several weeks before the announcement of the final settlement agreement, on March 10, 2010, AstraZeneca convened an "'Ask Mike' Town Hall" teleconference, moderated by AstraZeneca's Vice President of Cardiovascular Therapy, Mike Tilton, who told the sales force that AstraZeneca would, in the future, "do things differently" and "win the right way."  In a tacit admission of the Company's previously open encouragement of off-label promotion, Mr. Tilton specifically told sales representatives that they no longer would be permitted to talk outside a drug's FDA-approved label.

116.    Even prior to the announcement of the settlement agreement, AstraZeneca had begun to take steps to conceal its off-label promotion by removing discussion of off-label uses from training materials, visual sales aids, field coaching reports, and promotional speaker slide decks.  Further, during national and regional sales meetings, AstraZeneca limited training to

Seroquel IR and Seroquel XR's on-label indications, and the Company even purported to instruct sales representatives to exclude off-label discussion from their promotional details to physicians.

117.    These changes purported to bring AstraZeneca's promotion of Seroquel IR in line with AstraZeneca's official compliance policies, which declare a commitment to limiting promotion of all of AstraZeneca's drugs to approved uses and reflect AstraZeneca's knowledge of its legal obligation to do so.  AstraZeneca's "Global Policy" on "Providing Information About Our Products" states:  "We must promote only licensed products and only for approved uses in accordance with the approved prescribing information.  We must not initiate discussions on 'off-label' uses or unlicensed products in order to promote such use."  Likewise, AstraZeneca's official policy on "Marketing to healthcare professionals" states:  "Off-label promotion (the marketing of medicines for uses or for the treatment of patient groups not specified in the prescribing information) is illegal and not permitted by our policies."

118.    These instructions were only honored in the breach.  While the messages espoused in official training materials purported to reorient the Company solely toward promotion of on-label uses, AstraZeneca never directed sales representatives to stop using the old, off-label promotional messages.  On the contrary, during role play exercises at district sales meetings, sales representatives continued unabated to rehearse before their managers the same, illegal off-label promotional messages that Seroquel IR and Seroquel XR were safe and effective for the treatment of the symptoms of anxiety, unipolar depression, PTSD, sleeplessness, and behavioral symptoms in elderly and pediatric patients.

119.    Indeed, despite the Company's direct knowledge that it was illegal to do so, AstraZeneca's off-label promotion of Seroquel IR had centered largely on promoting based on the treatment of symptoms. AstraZeneca had promoted Seroquel IR's demonstrated safety and

133568.00601/36388526v.8

effectiveness in reducing symptoms stemming from certain on-label uses as evidence of Seroquel IR's safety and effectiveness for treating off-label conditions sharing similar symptoms. In October 2006, for example, when the FDA approved Seroquel IR for treatment of depressive episodes associated with bipolar disorder, AstraZeneca trained sales representatives, including Relator, to promote Seroquel IR's safety and effectiveness for treatment of depressive symptoms associated with bipolar disorder as evidence of Seroquel IR's safety and effectiveness for treatment of depressive symptoms generally, regardless of their association with bipolar disorder.

120.    In this manner, by deceptively focusing its promotion on symptoms while deflecting physicians' attention from both drugs' on-label indications, AstraZeneca's sales representatives leveraged visual sales aids that were facially on-label to promote the drugs for off-label uses. Visual sales aids thus obscured the reality of sales representatives' promotions by maintaining the appearance that their promotions were on-label, even as sales representatives used the sales aids as supplements to their promotions of Seroquel IR for off-label uses.

121.    AstraZeneca's efforts to conceal the existence of its off-label promotion of Seroquel IR have been longstanding, as was the resulting disjunction between the Company's actual promotional message and the message it memorialized in writing. Shortly after Relator arrived at AstraZeneca in 2000, she participated in a "ride-along" during which she accompanied her regional manager, Garren Foy, on a sales call to a child psychiatrist to whom they promoted Seroquel IR for pediatric use. Because Seroquel IR was not approved for any pediatric use until December 2009, the promotion was entirely off-label. As a new employee, however, Relator was unaware that the promotion was illegal and, following the call, entered the promotion into her call notes. Observing this, Foy instructed Relator that she should never enter off-label

promotional events into her call notes or otherwise record them on paper—although Relator should nonetheless continue to engage in such off-label promotion.

122.   Hence, Relator and other sales representatives clearly understood that "official" promotional messaging guidelines that adhered to Seroquel IR on-label indications, coupled with occasional admonitions that sales representations should abide by FDA regulations against off-label promotion, served to engender an image of the Company's promotional compliance, but were to be honored only in the breach by sales representatives' actual promotions.

123.   When employees did speak out against the Company's illegal promotional practices, rather than attempt to remedy the misdeeds, AstraZeneca punished the employees. Relator reported to AstraZeneca's Sharon Belnap in Human Relations that AstraZeneca continued to engage in off-label promotion of Seroquel IR as alleged herein, and there are others who did as well, and all were punished as a result.

124.   AstraZeneca's retaliation in response to Relator's compliance reports is described in ¶¶ 554-563, *infra*.

125.   With the exception of Relator, however, few sales representatives objected to the Company's engagement in off-label promotion.   As AstraZeneca conveyed the Company's situation to its sales representatives, restrictions on off-label promotion imposed by the FDA took an unreasonably cautious view of the evidence necessary to establish the safety and efficacy of a drug for a given use, and it was only as the result of this unreasonably strict regulatory regime that AstraZeneca was not allowed to promote Seroquel IR for the off-label uses that it sought to promote.   By promoting Seroquel IR for off-label use, AstraZeneca told its sales representatives, they were ensuring that patients benefited from uses of Seroquel IR that had been shown to be safe and effective, but had not yet received the imprimatur of the FDA.   As a

38

result, many sales representatives believed that AstraZeneca's evasion of the FDA's prohibition on off-label promotion was justified. Sales representatives were, in many respects, as deceived by AstraZeneca's off-label promotional claims as were physicians, unaware that the off-label uses for which they promoted Seroquel IR were neither supported by substantial clinical evidence nor medically accepted, and unaware that the promotional claims they made were blatantly misleading.

126.    Thus, the emphasis that AstraZeneca placed on maintaining a pretense of compliance leading up to the settlement agreement, although substantially increased in its intensity, was but a continuation of the Company's longstanding concealment of the existence of its illegal promotional practices from government oversight. Managers' instructions to sales representatives, including Relator, to cover up off-label uses in e-mail originated long prior to the 2010 settlement, and continued even after the settlement.

127.    Around 2008 the prohibition on discussion of off-label use was extended to voice-mail as well. Discussion of off-label uses was therefore limited to in-person, verbal interactions. For instance, during ride-alongs, including ones that occurred after January 1, 2007, District Manager Doug Yarborough routinely instructed Relator and other sales representatives in his district to promote Seroquel IR for off-label use, including treatment of behavioral symptoms in adult and pediatric patients, and Relator and Yarbrough in fact promoted Seroquel IR to physicians for off-label use. Nonetheless, Yarbrough's written coaching reports, one of which was completed in conjunction with each ride-along, specifically omitted reference to the off-label instructions that he had given, and the off-label promotions in which he had participated.

128.    When AstraZeneca did provide sales representatives with information regarding off-label use of Seroquel IR, it marked that information as "for educational purposes only" and

"not to be shared" with physicians, purportedly to instruct sales representatives not to use the information to promote Seroquel IR to physicians as effective for the off-label use discussed therein.  Verbally, however, district managers explicitly contradicted these directions and instructed sales representatives to use the information to promote Seroquel IR for off-label use. It was a running joke among sales representatives in Relator's district that "not to be shared with physicians" meant precisely the opposite.

129.    AstraZeneca's continued off-label promotion of Seroquel IR was widespread throughout the Company.  Based on her experience as a sales representative, and based on interactions in the course of her job duties with sales representatives from across the country, Relator knows that AstraZeneca's continued off-label promotion of Seroquel IR and its attempted concealment thereof was a nationwide scheme.

130.    Beginning with the launch of Seroquel XR in July 2007, AstraZeneca extended its illegal promotion of Seroquel IR to Seroquel XR.  For approximately a year following Seroquel XR's launch, until around October 2008, AstraZeneca's sales representatives promoted both Seroquel IR and Seroquel XR.  Then, around October 2008 when Seroquel XR was approved for the treatment of bipolar disorder, AstraZeneca's sales representatives began to promote Seroquel XR exclusively.

131.    From its launch in July 2007, AstraZeneca promoted Seroquel XR for the same off-label uses for which it had promoted Seroquel IR, including symptoms of aggression, anxiety, generalized depression, PTSD, sleeplessness, behavioral symptoms associated with dementia, and pediatric use.  As with its promotion of Seroquel IR, AstraZeneca's promotion of Seroquel XR centered on symptoms, leveraging evidence of Seroquel XR's safety and effectiveness at reducing symptoms associated with its approved uses to promote the drug as safe

40

and effective for treatment of those same symptoms divorced from Seroquel XR's approved indications.

132.    In addition to continuing to promote Seroquel XR for the off-label uses for which it had promoted Seroquel IR, AstraZeneca placed an increased emphasis on off-label promotion of Seroquel XR for treatment of MDD and GAD, for which it sought FDA approval.  Even after the FDA denied AstraZeneca's applications to expand use of Seroquel XR to MDD (monotherapy) and GAD in late 2009, its off-label promotion continued.

133.    AstraZeneca's illegal promotion of Seroquel IR and Seroquel XR for each of the aforementioned off-label uses is described in greater detail below.

134.    As with its promotion of Seroquel IR, AstraZeneca deliberately concealed its off-label promotion of Seroquel XR by excluding discussion of off-label promotions from e-mail, voice-mail, visual sales aids, and coaching reports.  When AstraZeneca did distribute off-label information, it marked the off-label materials as "for educational purposes only" and "not to be shared" with physicians, purporting to instruct sales representatives not to promote Seroquel XR for the off-label uses discuss therein.   In actual practice, however, these prohibitions were meaningless, and managers explicitly instructed sales representatives to ignore them. For example, as described *infra*, Relator's district manager forwarded sales representatives in her district a clinical trial describing Seroquel as effective for the treatment of behavioral symptoms in children, which her district manager described in his e-mail as for informational purposes only.  He subsequently directed Relator and her sales partner to use the study to promote Seroquel XR as safe and effective for off-label treatment of behavioral symptoms in children.

135.    AstraZeneca's off-label promotion of Seroquel XR was nationwide in scope. Relator knows this based on her conversations in the course of her job duties with sales

representatives from across the country; and based on her attendance at off-label promotional speaker programs, given by physicians who delivered presentations not only in Relator's district but across the country.

B.    Quotas and Credits Forced Sales Representatives to Promote Off-Label

136.    AstraZeneca forced sales representatives to promote Seroquel IR and Seroquel XR off-label by setting sales quotas that far exceeded the amount that sales representatives could achieve by only promoting for on-label use.  The quota and credit programs worked dually as a stick and carrot to sales representatives to increase sales, including, necessarily, off-label sales. Sales representatives that exceeded 105% of their Seroquel XR quota were paid additional bonus dollars and received a chance of winning award trips.  Sales representatives who fell below quota lost their jobs.

137.    The pressure for sales representatives to meet their sales quotas was therefore substantial.   Sales representatives who fell below 85% percent of their sales quotas were typically put on an "action plan," which specified further sales targets.  If sales representatives did not achieve those targets within 30 days, they were moved to a "performance improvement plan," which if not met, resulted in termination.  Because AstraZeneca had such aggressive sales targets for Seroquel XR, which it hoped would achieve market share comparable to Seroquel IR, failure to meet sales quotas was commonplace.

138.    Quotas were designed to account for the prescribing of all physicians on sales representatives' call lists.  To meet or exceed their quotas, sales representatives therefore needed to promote to all physicians on their call lists.  Howwever, knowing this, and as part of the particular details of the scheme to submit false claims, AstraZeneca heavily populated these call lists with health care professionals who did not treat patients for any of Seroquel IR or Seroquel XR's on-label indications, such as child psychiatrists, primary care physicians, and geriatricians.

42

Thus, convincing these physicians to prescribe Seroquel IR or Seroquel XR so that sales representatives could meet their sales targets required promoting Seroquel IR or Seroquel XR for off-label uses—exactly as AstraZeneca had trained and instructed sales representatives to do.

139.    The type of providers that composed the call lists for the CNS, Primary Care, and Hospital sales forces varied; however, the call lists for each, and hence the quotas and bonuses for each, included physicians who did not prescribe Seroquel IR or Seroquel XR for its on-label use: (1) CNS sales representatives' call lists included psychiatrists (adolescent, adult and geriatric), state psychiatric hospitals, and other select hospitals (general, academic, and psychiatric); (2) Hospital sales representatives called on state hospitals and larger institutions, including ones that treated only children or the elderly; and  (3) Primary Care sales representatives called on primary care physicians, internal medicine specialists, and small rural hospitals not covered by the Hospital representatives.

140.    The pressure to meet sales quotas was intense not only for sales representatives but also for district and regional managers and for the vice presidents of sales, each of whom was assigned a quota that was cumulative of the quotas of his or her direct reports.  Thus, the entire sales division was driven by quota to promote Seroquel IR and Seroquel XR to health care professionals who had little reason to prescribe Seroquel IR and Seroquel XR for on-label uses.

141.    While AstraZeneca claimed to implement procedures that allowed sales representatives to remove inappropriate targets from their call lists, in practice the Company systematically contravened its own procedures and refused to allow sales representatives to remove from their call lists physicians, such as child psychiatrists, who did not treat patients for the approved uses of Seroquel IR or Seroquel XR.

43

142.    In March 2009, the Target & Performance team announced that, at the request of AstraZeneca Legal and Compliance, it was instituting a process to remove "non-eligible targets" from call lists.   According to the announcement, a process had been initiated to identify physicians deemed inappropriate for detailing due to specialty.   The decisions to remove physicians from the call list were to be reviewed by the AZ Customer Master Team for final decision, a decision which would be considered final without any further field input.

143.    When AstraZeneca purported to acquiesce in a sales representative's request to remove an inappropriate call target, AstraZeneca removed the physician from the sales representative's call list, but not from the representative's sales quota. Thus, the sales representative remained responsible for meeting the sales goals that AstraZeneca had originally set based on the target's inclusion on the representative's call list, and the representative was effectively penalized for ceasing to promote to an off-label prescriber.

144.    While AstraZeneca asserted that it would update sales quotas to reflect call list changes during the following sales period—generally four months later—at the beginning of the next period, AstraZeneca often re-added the previously removed physician to the call list, leaving the sales quota untouched.   Removals of inappropriate call targets were therefore transient; sales incentives to promote to them were permanent.

145.    AstraZeneca's professed justification for requiring sales representatives to call on physicians who did not treat patients for Seroquel IR or Seroquel XR's on-label uses was that it had purchased data that showed that those physicians did, in fact, treat a handful of patients for on-label indications.   For example, prior to Seroquel IR and Seroquel XR's approval for treatment of any pediatric indication, AstraZeneca justified promotion to child psychiatrists

133568.00601/36388526v.8

based on data that showed those child psychiatrists also treated a few adult patients.  It justified calling on primary care physicians by claiming that they treated undiagnosed bipolar patients.

146.    The sales quotas that AstraZeneca set based on the inclusion of child psychiatrists and primary care physicians, however, did not correspond to the small on-label portion of those prescribers' practices.  The quotas instead corresponded to their entire patient populations and reflected AstraZeneca's knowledge of and intention that its sales representatives drive sales of Seroquel IR and Seroquel XR among all those prescribers' patients, including for off-label uses. Thus, even while AstraZeneca declared that it did not intend for sales representatives to promote Seroquel IR and Seroquel XR for use in off-label patient populations, the Company nevertheless held sales representatives responsible for obtaining sales from those very populations.

147.    In addition to the standard quarterly quota and bonus programs, AstraZeneca conducted short-term, generally week-long, special credit programs or contests to provide further incentives to grow sales.  In the same manner as the standard quota and bonus programs, described above, these "special incentive programs" imposed aggressive sales objectives and routinely targeted physicians who did not treat patients for the on-label indications of Seroquel IR or Seroquel XR, at least not proportionately to the sales targets set by AstraZeneca.  In one example, which is discussed in greater detail below, AstraZeneca instituted an "Abilify Offender" program, which targeted physicians who in the Company's eyes prescribed too great a share of Abilify at the expense of Seroquel XR.  The initiative targeted multiple child psychiatrists who did not treat patients for on-label uses of Seroquel XR.  AstraZeneca knew and intended that these programs, which were generally held once or twice per year and applied to sales representatives, district managers, regional managers and vice presidents, drive sales representatives to promote Seroquel IR and Seroquel XR for off-label uses.  The quota and credit

programs continued for Seroquel IR, even as AstraZeneca was under government investigation, and were instituted for Seroquel XR upon its approval in 2007.

### C.  Misleading Minimization of Safety Risks

148.  "Truth is Irrelevant," stated the heading of a slide in a presentation titled "Positioning: The Battle for the Doctor's Mind," which AstraZeneca gave to sales representatives in September 2008 in conjunction with their training for Seroquel XR's nearing bipolar depression approval.  Rather, "[w]hat matters most," it continued, "are the perceptions that exist in the mind[.]  The essence of positioning thinking is accepting that perceptions are reality and then restructuring those perceptions to create the position you desire."  That mantra encapsulated AstraZeneca's portrayal of the risks posed by Seroquel IR and Seroquel XR with regard to which AstraZeneca obfuscated and misconstrued the evidence to create in physicians minds the perception that it desired—namely, that Seroquel IR and Seroquel XR were far safer than the evidence actually demonstrated.

149.  For the use of a drug to be medically accepted, and hence reimbursable by Government Programs, that use must be not only effective, but safe.  A drug's safety is affected by both the likelihood of the occurrence of adverse events as well as the magnitude of those events; however, safety is not a fixed proposition that can be established by reference to a drug's adverse events alone.  Rather, whether the assumption of certain safety risks is warranted depends on the seriousness of the condition being treated, the effectiveness of the drug in treating that condition, and the safety of alternate available treatments.  For example, although a chemotherapy drug associated with risk of fatal hemorrhage may nonetheless still be considered safe, an antihistamine with that same risk would plainly be unsafe—particularly given the availability of alternate antihistamines without such a risk.

46

150.    Misrepresentation of the safety profiles of Seroquel IR and Seroquel XR was critical to AstraZeneca's off-label promotion of both drugs.  The reason that many of the off-label uses for which AstraZeneca promoted Seroquel IR and Seroquel XR were not medically accepted was not that those uses were ineffective, but rather that those uses were unsafe.  For example, the reason that the FDA refused to approve Seroquel XR as monotherapy for treatment of MDD was not that Seroquel XR did not effectively treat MDD, but that Seroquel XR was insufficiently safe for that use.  Importantly, the FDA's Advisory Committee reached this conclusion—that Seroquel XR was not safe as monotherapy for MDD—even though clinical trials in MDD showed Seroquel XR's safety profile for that use was comparable to Seroquel XR's safety profile for on-label uses.  In doing so, the FDA's Advisory Committee concluded that while Seroquel XR's safety risks may be acceptable in the context of severe psychiatric illnesses such as schizophrenia for which safer treatments are unavailable, those same risks are unacceptable in the context of MDD for which safer treatments such as selective serotonin reuptake inhibitor ("SSRI") antidepressants *are* available.

151.    But for AstraZeneca's sales representatives' misleading minimization of the risks posed by Seroquel IR and Seroquel XR, physicians would not have prescribed Seroquel IR or Seroquel XR for the off-label uses for which AstraZeneca promoted them, including aggression, anxiety, generalized depression, sleeplessness, behavioral symptoms associated with dementia, and pediatric use.  Seroquel XR was unsafe for each of these off-label uses, with respect to which AstraZeneca's promotions are described *infra*.

152.    Use of Seroquel IR and Seroquel XR is accompanied by numerous safety risks, including cardiac disorders, extrapyramidal side effects, cognitive impairment, hypotension, elevated liver enzymes, abdominal pain, constipation, dizziness, somnolence, and a litany of

47

other cardiac, digestive, musculoskeletal, and nervous system adverse events.  *See* ¶ 93, *supra*.
In addition, among the most common adverse events and the ones of most concern to physicians,
are metabolic abnormalities that lead to weight gain and diabetes.  Weight gain and diabetes may
in turn lead to increased morbidities including cardiac events, as well as increased mortality.

153.    Instead of training sales representatives to give a fair and balanced presentation of
Seroquel IR and Seroquel XR's safety risks, as FDA regulations required, AstraZeneca trained
sales representatives (1) to omit any discussion of Seroquel IR and Seroquel XR's safety risks,
unless initiated by a physician; and (2) if a physician did proactively raise concerns regarding
Seroquel IR or Seroquel XR's safety profile, to respond by minimizing those concerns.  During a
thirty-minute lunch with a physician to promote Seroquel IR or Seroquel XR, an AstraZeneca
sales representative only discussed the drugs' safety risks if those risks were raised by the
physician.

154.    Physicians did, in fact, regularly raise weight gain, diabetes, and akathisia as
objections to prescribing Seroquel IR and Seroquel XR for off-label use.   During district
meetings, managers trained sales representatives how to minimize those concerns.   Sales
representatives practiced role play exercises (i.e., mock promotional details during which the
district manager or another sales representative played the role of the physician) in which they
practiced delivering AstraZeneca's promotional messages minimizing these safety concerns.
Sales representatives also practiced role plays during which they omitted altogether reference to
safety concerns.

1.    **Misrepresentation of Risk of Weight Gain**

155.    One of the most prevalent adverse events accompanying use of Seroquel IR and
Seroquel XR is clinically significant weight gain.  In response to physicians' objections to
prescribing the drugs due to risk of weight gain, sales representatives told physicians that, while

48

some weight gain with any atypical antipsychotic was inevitable, weight gain with Seroquel IR and Seroquel XR was modest and limited to 5 pounds.  This claim, however, was contradicted by AstraZeneca's own analysis showing that over the course of a year, 37% of schizophrenia patients taking Seroquel IR experienced weight gain of greater than 7% their baseline weight— or, approximating based on the average patient weight, a gain of at least 12 pounds.  Martin Brecher et al., *Quetiapine and Long-Term Weight Change: A Comprehensive Data Review of Patients with Schizophrenia*, 68 J. Clinical Psychiatry 597, 599 (2005).  Over the course of two years using quetiapine, the portion of patients experiencing clinically significant weight gain increased to 45%.  *Id.* The Prescribing Information for Seroquel XR likewise shows significant incidences of weight gain.

156.    AstraZeneca multiplied the falsity of its misrepresentations with respect to Seroquel XR by telling physicians that Seroquel XR caused less weight gain than Seroquel IR due to Seroquel XR's "smooth release profile," which purportedly resulted in fewer carbohydrate cravings.   There was no adequate clinical data to support this claim.   It was simply false.  Nonetheless, during district meetings, sales representatives in Relator's district practiced delivering this unsubstantiated promotion during role play exercises, facilitating their delivery with a graph from the Seroquel XR core visual aid that showed the comparative blood plasma levels of Seroquel IR and Seroquel XR during the course of a day.

157.    Sales representatives also misrepresented to physicians that weight gain associated with Seroquel XR was limited to patients who took the drug as monotherapy, and that there was no weight gain observed among those taking the drug as adjunctive therapy.   Again, this promotion was also simply false.   The Seroquel XR Prescribing Information shows that the

49

incidence of clinically significant weight gain for patients taking Seroquel XR as adjunctive therapy was more than double the incidence in patients taking placebo.

## 2. Misrepresentation of Association with Diabetes

158. Physicians' concern regarding the risk of weight gain associated with Seroquel IR and Seroquel XR stemmed largely from weight gain's association with cardiac morbidities and diabetes, both of which are associated with use of Seroquel IR and Seroquel XR and warned of in the drugs' Prescribing Information, which states that "epidemiological studies suggest an increased risk of treatment–emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics." AstraZeneca minimized this risk by promoting to physicians that the risk of diabetes accompanying use of Seroquel IR and Seroquel XR was limited to 0.01%, or 1 in 10,000 patients, a figure that AstraZeneca derived from the number of post-marketing adverse event reports it received relative to the total number of users. Because the number of adverse events reported to a drug's manufacturer substantially understates the number of adverse events that actually occurred, AstraZeneca's use of this figure as a surrogate for the risk of diabetes accompanying use of Seroquel IR and Seroquel XR was highly improper and therefore very misleading.

159. Additional examples of particular details of this part of the scheme to submit false claims came in the form of e-mails. In an e-mail to Central Region district managers, who subsequently forwarded it to sales representatives, Kansas City CNS District Sales Manager Tom Dusterhoft summarized a then-recent regional sales meeting, held in St. Louis on May 24, 2006, during which AstraZeneca trained sales representatives to minimize physicians' concerns regarding Seroquel IR's risk of diabetes. In a document attached to the e-mail, titled "Unassailable Positioning – The Seroquel Story," and under the heading "Neutralize (Facts that cannot be denied – Defense)," Dusterhoft instructed sales representatives to respond to

physicians' objections by informing them that Seroquel IR's "Risk of diabetes [is] .01%," and that the observed increase in diabetes among patients taking the drug was the result of a "nat[ural] increase of diabetes" (i.e., a predisposition) in patients with schizophrenia and bipolar mania.

160.    Likewise, during district meetings, Doug Yarbrough repeatedly instructed Relator and other sales representatives in her district that, if physicians raised the risk of diabetes as an objection to prescribing Seroquel IR or Seroquel XR, they should assure them that if they monitored patients' blood work it would not be an issue, and to move the discussion to another topic as quickly as possible.

161.    On November 16, 2006, AstraZeneca received a Warning Letter from DDMAC that cited the Company for dissemination of a professional sales aid that was "false or misleading because it minimizes the risk of hyperglycemia and diabetes mellitus and fails to communicate important information regarding neuroleptic malignant syndrome, tardive dyskinesia, and the bolded [on the product insert] cataracts precaution." *Id*. at 1.  DDMAC concluded that this "promotional material raises significant public health and safety concerns through its minimization of the risks associated with Seroquel." *Id.*

### 3.    Misrepresentation of Risk of Akathisia

162.    Movement disorders are among the most common and serious adverse events accompanying use of antipsychotics and, while the risk associated with use of atypical antipsychotics is less than that associated with typical antipsychotics, the risk accompanying use of atypicals remains nonetheless significant.  Akathisia is one of the most prevalent movement disorders associated with Seroquel IR and Seroquel XR, which is characterized by

> complaints of restlessness and at least one of the following observed movements: fidgety movements or swinging of the legs while seated, rocking from foot to foot or 'walking on the spot' while standing, pacing

51

> to relieve the restlessness, or an inability to sit or stand still for at least
> several minutes.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 800

(4th ed., text rev. 2000).

163.     AstraZeneca falsely promoted that both Seroquel IR and Seroquel XR had demonstrated a risk of akathisia equivalent to placebo, regardless of the indication for which they were used.   To make this claim, AstraZeneca relied on clinical trials of Seroquel IR in schizophrenia, which had in fact shown Seroquel IR's risk to be equivalent to placebo in this population.  This result, however, was an isolated instance that diverged from Seroquel IR's risk when used to treat bipolar depression, where the incidence among patients taking Seroquel IR was quadruple that of patients taking placebo.  In Seroquel XR's clinical trials, Seroquel XR's risk of akathisia exceeded that of placebo for every indication, including schizophrenia.   In patients taking Seroquel XR for bipolar depression, the risk was quadruple that among those taking placebo.

164.     AstraZeneca's claims were therefore blatantly false, particularly with respect to Seroquel XR, with respect to which the risk of akathisia had *never* been shown to be equivalent to placebo.   Even with respect to Seroquel IR, AstraZeneca's claim was false in the overwhelming number of instances in which AstraZeneca's sales representatives made it, not only because schizophrenia was rare compared to Seroquel IR's other approved uses, but also because Seroquel IR was widely perceived as less effective than competing atypicals in treating it, leading AstraZeneca to focus its promotion of Seroquel IR on other uses.

165.     Additional particular details of the scheme to submit false claims were exemplified in an e-mail to Central Region district managers, who subsequently forwarded it to sales representatives, Kansas City CNS District Sales Manager Tom Dusterhoft, summarizing a

recent regional sales meeting, held in St. Louis on May 24, 2006, to which Dusterhoft attached a document titled "Unassailable Positioning – The Seroquel Story," which described Seroquel as the "[d]rug with [t]he greatest likelihood for success for that patient" and the "[d]rug with the least likelihood of problems for that patient."  Under the headings of "Offense" and "Facts that cannot be denied," Dusterhoft described Seroquel IR as "Akathisia = Placebo" and "[t]he only atypical [antipsychotic] that does not have EPS [extrapyramidal symptoms] and Akathisia greater than placebo through[out] the entire dose range."  Importantly, the meeting focused on promotion of Seroquel IR for bipolar depression (even though it was not yet approved for that use), not schizophrenia.

4.      **Misrepresentation of Risk of Somnolence**

166.    During the same sales meeting, AstraZeneca also trained sales representatives to "neutralize" physicians' objections to prescribing Seroquel IR due to its risk of somnolence— one of the most frequent adverse events associated with taking Seroquel IR and Seroquel XR— by claiming that "96% [of patients] [d]o not get somnolence," and in those that do, "it is mild/moderate/transient."  In fact, the Seroquel IR Prescribing Information at the time showed that 18% of patients in schizophrenia trials reported somnolence, as did 16% of patients in monotherapy bipolar mania trials, and 34% of patients in adjunctive bipolar mania trials.  Nor was there any evidence that those instances of somnolence were mild, moderate, or transient, as AstraZeneca claimed.   AstraZeneca's minimization of Seroquel IR's association with somnolence was therefore false and misleading.

167.    Additional particular details of the scheme included CNS Regional Trainer Wendy Romano reiterating many of these same claims in two handouts distributed on November 5, 2006, to Central Region district managers, with instructions to forward the handouts to their sales representatives.   The first handout listed as one of two "important points I feel each

53

representative must communicate to their doctor" that "[s]ome patients with bipolar depression who take Seroquel may experience sedation during the first 2-4 weeks of therapy. However, this sedation effects should be transient and should dissipate within 30 days." Again, there was no credible evidence to support AstraZeneca's claim that sedation abated after 2-4 weeks or that its effects were otherwise transient.

168.    Nonetheless, in explanation for its claim that sedation was transient, AstraZeneca asserted that observed instances of sedation actually stemmed from patients' underlying depression, not from Seroquel: "Patients with bipolar depression tend to have a lower battery of energy even without medication on board." They sleep because they're depressed, AstraZeneca told physicians; treat the symptoms of depression, and the somnolence will dissipate. This claim, however, is flatly disproven by the substantial divergence in the incidence of somnolence observed between treatment groups in Seroquel IR's bipolar depression trial, in which 13% of patients in the placebo group experienced somnolence versus 52% in the Seroquel IR group. The figures were similar in Seroquel XR's bipolar depression trials, where 15% of patients in the placebo groups experienced somnolence versus 57% in the Seroquel XR groups.

169.    In further explanation for its unsubstantiated claim with respect to Seroquel XR, AstraZeneca also asserted that, because Seroquel XR's smooth release profile purportedly resulted in reduced carbohydrate cravings, Seroquel XR caused less somnolence than Seroquel IR. This claim was entirely unsupported. On March 10, 2010, well after AstraZeneca had begun promoting Seroquel XR's superior tolerability profile, AstraZeneca released the results from a small, unpublished trial that found that, during the three hours immediately following administration on their first six days of treatment, patients who took Seroquel XR reported less sedation than those who took Seroquel IR. *See* Clinical Study Report Synopsis, Study Code

54

D1443C00040, *available at* www.astrazenecaclinicaltrials.com (last visited July 9, 2013).  The scores for both groups converged following hour three, however, and over the course of the full fourteen hours, there was no statistically significant difference between the areas under the curves for the two treatment groups.  Although AstraZeneca trained sales representatives to allude to "data on file" in their promotions that Seroquel XR was associated with only a minor incidence of somnolence—apparently in reference to this trial, although AstraZeneca never showed sales representatives the actual data—the modest and transient benefit observed during treatment initiation was insufficient to support AstraZeneca's sweeping claims that Seroquel XR's extended release profile mitigated its sedative effect, particularly when, over the full course of the day, it failed to do just that.

5.    **Continued Use of False Safety Claims with Respect to Seroquel IR; Extension to Seroquel XR**

170.    Although AstraZeneca initially trained sales representatives to make the aforementioned false and misleading claims with respect to Seroquel IR prior to January 1, 2007, following January 1, 2007 AstraZeneca continued to make these same misrepresentations.  In June 2007, AstraZeneca extended these same misrepresentations to its promotion of Seroquel XR.  From January 1, 2007 until she left AstraZeneca in May 2010, Relator attended numerous district meetings where sales representatives discussed and rehearsed making these false safety claims.  She also participated in multiple ride-alongs with Doug Yarbrough during which they actually made these misrepresentative claims repeatedly to physicians.

171.    In combination, AstraZeneca's misrepresentations concerning the safety of Seroquel IR and Seroquel XR caused physicians to believe that both drugs were far safer than they actually were.  With his e-mail to district managers following the May 24, 2006 regional sales meeting, *see* ¶ 159, *supra*, Dusterhoft also attached a single page labeled "Responder

55

Identification Tool," which he described as "an excellent tool to discuss the positioning of Seroquel with our customers within their practice…." The "Responder Identification Tool" showed a bell curve divided into thirds, with the lower tail labeled "Partial Responders," the central bulk of the curve labeled "Responders," and the upper tail labeled "Responders With Side Effects." *See* Figure 1 below. The small portion of the curve attributed to responders with side effects purported to represent that Seroquel IR's side effects were limited to a small subset of patients, which is, yet again, blatantly false. Although the Seroquel IR Prescribing Information does not list the overall incidence of adverse events (it lists individual event incidences only), the rate of reported somnolence alone in bipolar mania trials was 34%, and that in bipolar depression 57%.



*Figure 1.*

172.     Engendering this perception, however—that Seroquel IR and Seroquel XR were relatively safe, with adverse events limited to a small subset of patients—was fundamental to AstraZeneca's goal of convincing physicians to prescribe Seroquel IR and Seroquel XR for off-label uses for which those physicians otherwise would not have, had AstraZeneca characterized the drugs' safety risks accurately.

56

### D.    Off-Label Promotion of Seroquel IR and Seroquel XR for Non-Medically Accepted Uses

173.    The centerpiece of AstraZeneca's fraudulent marketing scheme was a campaign of off-label promotion designed to influence physicians to prescribe Seroquel IR and Seroquel XR for non-medically accepted uses.  With respect to Seroquel IR, AstraZeneca's off-label promotional campaign was largely a continuation of the campaign it had run since at least 2001, for which AstraZeneca entered into the April 2010 settlement and CIA.  By its terms, the CIA governed AstraZeneca's promotion of Seroquel IR for off-label uses including generalized depression, anxiety, aggression, and other behavioral symptoms in elderly, non-elderly adult, and pediatric patients.  With respect to Seroquel XR, AstraZeneca extended its promotion of Seroquel IR by promoting Seroquel XR for these same off-label uses, with an increased focus on MDD and GAD, for which AstraZeneca hoped to obtain, but was in the end denied, FDA approval.

### 1.    Major Depressive Disorder and Symptoms of Depression

174.    While AstraZeneca had long promoted Seroquel IR off-label as a treatment for generalized depression, its off-label promotion intensified in 2008 after Bristol-Myers Squibb's competing atypical antipsychotic Abilify received approval for adjunctive treatment of MDD and AstraZeneca prepared to submit its own sNDA for Seroquel XR's use to treat MDD. AstraZeneca's sNDA sought a broad approval of Seroquel XR to treat MDD; however, the FDA refused to approve Seroquel XR for the frontline and monotherapy indication that AstraZeneca sought.  The FDA instead followed the recommendation of its Advisory Committee, which concluded that the "profound implications" of known adverse events were too great to justify the widespread use that would follow from Seroquel XR's unqualified approval to treat MDD. Although Seroquel XR had demonstrated its efficacy for frontline and monotherapy treatment of

MDD, the FDA concluded there was inadequate evidence demonstrating its safety for those uses. The FDA therefore limited Seroquel XR's MDD approval to the much narrower indication of adjunctive treatment for patients with an inadequate response to a frontline antidepressant.

175.    Despite the conclusion of the FDA's Advisory Committee and the FDA itself that Seroquel XR was insufficiently safe for widespread treatment of MDD, AstraZeneca continued its off-label promotional campaign of Seroquel XR to treat MDD as both a monotherapy and frontline agent, all the while minimizing the associated risks of adverse events that led the FDA to deny Seroquel XR's approval for those uses.

(a)    **FDA Advisory Committee Concluded Seroquel XR Was Not Sufficiently Safe for Treatment of MDD**

176.    The FDA Advisory Committee agreed, by a vote of 9 to 0, that Seroquel XR was insufficiently safe as monotherapy treatment for MDD.  In explaining his "no" vote, Dr. Richard Malone said, "I think the risks of the antipsychotics are greater than I would like to see for metabolic syndrome and risk of dyskinesia for a monotherapy treatment."  Tr. 295:14-17. Dr. Delbert Robinson stated, "This is an area where there are a lot of other first-line treatments, and I don't think that the safety profile warranted being among them."  Tr. 297:2-5.

177.    The Advisory Committee members also expressed concern that the long-term safety risks of Seroquel XR remained ill-characterized, particularly given the short duration of the available clinical trials.  Moreover, many of the adverse events identified in short-term trials, such as weight gain, signaled the potential for more serious adverse events to manifest in the long term, such as diabetes and cardiac events.  An apparent increase in the risk of sudden cardiac death among atypical antipsychotics was of particular concern to the Advisory Committee members, including Dr. Daniel Pine, who noted "the need to be cautious in terms of cardiovascular risks associated with atypical antipsychotics in general, including quetiapine."

58

Tr. 261:19-262:1.  Dr. Harrington concurred that data "raise[d] at least some cautionary flags about the risk of sudden cardiac death associated with drugs like this."  Tr. 269:21-270:3.

178.    The Advisory Committee also concluded that inadequate data were available regarding long-term metabolic risks and the risk of tardive dyskinesia.  As such, the Committee determined that "the bar [for approval] should be set higher."  Tr. 234:10-11.

179.    The Committee's decision reflected the necessity of balancing the serious risks inherent in use of Seroquel XR with its effectiveness for the use being considered, as well as alternate, safer therapies that effectively treated the same condition.  The availability of other first-line treatments for MDD such as SSRIs (e.g., Prozac, Paxil) and serotonin and norepinephrine reuptake inhibitors ("SNRIs") (e.g., Cymbalta, Effexor), which posed significantly less safety risk than Seroquel XR, militated against use of Seroquel XR for first-line and monotherapy treatment of MDD, and weighed heavily in the Advisory Committee's recommendation against these uses.

180.    In recommending Seroquel XR as an adjunctive therapy for patients who had an inadequate response to a first-line medication, the Advisory Committee sought to limit Seroquel XR's use to only those MDD patients for whom it was truly necessary. Dr. Gail Griffith, in explaining her "yes" vote for adjunctive use, said, "I think we are hoping that this might be a treatment *resorted to as a treatment of last resort*."  Tr. 293:15-16 (emphasis added).  A number of committee members, in explaining their "yes" votes for adjunctive use, said that they voted that way because it implied that the patient had already failed a first-line therapy.  *See* Tr. at 293-94; *see also* Tr. 287:5-7 ("by virtue of suggesting as an adjunct, it's presupposing it's more narrowly used").

181.    For these reasons, in December 2009, the FDA granted Seroquel XR limited approval to treat MDD adjunctive therapy, in combination with an SSRI or SNRI antidepressant, in patients who had an inadequate response to an antidepressant alone.  In doing so, the FDA refused to grant Seroquel XR broader approval for monotherapy or frontline treatment of MDD due to the safety concerns raised by its Advisory Committee.

### (b)    Off-Label Promotion for Frontline and Monotherapy Treatment of MDD and Symptoms of Depression

182.    Although AstraZeneca's sNDA had requested "an all-comers [i.e., a broad] indication," Tr. 289:9, during the Advisory Committee even AstraZeneca purported to concede that frontline use was not appropriate, stating that "we are not looking to promote the use of quetiapine for all patients with major depressive disorder or GAD.  Our programs study patients with moderate to severe disease, and our goal is to provide a safe and effective option for patients where first-line therapies may not be appropriate."  Tr. 67:3-9.

183.    The Company's actual conduct, however, flatly contradicted that assertion. AstraZeneca had already long been engaged in off-label promotion of Seroquel XR, and prior to that Seroquel IR, for treatment of MDD and generalized depression.  While the beginning of AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for treatment of MDD *predated* the FDA's Advisory Committee meeting in April 2009, even after the Committee unanimously concluded that Seroquel XR was insufficiently safe to use as a frontline treatment for MDD, AstraZeneca *continued* to promote Seroquel XR aggressively for the treatment of MDD and generalized depression, while simultaneously minimizing the safety risks that formed the basis of the Advisory Committee's concerns.

184.    Even though safety was the critical consideration as to the medical acceptability of Seroquel XR's use for the treatment of depression, AstraZeneca trained sales representatives

60

not to mention safety during their promotional details unless physicians raised the issue, and then only to minimize the significance of physicians' concerns through false and misleading promotional claims.  *See* ¶¶ 148-172, *supra*.  Following AstraZeneca's instructions, sales representatives did just that.

185.    Sales representatives' promotional narratives instead focused on the symptoms of depression, such as lassitude, lethargy, and inner tension, which are individual components of the Montgomery-Asberg Depression Rating Scale (MADRS), a standard diagnostic tool and measure of depression severity.  Sales representatives frequently used a graph of individual MADRS symptoms included on page 1356 of a Seroquel IR bipolar depression study as an aid to show physicians Seroquel XR's purported effectiveness in treating individual symptoms of depression.  *See* Joseph R. Calabrese et al., *A Randomized, Double-Blind, Placebo-Controlled Trial of Quetiapine in the Treatment of Bipolar I or II Depression*, 162 Am. J. Psychiatry 1351, 1356 (2005) ("Bolder I").  By intentionally focusing on individual symptoms in this manner, sales representatives could divorce their promotion from Seroquel XR's approved indication as well as from the patient population actually studied in Bolder I, bipolar depression.

186.    A May 2008 slide deck titled "Successfully Selling SEROQUEL & SEROQUEL XR" directed sales representatives how to demonstrate Seroquel IR and Seroquel XR's effectiveness for treatment of various symptoms of depression based individual MADRS symptoms derived from bipolar depression trials:

> Control of mood symptoms (depression, anxiety, agitation) associated with bipolar disorder are differentiation factors of SEROQUEL.  The following information from your approved promotional pieces can be used to describe the effect of SEROQUEL on these mood symptoms. …
> Control of depressive symptoms in bipolar disorder can be shown as improvement in apparent and reported sadness within MADRS. …
> Agitation can be a physical manifestation of inner tension and control of

61

agitation in bipolar depression can be shown as improvement in inner tension within MADRS.

187.    AstraZeneca trained sales representatives to mention Seroquel XR's bipolar depression indication at the beginning of their sales call, but to do so as evidence of Seroquel XR's effectiveness for depression symptoms generally.  Sales representatives then proceeded, as they had been trained, to promote Seroquel XR as effective for the treatment of MDD and generalized depression without reference again to the drug's approved indication.  During role play exercises, AstraZeneca required that sales representatives instead focus their promotional narratives exclusively on generalized depression.  Indeed, sales representatives who referred to mania-related symptoms, which are necessary to diagnose bipolar disorder, were scored down in their manager's evaluations.

188.    A field coaching report written by Relator's District Manager, Doug Yarbrough, asked: "Are you able to articulate and sell to the MADRS items as they come up in appropriate patient type dialog?"  On January 13, 2009, Yarbrough sent sales representatives in his district a description of each of the ten symptoms included in the MADRS score and directed them: "It's important that you can identify the 10 MADRS items, what they mean, and why they may be clinically relevant."

189.    In an e-mail sent to Relator and her sales partner on July 30, 2008, Yarbrough similarly wrote:  "I'd be remised [sic] if I didn't take the opportunity to reinforce that your overall business with psych share growth in 2008 correlates with the effective treatment of depressive symptoms associated with BP Depression – specifically the patient experiencing lassitude and lethargy."  In another e-mail dated December 24, 2008, he instructed Relator and her sales partner that "you must firmly sell to depressive symptoms associated with bipolar disease."

190.    To facilitate sales representatives' symptom-centric off-label promotion but maintain the facade of compliance, AstraZeneca tailored its promotional materials to focus on the symptoms of bipolar depression, which sales representatives could then readily apply to depression generally.  The visual sales piece, referred to as the core visual aid ("CVA"), that sales representatives began using in early 2009, included a Venn diagram that AstraZeneca trained sales representatives to make a centerpiece of their promotions.  The diagram was composed of two overlapping circles, one of which represented the symptoms of depressive episodes associated with bipolar disorder and the other of which represented symptoms of MDD. The vast majority of symptoms were clustered in the center where the two circles overlapped, representing that the symptoms of bipolar depressive episodes and MDD were essentially identical.

191.    Though the CVA was facially on-label, purporting to encourage physicians to ensure that they had not confused their diagnosis given the similarities in symptoms, as they had been trained to do, sales representatives readily repurposed it in their promotional details to promote Seroquel XR's effectiveness for the symptoms, rather than the disease, as AstraZeneca intended for and instructed them to do.

192.    In one example, a "PSS Call Execution Guide" described Seroquel XR as "proven effective as monotherapy in treating bipolar depressive *symptoms*, like sadness, loss of interest, and feelings of worthlessness" (emphasis added).

193.    In July 2008, AstraZeneca instructed senior level sales managers and the sales force how to market Seroquel XR for MDD through a "XR Immersion Day" presentation. Although the presentation purported to be an overview of AstraZeneca's plans for future MDD and GAD indications, in reality it was summary of advisory board meetings that AstraZeneca

63

had conducted with physicians regarding use of Seroquel XR to treat MDD and GAD and, based on the results of those advisory boards, AstraZeneca's conclusions about the most effective promotional messaging to market Seroquel XR for these off-label uses.  One slide directed sales managers that

> promotion of XR should be mindful to highlight its benefits in depression not only in improved sleep and less tension, but also in terms of less sadness, hopelessness and difficulties concentrating. These latter benefits are independent of the calming-uplifting continuum and may offer some unique and believable reasons to choose XR over Abili[f]y with depressed patients.

194.    AstraZeneca's "XR Immersion Day" marketing summarized the key selling point: "Overall – Most compelling strategies for XR build on what physicians already know (and like) about Seroquel…" (ellipses in original), which included, *inter alia*, "'Calming' (i.e., good for anxiety, agitation and helping with sleep)" and "Helps anytime psychotic features are part of the picture."

195.    Following the annual meeting of the American Psychiatric Association in May 2008, AstraZeneca sent sales representatives a list of posters that the Company had presented at the meeting, including four regarding use of Seroquel XR to treat MDD.  "These posters indicate our emphasis on the anti-depressive qualities of Seroquel.  This is where we are different than the other atypicals and we can hang our hat on this difference," the summary stated, indicating that AstraZeneca regarded the MDD trials as bolstering its ongoing marketing campaign, rather than portending future indications.  "The competitors are very busy 'chasing' us in the above mentioned areas.  They are not finding the same success we have."

196.    In January 2009, nearly a year before Seroquel XR's even limited approval for adjunctive treatment of MDD, AstraZeneca provided further off-label training to sales representatives, including Relator, by requiring them to complete online MDD disease state and

64

disease management training modules.  The training was not limited to adjunctive or second-line use, but rather taught sales representative to promote Seroquel XR for the broader MDD frontline and monotherapy indications that AstraZeneca sought to obtain.

197.    AstraZeneca's aggressive promotion of Seroquel XR to treat MDD was driven largely by its competitor Abilify's approval for adjunctive treatment of MDD in November 2007, which threatened the share of the generalized depression market that AstraZeneca had garnered through its earlier off-label promotion of Seroquel IR.  *See* ¶ 387, *infra*.  To compete effectively, AstraZeneca construed Seroquel XR's bipolar depression indication not as a limitation on the appropriate scope of use of Seroquel XR, but as evidence that Seroquel XR was the most effective antidepressant regardless of the specific depressive indication.  AstraZeneca contended that bipolar depression was the most difficult form of depression to treat, and that Seroquel XR's proven effectiveness for that use sufficiently demonstrated its superior ability to treat all forms of depression, particularly MDD.  *See* ¶ 388, *infra*.  AstraZeneca's promotional materials therefore instructed sales representatives to "differentiate from [Abilify] and other atypicals based on approved indications"; "Abilify is not approved for treating bipolar depression."

198.    According to the official construction of this promotional message, sales representatives only sought to inform physicians that Abilify lacked approval for bipolar depression so that those physicians would prescribe Seroquel XR, not Abilify, for their bipolar depressed patients.  In reality, however, that promotional message held no prospect of stemming Abilify's gains or of achieving the substantial sales that AstraZeneca demanded its sales representatives achieve.  The prevalence of bipolar disorder is minimal relative to MDD: the DSM-IV estimates lifetime prevalence of Bipolar I as between 0.4% to 1.6% and that of bipolar I as around 0.5%, whereas the lifetime risk of MDD is between 10% to 25% for women and 5% to

65

12% for men.   Therefore, even if AstraZeneca were to succeed in converting all bipolar depressed patients to Seroquel XR, it would still make only a minor dent in Abilify's rapidly increasing share in the depression market.   The pretense then (i.e., that AstraZeneca sought to stem Abilify sales gains and protect its own depression market share through gains limited to bipolar depressive patients) was preposterous.

199.   Nonetheless, to evade the reality of the small bipolar depression market, AstraZeneca sought to convince physicians that the incidence of bipolar depression among their patients was higher than it actually was.   Around November 2008, at the time of Seroquel XR's launch for bipolar depression, AstraZeneca began promoting the drug to physicians by claiming that a substantial number of their patients currently diagnosed as having MDD were "misdiagnosed," and actually had bipolar depression, for which they should be treated with Seroquel XR.

200.   A sales piece, dated February 2009, that AstraZeneca distributed to its sales representatives to use in call details was entitled "Discover something new about Seroquel XR: Now Approved for bipolar depression" (#270266), and on page two included a Venn diagram composed of two circles that represented the diagnostic criteria for MDD and bipolar depression, respectively, and showed that the "[d]iagnostic criteria of major depressive episodes are identical for major depressive disorder and bipolar disorder."   The heading read, "Depressed mood may be the presenting symptom, but major depressive disorder may not be the correct diagnosis."

201.   The brochure also contained sample patient stories that sales representatives used as part of their sales details.   One regarded a 32-year-old patient with a "[t]entative diagnosis" of MDD, "still experiencing depressive symptoms" and currently being treated with an SSRI. According to the sales piece, the treating physician for this patient suspected that the patient must

66

have a "history of hypomanic or manic episodes, which prompts him to screen the patient for bipolar disorder." Sales representatives explained to physicians that many such patients were misdiagnosed as suffering from MDD, but were actually suffering from bipolar depression.

202.    Contrary to AstraZeneca's promotion of rampant misdiagnosis of MDD, the portion of patients misdiagnosed as MDD who are actually bipolar is in fact relatively small, in part because of the considerably greater incidence of MDD relative to bipolar depression. Indeed, even an AstraZeneca-funded study, of which three of the authors were current AstraZeneca employees, concluded that the prevalence of such misdiagnosis was less than 7%. Siddhesh A. Kamat et al., *Prevalence and Humanistic Impact of Potential Misdiagnosis of Bipolar Disorder Among Patients With Major Depressive Disorder in a Commercially Insured Population*, 14 J. Managed Care Pharmacy 632 (2008).

203.    To further its contention that a large portion of MDD patients were misdiagnosed, AstraZeneca sought to create the impression that the incidence of misdiagnosis was much greater than it actually was. A branded Seroquel IR slide deck presented by Dr. Paula Jo Malin asserted that the bipolar prevalence among a population of depressed patients at a family medical center was 28%, nearly four times greater than what AstraZeneca's own study concluded and grossly out of proportion with DSM-IV estimates of national prevalence.

204.    Even more egregious, however, than AstraZeneca's attempted inflation of the bipolar depression market were its directions to sales representatives' that, given the difficulty of diagnosing bipolar disorder and the possibility that it may take up to ten years to recognize the condition, they should detail physicians to prescribe Seroquel XR as frontline treatment. AstraZeneca's direction was to tell physicians that, if they could not determine with certainty whether the correct diagnosis was MDD or bipolar disorder, they should prescribe Seroquel XR

67

instead of an SSRI because an SSRI risked the induction of a manic episode if the patient actually had bipolar disorder.   "What do you have to lose?" sales representatives asked, rhetorically.   But for AstraZeneca's successful obfuscation of Seroquel XR's safety risks, physicians would reasonably have answered: "The health of our patients."

205.    The cleverness, and outright deception, of AstraZeneca's reasoning, if accepted, lay in its requirement that to diagnose MDD, physicians need disprove the occurrence of a future event that is by its nature unknowable.  By AstraZeneca's logic, every unipolar depressed patient would be diagnosed as, or at least be treated as if she or he had, bipolar disorder, because one could never rule out the possibility that the depressed patient would at some point in the future experience a manic episode.

206.    The Chairman of the DSM-IV Task Force, Dr. Allen Frances, warned against precisely this type of overprescribing of antipsychotics in cases of depression where bipolar disorder might be a possibility, but has not actually been diagnosed:

> [I]n boundary cases where the call [between bipolar II and unipolar depression] is close, people shouldn't jump on the bipolar bandwagon created by drug company hype.  The antipsychotic drugs are too risky to take unless there is a real reason.

Allen Frances, M.D., Saving Normal: An Insider's Revolt Against Out-of-Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary Life 152 (2013).  Drug manufacturer promotion, Frances wrote, has engendered the proclivity among physicians to vastly overprescribe antipsychotics for medically unnecessary uses.  "The massive misuse of antipsychotics is crazy and shameful—a triumph of marketing might over common sense and good medical practice."  *Id.* at 105.

207.    AstraZeneca recognized that its instructions to sales representatives were impermissible, and on multiple occasions sent compliance directives to sales representatives,

68

purporting to instruct them not to do precisely what AstraZeneca managers had repeatedly instructed them to do.  On October 7, 2009, CNS National Sales Director Tom Viscount and Commercial Brand Leader Jonathan Walker distributed an "Internal Communication" to all CNS sales representatives stating that "it is not appropriate to simply reference bipolar disorder or bipolar depression once within a detail, and then allow the conversation to expand to 'depressed patients,' 'depressive episodes,' or 'depressive symptoms' (including sadness, loss of interest, and feelings of worthlessness), without grounding this conversation in the approved indication of bipolar disorder."  It continued: "You must not state or suggest that SEROQUEL XR would be an appropriate treatment choice for patients still experiencing depressive symptoms with their current SSRI/SNRI treatment, unless a positive diagnosis of bipolar disorder has been made."  Having received such contradictory instructions from their managers that the compliance directives were only for corporate image purposes and should be ignored, however, AstraZeneca's sales representatives clearly understood that they should likewise ignore these directions.

### (c)     Head-to-Head Promotion versus SSRI and SNRI Antidepressants

208.   At a National Sales Meeting held in Dallas, Texas, which Relator attended on or about March 2010 along with the entire CNS Specialty Representative sales force, one month before the announcement of the Settlement Agreement and CIA, AstraZeneca's National Sales Director, Tom Viscount, stood on a chair and yelled: "Seroquel is an antidepressant!"  Viscount, through this exclamation, sought to convey that Seroquel XR stood beside commonly used SSRIs and SNRIs as a frontline option in a physician's cache of antidepressants.  Such a characterization was, of course, contrary to Seroquel XR's limited approval as "adjunct therapy to antidepressant" for patients who had failed on an antidepressant alone.  When a sales

69

representative in attendance objected, correctly, that Seroquel XR was not an antidepressant but rather an add-on to an antidepressant, however, she was asked to leave the meeting.

209.    By promoting Seroquel XR itself as an "antidepressant" rather than as an adjunct therapy to antidepressants, AstraZeneca sought to distance Seroquel XR from negative perceptions accompanying atypical antipsychotics and their attendant side effects and thereby to influence physicians to prescribe Seroquel XR for depression more broadly.

210.    Viscount's message was clear that, despite the impending settlement and CIA, AstraZeneca would continue to promote Seroquel XR as a frontline alternative to SSRI and SNRI antidepressants.  A sales trainer complained that Seroquel XR is "[s]till competing in the [a]typical m[ar]k[e]t."  Seroquel XR, however, "must get in the SSRI and SNRI m[ar]k[e]t."

211.    To further this promotion, in December 2008, AstraZeneca added to sales representatives' call lists and sales quotas "high decile" prescribers of SSRIs and SNRIs, including primary care and family practice physicians, thereby requiring sales representatives to increase sales of Seroquel XR in this population, which does not treat patients for Seroquel XR's on-label indications.   The original impetus for the addition of these prescribers to sales representatives' call lists and quotas was the FDA's anticipated approval of Seroquel XR's MDD application in late 2008.

212.    After the FDA refused to approve the MDD indication in late December, however, AstraZeneca maintained the same call lists and sales quotas that had been designed to drive sales in MDD.  A January 2009 slide deck titled "SEROQUEL XR Bipolar Launch" acknowledged that despite the Company's failure to obtain the MDD indication at that time, the "2009 objective has not changed."   Sales representatives and their managers were therefore

70

assigned responsibility for massively increasing sales among a group of physicians who did not treat patients for Seroquel IR or Seroquel XR's on-label uses.

213.   When Relator questioned Mr. Yarbrough, in early 2009, why family practice doctors were added to her call list, he informed her that AstraZeneca added these physicians because they prescribed SSRI and SNRI antidepressants and thus were targets for promotion of Seroquel XR for treatment of MDD and GAD.

214.   Primary care physicians did not treat either schizophrenia or bipolar disorder, Seroquel XR's only on-label indications at the time, and many primary care physicians expressed anger when AstraZeneca began promoting Seroquel XR to them, correctly contending that there was no legitimate reason for AstraZeneca to do so.   Rather, AstraZeneca's only purpose in calling on primary care physicians was to promote Seroquel XR for the off-label treatment of MDD and GAD.

215.   Because primary care physicians did not treat bipolar disorder and responded to sales representatives' references to it with statements that 'I don't treat bipolar,' AstraZeneca directed sales representatives instead to promote Seroquel XR by emphasizing treatment of symptoms, to the intentional exclusion of approved indications.   Although AstraZeneca's off-label promotion to psychiatrists also focused on treatment of symptoms to the exclusion of approved indications, symptoms assumed an even greater prominence in AstraZeneca's promotions to primary care physicians.   As AstraZeneca instructed, sales representatives made only passing reference to Seroquel XR's on-label approval before continuing to a general discussion of the symptoms of depression, all of which are treated safely and effectively by Seroquel XR, sales representatives promoted.

133568.00601/36388526v.8

216.     The Company instructed sales representatives to conduct a "[d]epressive conversation every time," which entailed a broad-based promotion of Seroquel XR's effectiveness for the treatment of MDD without reference to bipolar depression or Seroquel XR's role in treating patients with MDD as a second-line adjunct behind traditional antidepressants.

217.     Even following the FDA's approval of Seroquel XR for adjunctive use in patients with an inadequate response to an antidepressant alone, sales representatives' promotional narratives continued to seek physicians' agreement to prescribe Seroquel XR for all their MDD patients, not only those with an inadequate response to an antidepressant.  During their role plays at district sales meetings, AstraZeneca trained sales representatives not to mention that Seroquel XR's approval was limited to second-line adjunctive use.  Managers not only approved this off-label promotional messaging, they coached sales representatives how to perfect the deception.

218.     To provide additional support for their portrayal of Seroquel XR as a broad-use antidepressant, AstraZeneca trained sales representatives to cite a passage from *Stahl's Essential Psychopharmacology: Neuroscientific Basis and Practical Applications* (3d ed. 2008), which AstraZeneca provided to many physicians as gifts.  Stahl describes quetiapine as "the first atypical antipsychotic proven effective as a monotherapy for the treatment of the depressed phase of bipolar disorder," and continues to discuss the pharmacologic properties of quetiapine that potentially contribute to its effectiveness for this indication.  *Id.* at 415.  Quetiapine's active metabolite, norquetiapine, Stahl writes, "can block the norepinephrine transporter (NET), which would theoretically enhance norepinephrine (and dopamine) levels as do other known antidepressants…."  *Id.* (internal citation omitted).  "Furthermore, norquetiapine can block 5HT2C receptors, which should enhance the release of both norepinephrine and dopamine and contribute to antidepressant action and cognitive improvement."  *Id.*  (internal citation omitted).

These similarities in mechanism of action with SSRI antidepressants, sales representatives told physicians as they had been trained, explained Seroquel XR's effectiveness as a broad-based antidepressant and merited its use in place of SSRIs in physicians' practice.

219.    To broaden Seroquel XR's user base further, AstraZeneca sought to convert those patients who had had a "good response" to an SSRI to Seroquel XR, telling physicians that they should instead seek to induce remission, which SSRIs, AstraZeneca contended, were too ineffective to achieve.   Making a misleading head-to-head comparison of non-head-to-head studies, AstraZeneca trained sales representatives to promote, and they did promote, that Seroquel XR induced remission in 53% of depression patients, whereas dual-mechanism SNRIs such as Effexor were only capable of inducing remission in 42% of patients.   Sales representatives were thus instructed by their managers to (and they did) falsely and misleadingly claim that Seroquel XR's clinical trials were "[b]etter than any trial you [have] seen for antidepressants for the last 10 y[ea]rs."

220.    AstraZeneca itself recognized that this head-to-head comparison was both improper and clearly misleading.  In an MDD training module, Seroquel XR Brand Leader Scott Weintraub purported to instruct sales representatives that they could not promote Seroquel XR as more effective than SSRIs or SNRIs. "You cannot state or imply the inclusion of Seroquel XR… would have changed the results or that Seroquel XR is any more effective than any given antidepressant…. Seroquel XR has not been studied in comparison to other antidepressant agents."  Of course, this was yet another example in which AstraZeneca's official admonitions of compliance directly contradicted the actual instructions it gave sales representatives behind closed doors.

133568.00601/36388526v.8

221.   Indeed, in a Warning Letter dated July 29, 2010, the FDA's DDMAC charged that a leave-behind sheet distributed by AstraZeneca misleadingly and illegally promoted Seroquel XR, in part by suggesting that Seroquel XR led to superior remission responses relative to SSRIs.  The FDA specifically contended that the letter:

- Overstated the efficacy of Seroquel XR by "misleadingly suggesting that patients will achieve 'remission' with Seroquel XR plus antidepressant versus antidepressant alone when this has not been demonstrated by substantial evidence or substantial clinical experience."

- Overstated the efficacy of Seroquel XR by misleadingly suggesting "that Seroquel XR alleviates the <u>specific</u> symptoms of sadness and loss of interest [associated with MDD], when this has not been demonstrated by substantial evidence or substantial clinical experience."

- Omitted material facts in claiming that Seroquel XR could significantly improve an MDD patient's MADRS total score as early as one week, without disclosing that only the 300 mg dosage strength provided a significant improvement in MADRS total score in that time, "thus misleadingly implying that the 150 mg dosage strength also achieved this effect."

- Omitted information concerning risks associated with Seroquel XR.

222.   The FDA requested that AstraZeneca immediately cease disseminating this promotional piece and further demanded a written response on or before August 13, 2010, regarding AstraZeneca's willingness to comply with the demand.  Notwithstanding the FDA's admonition, AstraZeneca continued its false and misleading promotion unabated.

74

> **(d)** **Physician Information Requests to Promote Seroquel XR for MDD**

223.   To supplement its sales representatives' in-person promotions of Seroquel XR for off-label use to treat MDD, AstraZeneca impermissibly leveraged responses to Physician Information Requests ("PIRs") as promotional vehicles.  PIRs purportedly provide a legitimate means for AstraZeneca's Medical Affairs department to communicate what is supposed to be unbiased, non-promotional information to health care professionals about off-label uses of AstraZeneca's drugs.  AstraZeneca's ability to permissibly respond to PIRs with off-label information, however, is conditioned on the requests for that information being unsolicited.  AstraZeneca abused the use of PIRs and turned them into off-label promotional tools by proactively soliciting, through its sales representatives, requests from health care professionals for off-label information about the uses of Seroquel IR and Seroquel XR that AstraZeneca wanted to promote.

224.   On or about December 1, 2008, DDMAC sent AstraZeneca a Warning Letter, citing the Company for its misuse of a response to a PIR to promote Seroquel IR and Seroquel XR off-label for the treatment of MDD.  The Warning Letter found that an AstraZeneca sales representative had orally promoted Seroquel IR and Seroquel XR for the off-label treatment of MDD on January 3, 2008, in response to which the physician had requested further information regarding that use of Seroquel IR.   On January 4, 2008, AstraZeneca sent a mailing to the same provider that contained information—namely, summaries of eight clinical trials—about the use of Seroquel and Seroquel XR for the off-label treatment of MDD.  DDMAC emphasized that "[t]his mailing was not the result of an unsolicited request by the physician, but rather was prompted by the sales representative's statements."

75

225.   DDMAC discounted the language in AstraZeneca's response that contended the response was non-promotional.  "Although the letter to the physician states that '[AZ] does not recommend the use of SEROQUEL or SEROQUEL XR in any other manner than as described in the enclosed prescribing information,' this disclaimer is insufficient to mitigate the promotion of a new 'intended use' for which the products lack adequate direction."

226.   In response to the DDMAC warning letter, AstraZeneca falsely informed the FDA that all violative promotion had ceased when, in fact, it had no intention of complying with the FDA's request, and it continued its unlawful promotion of Seroquel IR and Seroquel XR through responses to PIRs.

227.   Beginning at least as early as 2008, AstraZeneca's sales representatives proactively solicited PIRs promoting Seroquel XR off-label for treatment of MDD.

228.   In furtherance of its fraudulent scheme, AstraZeneca proactively solicited PIRs from, and sent responses to, the following physicians in order to promote Seroquel IR and Seroquel XR for the off-label treatment of MDD:

| Date | Recipient | City |
|---|---|---|
| Jan. 18, 2008 | Michael Taylor, MD | Des Moines, IA |
| Jan. 22, 2008 | J. Patrick Bertroche, DO | Clive, IA |
| Feb. 8, 2008 | Michael Corsberg, PA | Fort Dodge, IA |
| Feb. 20, 2008 | Charles Wadle, MD | Des Moines, IA |
| Mar. 28, 2008 | Randall Kavalier, DO | West Des Moines, IA |
| Apr. 25, 2008 | Shaad Swim, MD | Des Moines, IA |
| Sept. 4, 2009 | Michael Corsberg, PA | Fort Dodge, IA |

133568.00601/36388526v.8

<h3 style="text-align:center">(e)      Paid Speakers</h3>

229.    AstraZeneca also enlisted paid speakers to promote off-label use of Seroquel XR to treat MDD.   As it did with sales representatives, AstraZeneca began training speakers to promote Seroquel XR for treatment of MDD nearly a year before it was approved even for adjunctive use.   AstraZeneca, however, trained its paid speakers to promote Seroquel XR for treatment of MDD as monotherapy.   Additional particular details of this part of the scheme to submit false claims include (without limitation) an e-mail dated December 12, 2008, in which District Manager Yarbrough announced that "[w]e have 4 doctors within our territory that will be MDD speakers for 2009.   We have begun preparing them for their training in late January and they are all very excited about the upcoming data and indications."

230.    Dr. Charles Scott Jennisch of Des Moines, Iowa, served as a regular paid speaker and routinely promoted Seroquel XR off-label for treatment of MDD and GAD.   Dr. Jennisch based his presentations around examples of individual patients, exhibiting general symptoms such as depression and irritability, and explained that he would choose Seroquel XR to treat such a patient because it was more effective than SSRIs such as Lexapro.   To support these claims, Dr. Jennisch made unreliable head-to-head comparisons of non-head-to-head study results.   (Dr. Jennisch also taught sales representatives how to promote Seroquel XR as an antidepressant using these same claims.)

231.    On March 12, 2009, Dr. Jennisch gave a speaker program entitled, "Importance of Early Recognition and Appropriate Treatment of Bipolar Depression," at the Family Clinic at the University of Iowa Clinic in Perry, Iowa.   (This facility has since been taken over by Mercy Clinics, Inc.)   Despite the ostensibly on-label title, Dr. Jennisch's program in fact promoted Seroquel XR for the off-label treatment of MDD and GAD.    The Relator hosted this meeting, and AstraZeneca paid Dr. Jennisch $1,500 in speaker fees for this program, plus an

77

additional $37.40 in expenses.  In attendance were family practice physicians Steven D. Sohn and David M. Huante, who did not treat patients for Seroquel XR's on-label indications, but whom AstraZeneca targeted for off-label promotion of MDD and GAD.

232.   On March 19, 2009, Dr. Jennisch gave the same presentation at Primary Health Care, Inc., in Des Moines, Iowa.  Primary Health Care, Inc. is a nonprofit community health center dedicated to serving, among others, the uninsured and underinsured, including many Medicaid beneficiaries.  Dr. Jennisch was paid $1,200 in speaker fees for this program.  During the presentation, he promoted Seroquel XR as superior to Abilify for treatment of MDD and presented the AstraZeneca Venn diagram, purporting to show that the diagnostic criteria for bipolar depression and MDD "are identical" with one another as evidence of Seroquel XR's effectiveness for the off-label treatment of MDD.   Uma R. Palakurthy, MD, an internist, and Wendy M. Hansen, DO, a family practice specialist, attended this program.   Neither Dr. Palakurthy nor Dr. Hansen is a psychiatrist, and neither treated a significant number of patients for any of Seroquel XR's on-label uses.  By inviting them to this program, AstraZeneca sought to, and did, influence them to prescribe Seroquel XR for the off-label treatment of MDD.

233.   On April 8, 2009, Dr. Gordon Robinson of St. Louis, Missouri, gave a program entitled "Importance of Early Recognition and Appropriate Treatment of Bipolar Depression," during which he promoted, unsolicited, Seroquel XR for the treatment of MDD and GAD, and as adjunctive therapy for the treatment of MDD.  The program was held at Broadlawns Medical Center in Des Moines.  Several health care professionals attended this presentation, including Dr. Manmohan Singh, Kathy Adams, NP (who only treats children), and Michael Johnston, NP. Dr. Robinson was paid a fee of $1,500 for this presentation.

234.    Dr. Robinson made the same presentation at a dinner meeting at Fleming's Prime Steakhouse & Wine Bar in West Des Moines, Iowa that same evening.  Dr. Robinson again provided unsolicited information concerning off-label use of Seroquel XR as monotherapy to treat MDD and GAD, and as adjunctive therapy for the treatment of MDD.  Dr. Robinson received a fee of $1,100 for this presentation, in addition to expenses of $339.  Dr. Devi Mikkilineni, a psychiatrist at Iowa Lutheran Hospital, among others, attended this presentation.

235.    In addition, there is significant reliable indicia that false claims were actually submitted by physicians who attended these presentations.  For example, following the presentation, Dr. Mikkilineni's Seroquel XR prescribing increased substantially.  On May 4, 2009, sales representative Kelly Ricketts e-mailed Relator and her sales partner that "Dr. Devi is doing some serious XR writing.  Enjoy!!!"  The attached prescribing report showed that in the prior five weeks, Dr. Mikkilineni had written 11 new prescriptions for Seroquel XR, whereas in the five weeks before that he had written two.  Dr. Mikkilineni wrote these additional nine prescriptions of Seroquel XR as a result of AstraZeneca's off-label promotion of Seroquel XR.  Dr. Mikkilineni treats a substantial number of Medicaid patients, and Medicaid reimbursed a portion of these off-label prescriptions for Seroquel XR.

236.    Dr. Robinson gave this same off-label speaker program at Mercy Psychiatric Services in Des Moines, Iowa on April 9, 2009.

237.    On October 6, 2009, Dr. Robinson gave a presentation entitled "Assessment and Management of Bipolar Depression" to health care professionals at Broadlawns Hospital, *see infra*, where he promoted Seroquel XR off-label for the treatment of MDD and GAD.

238.    On that same day, Dr. Robinson gave the same off-label speaker program at the Behavioral Health Center of Southern Iowa, in Leon, Iowa.   Mark Hensley, an Advanced

Registered Nurse Practitioner, attended this presentation.  Dr. Robinson was paid a fee of $1,200 for this presentation.  The Behavioral Health Center of Southern Iowa treats a substantial number of patients covered by Federal Health Programs and Iowa and Missouri state health care programs.  As of March 2010, Mr. Hensley's patient mix included 44% Iowa and Missouri Medicaid, as well as 32% Medicare Part D patients, and 6% Tricare patients.

239.    On April 14, 2009, Dr. Azfar M. Malik, a regular consultant and paid speaker for AstraZeneca, conducted visiting professorship meetings with Michael Corsberg, a physician assistant at the Berryhill Center for Mental Health in the Trinity Regional Medical Center in Fort Dodge, Iowa, and Julie Schneider, an Advanced Registered Nurse Practitioner with Genesis Mental Health Associates, LLC, in Fort Dodge, during which he provided unsolicited information about off-label use of Seroquel XR to treat MDD and GAD.  Both Mr. Corsberg and Ms. Schneider also treat children, and any use of Seroquel XR in children or adolescents would be off-label.   Approximately 95% of the patients treated by Mr. Corsberg are covered by Medicaid and Medicare Part D.  Approximately half of the patients treated by Ms. Schneider are covered by Medicaid or Medicare Part D.  Moreover, both Mr. Corsberg and Ms. Schneider treat patients covered by Hawk-i, which provides medical insurance for uninsured children in the state of Iowa, and which does not require prior authorizations.

240.    Later that same day, Dr. Malik gave a speaker program to health care professionals, including child psychiatrists, at the St. Anthony Mental Health Services out-patient clinic in Carroll, Iowa, during which he promoted the off-label use of Seroquel XR to treat MDD and GAD.  Dr. Michael D. Carabine and Susan Muhlbauer (an advanced practice registered nurse), both of who treat geriatric patients, attended this presentation.  AstraZeneca paid Dr. Malik $2,400 for this presentation, plus expenses of $39.74.

80

241.    In June 2009, Dr. John Luehr, a child and adolescent psychiatrist from St. Paul, Minnesota, who spoke frequently on behalf of AstraZeneca in Minnesota and Iowa, gave a speaker program to health care professionals where he promoted Seroquel XR for off-label use as monotherapy treatment of MDD and GAD, as well as use of Seroquel XR to treat children.

### (f)    Samples to Facilitate Off-Label Promotion for MDD

242.    As part of its off-label promotion of MDD and GAD, beginning in 2009, AstraZeneca provided its sales force with samples of Seroquel XR designed to promote off-label use of the drug for MDD and GAD.  Relator received multiple times the normal amount of 50 mg and 150 mg samples, which AstraZeneca instructed that she furnish to family practice physicians.  These physicians, however, had no use for the free samples except for off-label use for treatment of patients diagnosed with MDD or GAD.

243.    That AstraZeneca intended these samples to serve as marketing for off-label use was readily apparent because the titration schedule for use of Seroquel XR for treatment of MDD and GAD required these lower doses of 50 mg and 150 mg, whereas the drug's on-label uses required higher doses.  At the time, psychiatrists who would have used Seroquel XR on label for schizophrenia and bipolar disorder expressed confusion as to why the company was no longer offering higher doses as samples, which would have been used to treat patients on-label.

244.    AstraZeneca knew that its provision of product samples effectively influenced physicians to prescribe Seroquel IR and Seroquel XR off-label.  Most physicians on whom Relator called relied on product samples to initiate new patients on antidepressant or antipsychotic therapy, and those physicians would not have routinely prescribed Seroquel IR and Seroquel XR but for their receipt of product samples from AstraZeneca.  Samples of Seroquel IR and Seroquel XR thereby caused a dramatic increase in the amount of off-label prescriptions of Seroquel IR and Seroquel XR.

245.    AstraZeneca also knew that its provision of product samples of Seroquel IR and Seroquel XR to physicians who did not treat patients for those drugs' on-label uses, or to physicians whom AstraZeneca had promoted those drugs for off-label uses, influenced those physicians to prescribe Seroquel IR and Seroquel XR for off-label uses.

246.    While physicians' provision of Seroquel IR and Seroquel XR product samples to their patients did not in itself result in the submission of any claims, the samples caused physicians to provide their patients with prescriptions for continuing therapy on Seroquel IR and Seroquel XR, which subsequent prescriptions were filled by pharmacies and caused the submission of false claims to Government Programs, as described *infra*.  AstraZeneca knew and intended that its provision of samples would cause the submission of claims resulting from prescriptions for continuing therapy in this manner.

(g)    <b>AstraZeneca's Off-Label Promotion for MDD Was Successful</b>

247.    Even following the FDA's denial of AstraZeneca's application for a broad MDD indication, AstraZeneca pursued/continued its off-label promotion of Seroquel XR as frontline and monotherapy treatment of MDD.  Although AstraZeneca sent sales representatives a voice-mail informing them of the FDA's denial of a broader MDD indication, it did not address the Advisory Committee's safety concerns, and allowed the sales force to carry on with its misrepresentative safety claims unchecked.

248.    The Company's off-label promotional campaign for frontline and monotherapy treatment of MDD was successful.  Largely as a result of AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR, by July 2008, 18% of Seroquel IR use and 17% of Seroquel XR use was for MDD, as shown in the "XR Immersion Day" slide deck. As AstraZeneca's slide deck also shows, a substantial portion of the cost of cost of drugs prescribed for MDD was borne by Government Programs, including 26% by Medicare and 16% by Medicaid.

82

249.    From January 2009 to June 2009, when AstraZeneca's promotion of Seroquel XR for MDD was most intense, Seroquel XR's market share among Florida Medicaid beneficiaries increased from 2.11% to 4.50%.   Among Tennessee Medicaid beneficiaries it increased from 1.99% to 4.40%.  Among Georgia Medicaid beneficiaries it increased from 2.06% to 3.77%. And among United HealthCare/Pacificare/AARP Medicare Part D beneficiaries, it increased from 1.47% to 3.66%.  This growth derived from off-label prescriptions for treatment of MDD and resulted from AstraZeneca's promotion of Seroquel XR for that same use.

250.    The way in which AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for treatment of MDD caused the submission of false claims to Government Programs is described in detail in ¶¶ 510-537, *infra*.

### 2.    Generalized Anxiety Disorder and Symptoms of Anxiety

251.    AstraZeneca had long promoted Seroquel IR, and for a short time Seroquel XR, off-label for treatment of symptoms of anxiety; however, that off-label promotion accelerated in mid-2008 following the release of a number of clinical trials demonstrating Seroquel XR's effectiveness for the treatment of GAD.

252.    The DSM-IV describes GAD as characterized by "excessive anxiety and worry (apprehensive expectation)" that the subject has difficulty controlling, and that occurs "more days than not for a period of at least 6 months."  DSM-IV at 472.  Symptoms of GAD include anxiety, trouble concentrating, irritability, startling easily, awareness that anxiety is inappropriate, and depression. The National Institute of Mental Health estimates that approximately 4 million Americans, representing 2.8% of the adult population, suffer from GAD.

253.    While use of Seroquel XR has been demonstrated as effective for treatment of GAD, it has not been demonstrated as safe.  As it did with respect to MDD, AstraZeneca

83

submitted an sNDA seeking approval for Seroquel XR for the treatment of GAD, and in response the FDA held an Advisory Committee—the same one at which the MDD indication was considered—to recommend whether Seroquel XR was safe and effective for this use.  As it had with respect to MDD, the Advisory Committee concluded that Seroquel XR was insufficiently safe for *any* treatment of GAD, even following failure of first-line therapies, and as such recommended *against* Seroquel XR's approval for treatment of GAD.

254.    Although the Advisory Committee found that Seroquel XR had been demonstrated effective for the treatment of GAD, they agreed unanimously, by a vote of 9 to 0, that Seroquel XR was not shown to be acceptably safe as monotherapy for the treatment of GAD.  Moreover, the Committee agreed by a vote of 6 to 2 that Seroquel XR had not been shown to be acceptably safe even in certain instances—i.e., for patients who had failed on a first-line therapy.

255.    Dr. Pine discussed his concerns regarding approving the use of an antipsychotic medication, such as Seroquel or Seroquel XR, as a first-line treatment for a condition like GAD:

> I am very uneasy, to be blunt and frank about it, about proposing, or advocating for, or approving an antipsychotic medication as a first-line treatment in a condition like [GAD], given a lot of the things we've heard [earlier in the hearing] and a lot of the things that we haven't talked about.  I mean, I do think we should talk about that, but as a psychiatrist – and maybe this is what Dr. [Wayne] Goodman [of the National Institute of Mental Health, and the Committee Chair] was thinking about – my discussion is going to be pretty brief about [whether] this is a reasonable first-line treatment.  In my eyes, it's probably not.

Tr. 217:8-19.

256.    The availability of other, much safer therapies was an important influence in the determination that Seroquel XR was insufficiently safe for this use.  SSRI and SNRIs both effectively treat GAD and are regarded as far less dangerous than atypical antipsychotics.

133568.00601/36388526v.8

257.    Although the Advisory Committee voted to approve use of Seroquel XR for MDD patients with an inadequate response to frontline therapies, it declined to make such an exception for those with GAD.  As Dr. Delbert Robinson explained, it did so partly because the frontline therapies are so effective for treatment of GAD that patients with an inadequate response are exceptionally rare.  Explaining his no vote, Dr. Robinson said,

> [T]he reason I voted no on this one versus the MDD is that normally with GAD, you don't go to – people respond usually in GAD much better, most people, with benzodiazepine or various standard antidepressants, get better.  And you usually are not thinking about the really aggressive treatment that you to[o] often do for people with, really, refractory MDD.

Tr. 304:9-16.  Considering whether Seroquel XR would be justified in the case of a patient non-responsive to a frontline therapy, Dr. Robinson continued, "But those are such an unusual group of patients that that's why I" voted no. Tr. 304:22-305:1.

258.    The FDA followed its Advisory Committee's recommendation and refused to approve Seroquel XR for treatment of GAD.

259.    Despite clear evidence that Seroquel XR was unsafe for the treatment of GAD, AstraZeneca nonetheless promoted it as a frontline monotherapy for that use, and in doing so misleadingly minimized the safety concerns that had made it a non-medically accepted use.  This misleading minimization of Seroquel XR's safety risks was critical to convincing physicians to prescribe it for treatment of GAD, since advisory boards that AstraZeneca conducted with both psychiatrists and primary care physicians confirmed that Seroquel XR's safety profile constituted physicians' primary objection to prescribing Seroquel XR for GAD.  Summarizing the advisory board members' opinions, the "XR Immersion Day" slide deck, dated July 8, 2008, states: "The efficacy of atypicals in treating the symptoms of depression and anxiety are accepted and well understood, but do not outweigh fear of the side effect profile and stigma of the class to treat a

85

broad set of patients. . . ."  The same slide also noted that primary care physicians were, relative to psychiatrists, "much more hesitant to prescribe atypicals to treat MDD and GAD."

260.    AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for promotion of symptoms of anxiety and GAD closely mirrored its promotion for MDD, in that rather than relying on clinical trials specific to anxiety or GAD, AstraZeneca's sales representatives selectively pulled symptoms from trials in other disease states, primarily bipolar disorder.  Sales representatives then promoted to physicians that Seroquel XR safely and effectively treated these symptoms of anxiety regardless of the context in which they manifested.

261.    A May 2008 slide deck titled "Successfully Selling SEROQUEL & SEROQUEL XR" instructed sales representatives how to demonstrate both drugs' effectiveness for treatment of various symptoms associated with anxiety: "Control of mood symptoms (depression, anxiety, agitation) associated with bipolar disorder are differentiation factors of SEROQUEL.   The following information from your approved promotional pieces can be used to describe the effect of SEROQUEL on these mood symptoms… Control of anxious symptoms in bipolar mania can be shown as improvement in irritability within YMRS since irritability can manifest in the form of anxiety.  Agitation can be a physician manifestation of inner tension and control of agitation in bipolar depression can be shown as improvement in inner tension within MADRS."

262.    Sales representatives used the graph on page 1356 of the Bolder I study, *see supra*, as evidence of Seroquel IR and Seroquel XR's effectiveness in reducing these MADRS symptoms.  They also cited the reduction in the Hamilton Anxiety Rating Scale (HAM-A) observed in the "Bolder II" study as evidence of the ability of Seroquel IR and Seroquel XR to treat symptoms of depression and GAD, even though Bolder II was a trial of bipolar depression.

133568.00601/36388526v.8

Michael E. Thase et al., *Efficacy of Quetiapine Monotherapy in Bipolar I and II Depression*, *A Double-blind, Placebo-controlled Study*, 26 J. Clinical Psychopharmacology 600 (2006).

263.    In early 2007, District Manager Yarbrough provided sales representatives in his district with a newsletter titled "Bipolar Network News," which he instructed them to use as part of their details to physicians to promote Seroquel XR off-label for the treatment of MDD and GAD.  The newsletter, the language of which was plainly promotional and makes almost no reference to side effects, summarized clinical trial posters presented at the meeting of the American College of Neuropsychopharmacology:

> Several studies were all positive for quetiapine monotherapy in unipolar depression.  In addition, there was a positive study of quetiapine in generalized anxiety disorder, with 150 mg and 300 mg/day both yielding better results than placebo. These data, taken along with studies on the monotherapy of bipolar depression, in which prominent antianxiety and pro sleep effects were observed with 300 mg and 600 mg compared to placebo, suggest that quetiapine has notable effects in anxiety symptomatology across several different diagnoses, from unipolar and bipolar depression to generalized anxiety disorder.

264.    Following the American Psychiatric Association annual meeting in May 2008, at which AstraZeneca presented a number of posters regarding Seroquel XR's use for the treatment of GAD, the Company distributed a "2008 APA Annual Meeting Review" to sales representatives, which included summaries of three clinical trials regarding use of Seroquel XR in GAD.  The review stated: "We are also focussing [sic] on our successful derailment of the symptoms of anxiety."  It continued: "The competitors are very busy 'chasing' us in the above mentioned areas.  They are not finding the same success as we have."

265.    AstraZeneca's promotion of Seroquel XR for treatment of GAD accelerated after this meeting when AstraZeneca provided sales representatives with copies of a poster summarizing the Bandelow poster, Borwin Bandelow et al., *Results from a phase III study of*

87

*once-daily extended release quetiapine fumarate (quetiapine XR) monotherapy in patients with*
*generalized anxiety disorder*, 13 Int'l J. Neuropsychopharmacology 305 (2010).   The poster
concluded that once-daily Seroquel XR at 50 mg or 150 mg per day was both effective and well
tolerated for treatment of symptoms of anxiety in patients with GAD.

266.   Bill Schneider, another sales representative in Relator's district, had obtained
copies of the Bandelow poster at the APA convention and provided copies to all of the other
sales representatives in the district.   They were directed by Steven Levandowski (the one-time
district sales manager for the Minnesota group who ultimately became Relator's regional sales
director) to use the Bandelow poster in their details to promote Seroquel XR off-label for
treatment of GAD.   The Bandelow poster had never been approved by the Company's Medical
Affairs department, and its use was completely off-label.

267.   During district meetings, sales representatives practiced promoting Seroquel XR
for treatment of GAD with a confidence and a brazenness that suggested the drug was FDA
approved for that use.

268.   In the July 2008 "XR Immersion Day" slide deck, AstraZeneca described
promotion for anxiety as a key component of AstraZeneca's strategy for Seroquel XR.   Under
the heading "'Natural' XR Position 2009," the slide deck included foremost among the benefits
of Seroquel XR, the "[s]ame efficacy and applicability by symptoms [as Seroquel IR;] Great fit
for bipolar, anxiety and depression with anxiety/psychosis."

269.   In late 2008, in anticipation of receiving FDA approval for treatment of GAD and
MDD, AstraZeneca added to sales representatives' call lists and sales quotas numerous primary
care physicians based on their prescribing of SSRI and SNRI antidepressants, which are used to
treat anxiety as well as depression.   When the FDA did not approve AstraZeneca's sNDA for

88

GAD in December 2008, however, AstraZeneca did not revise representatives' call lists and quotas to remove these physicians, but left them unchanged, requiring representatives to call on and drive sales among a group of physicians that did not treat patients for Seroquel IR and Seroquel XR's on-label uses, and certainly did not do so in a quantity commensurate with the aggressive quotas set by AstraZeneca. To meet their quotas, sales representatives were therefore forced to promote Seroquel XR for off-label uses, including GAD and symptoms of anxiety.

270. To bolster the off-label promotional details of its sales representatives, AstraZeneca also relied on a number of other tools to influence physicians to prescribe Seroquel XR for off-label treatment of GAD. These included paid promotional speakers, which are largely described *supra*, due to the substantial overlap in AstraZeneca's off-label promotions of Seroquel XR for MDD and GAD. *See* ¶¶ 229-241, *supra*.

271. In addition to the above-described promotional speakers, Dr. Thomas Winegarden, a child and adolescent psychiatrist from Chanhassen, Minnesota, spoke frequently on behalf of AstraZeneca in Minnesota and Iowa, regarding his off-label use of Seroquel XR in the treatment of GAD. AstraZeneca paid Dr. Winegarden approximately $1,500 per presentation. In Minnesota alone, according to data available from the State of Minnesota, during 2007 and 2008, Dr. Winegarden received $90,738 for 73 speaker programs at which he regularly gave unsolicited information about using Seroquel XR off-label for the treatment of GAD.

272. To cause health care professionals to prescribe Seroquel XR for treatment of GAD, AstraZeneca also leveraged low-dose product samples, which were dosed appropriately only for off-label uses. *See* ¶¶ 242-243, *supra*.

133568.00601/36388526v.8

273.    Scott Eastin, M.D., is a psychiatrist with the Mercy-Franklin group in Des Moines.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner promoted Seroquel IR and Seroquel XR to Dr. Eastin by, among other things, delivering low-dose samples.  As a result of AstraZeneca's off-label promotion, Dr. Eastin's prescribing of Seroquel IR and Seroquel XR increased.  Approximately 50 percent of Dr. Eastin's prescriptions were off-label for anxiety.  As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 157 claims resulting from prescriptions written by Dr. Eastin for Seroquel IR and 69 claims resulting from prescriptions written by him for Seroquel XR, approximately 50 percent of which were off-label for the treatment of GAD.

274.    AstraZeneca proactively solicited PIRs from, and sent responses to, the following physicians in order to promote Seroquel IR and Seroquel XR for the treatment of GAD:

| | | |
|---|---|---|
| Feb. 20, 2008 | Charles Wadle, MD | Des Moines, IA |
| Jan. 18, 2008 | Michael Taylor, MD | Des Moines, IA |
| Jan. 22, 2008 | J. Patrick Bertroche, DO | Clive, IA |
| Sept. 4, 2009 | Michael Corsberg, PA | Manson, IA |
| Mar. 28, 2008 | Randall Kavalier, DO | West Des Moines, IA |
| Feb. 8, 2008 | Michael Corsberg, PA | Fort Dodge, IA |

275.    By promoting Seroquel IR and Seroquel XR for the off-label treatment of symptoms of anxiety and GAD, AstraZeneca successfully caused physicians to prescribe both drugs for these off-label uses.  Reliable indicia that such promotion caused the submission of false claims came from AstraZeneca's own materials.  The "XR Immersion Day" slide deck showed that as of July 8, 2008, GAD constituted 5% of Seroquel IR use and 4% of Seroquel XR use.  The slide deck also showed that 26% of GAD prescriptions were paid by Medicare and

90

16% by Medicaid. The way in which AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for treatment of MDD caused the submission of false claims to Government Programs is described in detail in ¶¶ 510-537, *infra*.

3. **Behavioral Symptoms in Elderly Patients with Dementia**

276. In another continuation of its earlier violative promotion of Seroquel IR, AstraZeneca persisted in promoting Seroquel IR and, subsequently, Seroquel XR for the treatment of behavioral disturbances in elderly patients with dementia, including psychosis, depression, aggression, anxiety, and sundowning. This continued off-label promotion was even more egregious than AstraZeneca's earlier off-label promotion, given the availability of new evidence that demonstrated Seroquel IR was not only ineffective for these uses, but that it also increased elderly patients' risk of death.

277. Under government scrutiny, AstraZeneca eliminated the most visible facets of its off-label promotion of Seroquel IR for behavioral symptoms in elderly patients with dementia by renaming its long-term care ("LTC") sales force and by ceasing to call on nursing homes and institutional pharmacies. Sales representatives, however, continued to call on geriatricians, neurologists, and geriatric psychiatrists, including ones who, while maintaining a private practice, also covered the nursing homes on which AstraZeneca's LTC sales force had previously called directly. AstraZeneca referred to this as the "outside-in" approach.

278. And while AstraZeneca eliminated LTC facilities and LTC pharmacy providers (who contract with LTC facilities to supply pharmacy services) from sales representatives' call lists, both remained included in sales quotas, incentivizing sales representatives and their managers to make effective use of the outside-in approach to drive LTC use, which was almost entirely off-label. A slide deck titled "CNS Specialty Care Q1 & Q2 2009 FSIP Design[:] Incentives & Objectives" shows that LTC retail sales were included together with standard retail

91

sales and accounted for 70% to 100% of representatives' quotas.   Non-retail LTC pharmacy providers accounted for 10% to 15%, depending on precisely how district and regional managers chose to weight the respective categories.

279.    AstraZeneca professed to block from sales representatives' call lists physicians "who write a significant amount of off-label prescriptions," including "LTC Physicians," "Neurologists," and "Child & Adolescent Psychiatrists."   A caveat, however, specified that not all physicians in the specialties are blocked.   In practice, the exception swallowed the rule.   Until AstraZeneca began to remove neurologists from call lists, AstraZeneca continued to target most high-prescribing geriatric psychiatrists and neurologists despite knowing that they did not treat patients for Seroquel IR or Seroquel XR's on-label uses.   To these physicians, AstraZeneca continued to promote Seroquel IR and later Seroquel XR as effective for treatment of behavioral disturbances associated with dementia.

280.    The FDA-approved Prescribing Information for Seroquel IR and Seroquel XR contains black box warnings against the use of both drugs in elderly patients with dementia under the heading "INCREASED MORTALITY IN ELDERLY PATIENTS WITH DEMENTIA" (emphasis in original).   The warning specifically states that "[e]lderly patients with dementia-related psychosis treated with antipsychotic drugs are at an increased risk of death.   SEROQUEL XR is not approved for elderly patients with dementia-related psychosis." The FDA required AstraZeneca and other manufacturers of atypical antipsychotics to add this warning on April 11, 2005, after an

> [a]nalysis of 17 placebo-controlled trials … revealed a risk of death in drug-treated patients of between 1.6 to 1.7 times the risk of death in placebo-treated patients.   Over the course of a typical 10-week controlled trial, the rate of death in drug-treated patients was about 4.5% compared to a rate of about 2.6% in the placebo group.   Although the causes of death were varied, most of the

deaths appeared to be either cardiovascular (e.g., heart failure, sudden death) or infectious (e.g., pneumonia) in nature.

281.   The weight of evidence militating against use of Seroquel IR and Seroquel XR for treatment of behavioral symptoms in elderly patients with dementia increased further when, on October 12, 2006, the New England Journal of Medicine published a study concluding that atypical antipsychotics, including Seroquel IR, were not only unsafe, but also ineffective for this use.  The abstract summarized:  "Adverse effects offset advantages in the efficacy of atypical antipsychotics drugs," including Seroquel IR, "for the treatment of psychosis, aggression, or agitation in patients with Alzheimer's disease."  Lon S. Schneider et al., *Effectiveness of Atypical Antipsychotic Drugs in Patients with Alzheimer's Disease*, 355 New Eng. J. Med 1525, 1525 (2006).

282.   This double-blind, placebo-controlled study included 421 patients with Alzheimer's disease and psychosis, aggression, or agitation, who were randomized to receive Seroquel IR, Zyprexa, Risperdal, or placebo.  Of the 94 patients assigned to receive Seroquel IR, 82% discontinued treatment within 36 weeks—53% for lack of efficacy, 16% for intolerability, and 13% for other reasons.  *Id.* at 1530-31.  The mean times to discontinuation of treatment due to lack of efficacy, a surrogate measure for comparing efficacy, were 9.1 weeks in the Seroquel IR group compared to 9.0 weeks in the placebo group, a statistically insignificant difference signaling that Seroquel IR was no more effective than placebo.  *Id.* at 1531.  Moreover, the mean times to discontinuation for any reason were 5.3 weeks in the Seroquel IR group compared to 8.0 weeks in the placebo group, signaling that Seroquel IR was worse tolerated than placebo.  *Id.*

283.   Despite the addition of this black box warning and evidence of Seroquel IR's ineffectiveness, however, AstraZeneca continued its promotion of Seroquel IR and later Seroquel XR for off-label treatment of behavioral disturbances in elderly patients with dementia.  While

93

AstraZeneca sent sales representatives an e-mail notifying them of the addition of the black box, its promotional message remained the same. Undaunted, at district meetings following the addition of the black box, Relator and other sales representatives in her district practiced role play exercises during which they promoted Seroquel IR as effective for the treatment of symptoms associated with dementia, including psychosis.

284.     Rather than relying on clinical trials specific to the off-label uses for which AstraZeneca was promoting Seroquel IR and Seroquel XR, since those trials were overwhelmingly negative, AstraZeneca's promotion for behavioral disturbances in the elderly pulled from its promotion for off-label uses in non-elderly adults, highlighting specific symptoms that Seroquel IR or Seroquel XR had effectively addressed in patients taking the drugs for their on-label uses. For example, AstraZeneca promoted that the safety and efficacy of Seroquel IR and Seroquel XR for the treatment of agitation in elderly, non-bipolar adults based on the drugs' success reducing the individual MADRS symptom of inner tension in bipolar depression trials.

285.     To minimize concerns raised by physicians regarding the dangers of Seroquel IR and Seroquel XR in treating the elderly, AstraZeneca emphasized the need to "go low and slow"—i.e., to start at a low dose and gradually titrate up—when prescribing Seroquel IR or Seroquel XR for elderly patients. Doing so, AstraZeneca claimed, would mitigate the risk of adverse events, which it told doctors generally occurred because the drugs had been initiated at too high a dose or the dose had been increased too quickly. There was no reliable support for this assertion, but by falsely instructing physicians that they could avoid the serious safety risks of Seroquel IR and Seroquel XR through cautious dosing, AstraZeneca convinced physicians to

133568.00601/36388526v.8

prescribe the drugs for off-label uses for which they otherwise would not have out of concern for their patients' safety.

286.   AstraZeneca also sought to overcome physicians' objections to prescribing Seroquel IR and Seroquel XR due to their known association with weight gain and diabetes by falsely telling physicians that the drugs were "weight neutral," which sales representatives explained meant that they pushed patients toward their natural weight, causing underweight patients to gain weight and overweight patients to lose weight.  As such, Seroquel IR and Seroquel XR actually provided a benefit to underweight geriatric patients, AstraZeneca claimed. No reliable evidence, however, supported these claims—either that Seroquel IR or Seroquel XR was "weight neutral," or that weight gain conferred a clinical benefit.

287.   Sales representatives' call lists for both Seroquel IR and Seroquel XR included physicians and other health care professionals who treated the elderly but had minimal or no occasion to treat patients for the on-label indications for Seroquel IR and Seroquel XR, including geriatricians such as Dr. John Larson of Des Moines, Iowa, whom AstraZeneca included on Relator's March 2010 call list.  Even for geriatricians who may have treated a small portion of patients being treated for the drugs' approved indications, the quotas and bonus targets that AstraZeneca set for sales representatives necessitated that they promote well beyond those on-label populations.  AstraZeneca's sales force was instructed to (and did) promote Seroquel XR off-label to these physicians for the treatment of behavioral symptoms in the elderly, including agitation, aggression, psychosis, and inability to sleep.

288.   AstraZeneca also required sales representatives to call on and drive sales among neurologists, another physician specialty that did not treat patients for Seroquel IR or Seroquel XR's approved indications, but whom AstraZeneca sought to influence to prescribe the drugs

95

off-label for treatment of psychosis and sundowning.  These conditions are Parkinson's disease symptoms for which neurologists frequently prescribed the drug levodopa.  Though AstraZeneca purported also to call on these physicians to promote the migraine drug Zomig, which CNS sales representatives also carried, AstraZeneca's primary purpose in calling on neurologists was to promote Seroquel IR and later Seroquel XR off-label for treatment of behavioral symptoms in elderly patients, including those suffering from Parkinson's disease.  AstraZeneca's insistence on inclusion of neurologists in sales representatives' sales quotas predictably forced sales representatives to promote Seroquel IR and, later, Seroquel XR off label for treatment of Parkinson's symptoms.

289.    Studies (including randomized controlled testing) were conducted at least through 2009 that investigated Seroquel's efficacy in treating psychosis in Parkinson's patients, and whether it reduced drug induced dyskenisia that has been associated with other typical Parkinson's therapies.  Despite the fact that studies failed to show any demonstrable benefit in treating agitation or psychosis in Parkinson's patients, AstraZeneca continued to require sales representatives to call on neurologists to promote Seroquel IR and later Seroquel XR off-label for use in treating these symptoms in Parkinson's patients.  *See, e.g.,* Roger Kurlan et al., *Quetiapine for agitation or psychosis in patients with dementia and parkinsonism*, 68 Neurology, 1356-1363 (2007); William G. Ondo, et al., *Double-blind, placebo-controlled, unforced titration parallel of quetiapine for dopaminergic-induced hallucinations in Parkinson's disease. 20 Movement Disorders*, 958–963 (2005); Paul Shotbolt, et al., *A randomized controlled trial of quetiapine for psychosis in Parkinson's disease.*, 5 J. of Neuropsychiatric Disease & Treatment, 327-332 (2009).  The Ondo study was in fact funded by AstraZeneca.

290.     The sales quotas that AstraZeneca set for neurologists far outstripped their small numbers of on-label patients who purportedly justified the neurologists' inclusion on sales representatives' call lists.   The leadership did not address how it justified representatives' sales objectives, which far exceeded the on-label population that sales representatives were supposedly targeting.

291.     To further the effects of its off-label promotion, AstraZeneca provided numerous samples of Seroquel IR and Seroquel XR to geriatricians, geriatric psychiatrists, and neurologists who AstraZeneca knew did not prescribe Seroquel IR or Seroquel XR on-label.   Moreover, the low, 25 and 50 mg doses of samples that AstraZeneca provided were unsuitable for on-label use, but were the doses that geriatric physicians and neurologists prescribed to elderly patients for treatment of behavioral symptoms and sleep.   These samples caused physicians to prescribe Seroquel IR and Seroquel XR for off-label use in the way described in ¶¶ 242-246, *supra*. Examples of specific physicians whom AstraZeneca knowingly caused to prescribe Seroquel IR and Seroquel XR off-label through the provision of samples are described in ¶¶ 273-274, *infra*.

292.     Paid promotional speakers served as critical contributors to AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR as safe and effective for treatment of behavioral symptoms in the elderly.   On March 14, 2007, District Manager Doug Yarbrough sent an e-mail to sales representatives in his district recommending a number of regional speakers for use during representatives' programs.   The list included Dr. Kevin Mays, a geriatric psychiatrist from Leawood, Kansas, who Yarbrough recommended as "put[ting] side effects in a positive light."

293.     On October 14, 2009, Dr. Michael Ishii of Sun Prairie, Wisconsin, gave a speaker program to several psychiatrists at Mercy Psychiatric Services, Des Moines, Iowa, and later that

97

day gave a talk at Freedom House, in Iowa Falls, Iowa (a mental health and substance abuse hospital that treats a large volume of Medicaid patients), where he proactively promoted, without prompting from the audiences, Seroquel XR as safe and effective for the treatment of sundowning.  Dr. Ishii also claimed that Seroquel XR effectively reduced the number of falls experienced by elderly patients.  Neither of Dr. Ishii's claims that Seroquel XR was safe and effective for sundowning or reducing falls in the elderly was supported by reliable evidence.

294.   Dr. Michael Farnsworth, a forensic psychiatrist from Mankato, Minnesota, also spoke frequently on behalf of AstraZeneca in Minnesota and Iowa regarding his off-label use of Seroquel XR in the treatment of behavioral symptoms in the elderly.  From 2007 through 2010, AstraZeneca paid Dr. Farnsworth $123,470 in compensation and expenses for promotional programs, during which he often promoted Seroquel XR as safe and effective for treatment of behavioral disturbances in the elderly.

295.   Dr. Dean Knudson of Minneapolis, Minnesota, also spoke frequently on behalf of AstraZeneca in Minnesota and Iowa regarding his off-label use of Seroquel XR in the treatment of the elderly.  AstraZeneca paid Dr. Knudson approximately $1,500 per presentation.  From 2007 through 2010, AstraZeneca paid Dr. Knudson $193,402 for 124 speaker programs where he regularly promoted Seroquel XR off-label for the treatment of behavioral disturbances in the elderly.

296.   AstraZeneca's promotion of Seroquel IR and Seroquel XR for treatment of behavioral symptoms in the elderly was successful in causing physicians to prescribe both drugs for this off-label use.  Given the predominance of Medicare coverage among the geriatric population that AstraZeneca targeted, the resultant claims were paid disproportionately by Medicare Part D.

297.    Theodore Liautaud, D.O. was a psychiatrist practicing in Lake View, Iowa. Approximately 90 percent of Dr. Liautaud's patients were elderly.  Between 2006 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner promoted Seroquel IR and Seroquel XR to Dr. Liautaud for treatment of behavioral symptoms in sundowning patients and for agitation in elderly patients.  Relator and her sales partner invited Dr. Liautaud to speaker programs, including some presented by Dr. Jennisch, and to peer-to-peer programs, and provided him with low-dose samples of Seroquel XR.  As a result of AstraZeneca's off-label promotion, Dr. Liautaud's prescribing of Seroquel IR and Seroquel XR significantly increased.   A significant portion of these prescriptions were for treatment of sundowning and agitation.  As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 883 claims resulting from prescriptions written by Dr. Liautaud for Seroquel IR and 501 claims resulting from prescriptions written by him for Seroquel XR, a significant number of which were for the off-label treatment of sundowning and agitation.

298.    Sang O. Lee, M.D., is a psychiatrist practicing in Fort Dodge, Iowa. Approximately 50 percent of Dr. Lee's patients were elderly.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner promoted Seroquel IR and Seroquel XR to Dr. Lee for anxiety, depression, and use in elderly patients.  Relator and her sales partner arranged peer-to-peer programs and provided low-dose samples of Seroquel XR.  As a result of AstraZeneca's off-label promotional activities, Dr. Lee's prescribing of Seroquel IR and Seroquel XR increased.  A significant portion of these prescriptions were for off-label uses for anxiety and depression and use in elderly patients.   As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 188 claims resulting from prescriptions written by Dr. Lee for Seroquel IR, a significant number of which were for off-label use.

133568.00601/36388526v.8

299.    Timothy Morgan, M.D., is a general practice physician practicing in Glenwood, Iowa.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner promoted Seroquel IR and Seroquel XR to Dr. Morgan for calming in elderly patients.  As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 184 claims resulting from prescriptions written by Dr. Morgan for Seroquel IR, a significant number of which were for off-label use.

300.    Waynella Runcie is an advanced registered nurse practitioner with the Mercy-Franklin mental health group in Des Moines.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner met regularly with Ms. Runcie and the entire Mercy-Franklin mental health group, and provided a standing lunch order on a regular basis.  Ms. Runcie regularly prescribed Seroquel IR and Seroquel XR for off-label uses, including for use in elderly patients.  As a result of AstraZeneca's off-label promotion, during 2011, Medicare Part D paid 159 claims resulting from prescriptions written by Ms. Runcie for Seroquel IR, a significant number of which were for off-label use in elderly patients.

301.    Lynn Struck, M.D., is a neurologist practicing in Des Moines.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner promoted Seroquel IR and Seroquel XR to Dr. Struck anxiety, pain, Parkinson's Disease, and sleep problems in elderly patients.  Relator's promotional activities included regular sales calls and provision of low-dose samples.  As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 113 claims resulting from prescriptions for Seroquel IR written by Dr. Struck, virtually all of which were for off-label uses.

302.    Dale Grunewald, D.O., is a family practitioner in West Des Moines, Iowa.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales

partner assisted sales representatives focused on family practitioners in promoting Seroquel IR and Seroquel XR to Dr. Grunewald for use in elderly patients. Relator's promotional activities included regular sales calls and provision of low-dose samples. As a result of AstraZeneca's off-label promotion, during 2011 Medicare Part D paid 663 claims resulting from prescriptions for Seroquel IR written by Dr. Struck, virtually all of which were for off-label uses.

4. Behavioral Disturbances and Developmental Disorders in Children and Adolescents

303. AstraZeneca promoted pediatric use of Seroquel IR and Seroquel XR not just for uses that were approved only in adults, but also for uses that were approved in neither adults nor pediatric patients, such as treatment of behavioral disturbances and developmental disorders. In effect, AstraZeneca's promotion to pediatric psychiatrists was an extension of its off-label promotional campaign to adult psychiatrists, and the uses for which AstraZeneca promoted Seroquel IR and Seroquel XR were therefore doubly off-label—lacking approval for both the conditions themselves as well as the pediatric patient population in which AstraZeneca promoted them.

304. Off-label use of atypical antipsychotics among children and adolescents has exploded despite the lack of research into their safety and effectiveness for these uses and in this population. Dr. Ronald Brown, who headed an American Psychiatric Association committee that evaluated the issue, put it succinctly: "The bottom line is that the use of psychiatric medications far exceeds the evidence of safety and effectiveness." Tori DeAngelis, *Should our children be taking psychotropics?* 35 Monitor on Psychol. 42 (2004).

305. The Chairman of the DSM-IV Task Force, Dr. Allen Frances, attributed the excessive prescribing of antipsychotics for pediatric use to the influence of drug manufacturer promotion, writing that "[w]hen the adult market [in psychotropic drugs] seemed saturated, the

drug companies expanded their customer demographics by pushing product onto children—it is not by accident that all the recent epidemics of psychiatric disorder have occurred in kids.  And children are particularly choice customers—bring them on board early, and you may have them for life."  Allen Frances, M.D., *Saving Normal:  An Insider's Revolt Against Out-of-Control Psychiatric Diagnosis, DSM-5, Big Pharma, and the Medicalization of Ordinary Life* 95 (2013).

306.    The brunt of this questionable prescribing is disproportionately borne by lower-income children.  Recent federally funded research revealed a stark disparity:  children covered by Medicaid are prescribed antipsychotics at a rate four times higher than children covered by private insurance.  Duff Wilson, *Poor Children Likelier to Get Antipsychotics*, N.Y. Times, Dec. 9, 2009, *available at* http://www.nytimes.com.  Moreover, Medicaid-covered children are more likely to receive the drugs for less-severe conditions than their middle-class counterparts, the data showed.  *Id.*

307.    AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for pediatric patients was particularly troubling given both that the safety and efficacy of the uses for which AstraZeneca promoted the drugs had not been established, and the evidence that does exist suggests that pediatric patients taking Seroquel IR and Seroquel XR bear an even greater risk of adverse events than do adult patients.  Seroquel IR and Seroquel XR both contain black box warnings that the drugs are associated with an "[i]ncreased risk of suicidal thoughts and behavior in children, adolescents and young adults," and that patients should be "[m]onitor[ed] for worsening and emergence of suicidal thoughts and behaviors."

308.    The Prescribing Information for Seroquel IR also states that "[i]ncreases in systolic and diastolic blood pressure occurred in children and adolescents and did not occur in adults."

102

309.     AstraZeneca, however, sought to minimize the significance of the risk of adverse events in children, just as it did in adults.  *See ¶¶ 148-172, supra*.  AstraZeneca also specifically sought to minimize the risk of suicidality by telling physicians that "[s]uicidal thoughts were significantly improved by the end of the first week."   That claim, however, relied on a retrospectively-defined endpoint from a single bipolar depression trial that did not include *any* pediatric patients—i.e., those to whom the warning specifically pertains.  Joseph R. Calabrese et al., *A Randomized, Double-Blind, Placebo-Controlled Trial of Quetiapine in the Treatment of Bipolar I or II Depression*, 162 Am. J. Psychiatry 1351, 1352 (2005).  The size of the Bolder I study was entirely inadequate to assess the prevalence of this relatively rare adverse event.  More importantly, the Prescribing Information itself recognizes that there was no increase in suicidality in patients older than 24, making data from the Bolder I study inapposite to assessing Seroquel IR's risk of increasing suicidality in children and adolescents.  Thus, AstraZeneca's use of the Bolder I study to deny a significant risk of suicidality among children and adolescents was both materially false and misleading.

310.     AstraZeneca had long promoted Seroquel IR for off-label use in pediatric patients even before Seroquel IR was approved for *any* pediatric use.  From January 1, 2007 until AstraZeneca ceased promotion of Seroquel IR to focus exclusively on Seroquel XR, sales representatives received call lists for Seroquel IR that included pediatric psychiatrists who, by definition, could not prescribe Seroquel IR for any on-label use.  Nonetheless, the structure of sales representatives' quotas, *see ¶¶ B-140, infra*, necessitated that they call on these pediatric psychiatrists as well as promote Seroquel IR for off-label use to them.

311.     As part of their sales details, AstraZeneca's sales representatives regularly provided health care professionals with reprints of research studies funded by AstraZeneca that

purported to support pediatric use of Seroquel IR. The two studies most frequently used by AstraZeneca to promote Seroquel IR and, later, Seroquel XR for off-label pediatric use were conducted by paid AstraZeneca consultant Dr. Melissa DelBello, who not only received significant research monies from AstraZeneca, but also served as a paid speaker, promoting Seroquel IR and Seroquel XR for off-label pediatric use throughout the United States. In fact, DelBello received such a substantial quantity of money from AstraZeneca that Senator Charles Grassley of Iowa used her as an example in a speech he gave on the Senate floor, during which he criticized DelBello for misleadingly concealing the extent of money that AstraZeneca had paid her while she promoted Seroquel IR. Sarah Rubenstein, *Sen. Grassley Knocks Psychiatrist's Funding from AstraZeneca*, *Wall Street Journal Health Blog*, April 7, 2008, http://blogs.wsj.com/health/2008/04/07/sen-grassley-knocks-psychiatrists-funding-from-astrazeneca/?mod=WSJBlog.

312.    In one study, Melissa P. DelBello et al., *A double-blind, randomized, placebo-controlled study of quetiapine as adjunctive treatment for adolescent mania*, 41 J. Am. Acad. Child & Adolescent Psychiatry 1216 (2002), Dr. DelBello compared the effectiveness of Depakote monotherapy versus Seroquel IR plus Depakote, for the treatment of bipolar mania in adolescents. Although at study end the Seroquel group averaged better on a standard measure of mania, by that point almost half of the Seroquel group had dropped out of the study—generally a sign of inefficacy or safety concerns—while the Depakote monotherapy group remained at nearly full force. Such discrepant dropout rates between treatment groups are highly problematic because they raise the possibility that those who dropped out were those who experienced the least efficacy, meaning those who remain for analysis at study end give a misleadingly positive estimate of the study drug's efficacy. In this case, the dropout rates were

so discrepant, and the possibility of systematic bias so considerable, that the study's conclusion was essentially meaningless. Even Dr. DelBello later acknowledged that the study was not conclusive. In the paper published in 2002, however, she touted Seroquel in combination with Depakote as "more effective for the treatment of adolescent bipolar mania" than Depakote alone, *id.*, a line echoed by AstraZeneca's sales representatives without caveat in their promotions throughout the United States.

313.     The focus of AstraZeneca's off-label promotion of Seroquel IR for pediatric use, however, was *not* on schizophrenia and bipolar mania, the indications for which it eventually received FDA approval; rather, its off-label promotion mirrored that in adults, focusing on behavioral symptoms, thereby expanding physicians' use of Seroquel IR well beyond the realms of schizophrenia and bipolar disorder. Even following Seroquel IR's approval in December 2006 for the treatment of schizophrenia and bipolar mania in pediatric patients, AstraZeneca continued to base its pediatric promotion of Seroquel IR around symptoms and to promote Seroquel IR for the treatment of general behavioral disturbances, because Seroquel IR's on-label markets remained small compared to the quantity of sales that AstraZeneca sought and demanded that its sales representatives generate. Seroquel IR's pediatric approvals were more valuable to AstraZeneca as concealment for its off-label promotion than they were sales of the on-label uses themselves.

314.     Following the launch of Seroquel XR in 2007, AstraZeneca promoted Seroquel XR for off-label pediatric use in precisely the manner it had promoted Seroquel IR, by promoting it for the treatment of general symptoms and behavioral disturbances. Seroquel XR, however, was not approved for *any* pediatric use until April 30, 2013. When AstraZeneca began to focus its promotion of Seroquel XR in adults on off-label treatment of MDD and GAD, it used those

105

same studies and same promotional messages to promote Seroquel XR for the treatment of MDD and GAD in children and adolescents.

315.   Even while promoting Seroquel XR as effective for treatment of depression in pediatric patients based on off-label MDD studies conducted in adults, however, AstraZeneca misleadingly concealed from physicians that it had already conducted a failed study of Seroquel XR to treat bipolar depression in pediatric patients aged 10 to 17 years.  That study, which is described in sections 8.4 of the Prescribing Information for both Seroquel IR and Seroquel XR, included nearly 200 patients, but showed no difference in effectiveness between Seroquel XR and placebo.   The Seroquel XR Prescribing Information notes that the children enrolled nonetheless experienced significant adverse events including "metabolic changes, weight gain, increases in blood pressure and increases in heart rate…."  AstraZeneca failed to discuss this study with its sales representatives, who, as a result, failed to disclose it to physicians and instead continued to promote Seroquel XR misleadingly as effective for treatment of pediatric depression without reference to it, as the Company had trained them.

316.   The FDA's approval of Seroquel IR for pediatric use legitimized AstraZeneca's promotion of Seroquel IR to pediatric psychiatrists (which it had already been doing for years), even though it did not legitimize AstraZeneca's continued off-label promotion for other uses. When AstraZeneca began to promote exclusively Seroquel XR, however, and to rate sales representatives' performance based only on their sales of Seroquel XR, AstraZeneca no longer had a legitimate reason to call on child psychiatrists.  Of course, it continued to do so.  From the launch of Seroquel XR in July 2007, sales representatives had numerous child psychiatrists on their call lists, and these child psychiatrists remained on sales representatives' call lists even after AstraZeneca began promoting Seroquel XR exclusively.

133568.00601/36388526v.8

317.    When Relator and her sales partner objected to the continued inclusion of child psychiatrists on their call lists, their district manager told them to be quiet and promote Seroquel XR to them as they had been instructed. Although AstraZeneca announced in July 2008 that child and adolescent psychiatrists designated as such by the American Medical Association would be deleted from the quota and credit programs, it never actually did so.

318.    In 2010, AstraZeneca reversed its position and claimed that a third-party vendor had determined that the child psychiatrists on sales representatives' call lists actually did treat adults.  This was, based on Relator's years of experience promoting to these child psychiatrists, plainly ridiculous.   The absurdity of AstraZeneca's purported rationale for allowing this promotion—that these child psychiatrists occasionally treated an adult patient—was made clear by AstraZeneca's instructions to sales representatives to promote Seroquel XR specifically for pediatric, not adult, use (e.g., based on the DelBello studies).

319.    Of Relator's top 20 highest prescribing physicians on her call list, eight were child psychiatrists.  On July 16, 2009, Relator sent an e-mail to Arthur McCarthy, an AstraZeneca senior compliance manager, listing the child psychiatrists who she had requested be removed from her call list, and explaining her belief that the prevalence of these child psychiatrists on her call lists had been a key impetus of Yarbrough's insistence that she use another off-label DelBello article, discussed *infra*, to promote Seroquel XR for the treatment of pediatric behavioral disturbances.  AstraZeneca nonetheless refused to remove these physicians from her call list, ignoring her compliance concern.

320.    In January 2008, District Manager Doug Yarbrough directed Relator and her sales partner to use a second AstraZeneca-funded DelBello study to promote Seroquel XR for the treatment of behavioral disturbance in children and adolescents.  *See* Melissa DelBello, *A 12-*

*Week Single-Blind Trial of Quetiapine for the Treatment of Mood Symptoms in Adolescents at High Risk for Developing Bipolar I Disorder*, 68 J. Clinical Psychology 789 (2007).  The study, which lacked a placebo comparator, concluded that Seroquel IR "may be an effective treatment for mood symptoms in adolescents with a familiar risk for developing bipolar I disorder."  *Id.* The study was thus completely off-label and, moreover, inadequate to make such claims.

321.   Yarbrough nonetheless directed Relator to contact a sales representative in Minnesota, who along with other sales representatives in his district had had success using this DelBello study to promote Seroquel XR for off-label pediatric use.  Minnesota had been part of the district for which Steve Levandowski was responsible before he was promoted to regional sales manager, and, as Relator learned when a number of Minnesota sales representatives joined her district as part of a realignment, Levandowski had made off-label promotion the centerpiece of Minnesota's promotion of Seroquel IR, and later Seroquel XR.   Minnesota's sales representatives' use of the DelBello study to promote Seroquel XR off-label provides further evidence of the nationwide scope of AstraZeneca's fraudulent scheme.

322.   In addition, sales representatives experienced a disturbing pressure and direction from corporate leadership to promote Seroquel XR off-label for use in children and adolescents, including pressure and direction to market directly to child and adolescent psychiatrists, and to sell competitively against drugs like Abilify, a medication that was actually indicated for use in children and adolescents.  This off-label promotion for child and adolescent use was performed using many of the same tactics as AstraZeneca's other illegal marketing schemes, including using symptomology to promote for MDD and other behavioral issues in children.

323.   AstraZeneca pursued a marketing scheme to "blunt Abilify" and market off-label for use in children and adolescents.  Despite Abilify possessing indications for patient groups,

like children and adolescents, and in disease states where Seroquel XR did not have a corresponding indication, AstraZeneca used Abilify's sales numbers as both a target and a measuring stick for its own sales force.  Prescribers' Abilify prescription volume, as well as their prescriptions of SSRIs and SNRIs which were also indicated for use in children, were used to create the call plans to which AstraZeneca sales representatives were held accountable.   In creating the calls plans, AstraZeneca did not take into account that these drugs had indications that were different from and in addition to those possessed by Seroquel XR.   If a sales representative was not effective in meeting arbitrary goals set by the Company, utilizing in its calculations prescriptions for Abilify and other drugs that would be off-label if a doctor were to write Seroquel XR instead, then the sales representative could be subject to decreases in pay, reprimands, or even termination.  Again, a significant portion of Abilify prescriptions would be, by definition, off-label for Seroquel XR, including for use in children and adolescents.  Using this system, AstraZeneca was able to force its representatives to market off-label for use in children and adolescents.

324.    But AstraZeneca did not merely set the bar so high that sales representatives were systematically forced to market off-label for pediatric use or face consequences.  AstraZeneca also specifically directed its employees to market to physicians like child and adolescent psychiatrists, knowing full well that virtually all Seroquel XR prescriptions written by those doctors would be off-label.

325.    By May of 2009, AstraZeneca had begun to label high volume Abilify prescribers as "offenders," and designated them as high-value targets for its sales force.  This was sometimes known as the "Targeted 10 Initiative."

133568.00601/36388526v.8

326.    AstraZeneca continued a practice of holding its DSMs and their teams accountable for calling on child and adolescent psychiatrists, and for gaining market share and prescription volume in those physicians' off-label patient demographics.

327.    Despite AstraZeneca District Sales Managers and the AstraZeneca sales force being told at some time in 2009 that certain speakers were being made ineligible to continue speaking for the Company due to their specialty area, such as child and adolescent psychiatrists, child and adolescent psychiatrists remained on call plans, and DSMs and sales representatives were held accountable to make calls on them and increase their prescription of Seroquel XR.

328.    To supplement sales representatives' promotions, AstraZeneca leveraged PIRs to disseminate further information about off-label uses to physicians.  Although PIRs are officially intended to be a means for AstraZeneca to respond in a non-promotional manner to unsolicited physician requests for off-label information about its drugs, AstraZeneca's sales representatives actively solicited physicians' requests for information to promote Seroquel IR and Seroquel XR for off-label uses.

329.    In one example of PIR misuse, on January 8, 2007, AstraZeneca sent a PIR response to Dr. J. Patrick Bertroche, regarding use of Seroquel IR in children and adolescents. As she had been directed to do, Relator proactively solicited the PIR from Dr. Bertroche, and it was therefore promotional in nature.  The PIR response recommended Seroquel IR as effective for off-label uses including treatment of psychotic disorders, developmental disorders, conduct disorders, Tourette's disorder, and posttraumatic stress disorder, all in adolescents and children.

330.    On March 28, 2008, AstraZeneca sent another PIR response to Dr. Randall Kavalier regarding off-label use of Seroquel XR for treatment of MDD and GAD in children and adolescents.  Again, as she had been directed to do, Relator had proactively solicited the PIR

133568.00601/36388526v.8

from Dr. Kavalier, and it was therefore promotional in nature.  The PIR response recommended

the off-label use of Seroquel XR to treat MDD and GAD.  Because Dr. Kavalier was a pediatric

psychiatrist, the response constituted not only off-label promotion of Seroquel XR for MDD and

GAD, but also off-label promotion for these uses in children and adolescents.

331.    While sales representatives played an important role in AstraZeneca's off-label

promotion of Seroquel IR and Seroquel XR for pediatric use, increased government scrutiny in

connection with AstraZeneca's negotiation of the Seroquel IR settlement agreement meant that

paid speakers became an increasingly important off-label promotional tool, particularly with

respect to Seroquel XR.  Although paid speakers were subject to the same legal requirements to

limit their promotional presentations to on-label uses as AstraZeneca's sales representatives

were, AstraZeneca apparently believed that speakers were, as a practical matter, less likely to get

caught, since attending physicians would be more likely to report an objectionable off-label

message delivered by a sales representative than one delivered by a physician colleague.

332.    Pediatric psychiatrists delivering paid promotional presentations officially

adhered to the same on-label, adult slide deck as did other promotional speakers.  In practice,

however, they discussed, without exception, their own use of Seroquel IR or Seroquel XR in

pediatric patients and recommended Seroquel IR and Seroquel XR for off-label pediatric use.

Moreover, the very reason that sales representatives chose these pediatric psychiatrists to

repeatedly return as speakers was that they would promote Seroquel IR and Seroquel XR for off-

label pediatric use and thereby grow off-label prescribing.

333.    Although AstraZeneca's policies required sales representatives to report in a post-

event form if a speaking event had included off-label promotion, sales representatives and their

managers never actually did so.  Despite having attended innumerable speaker programs at

133568.00601/36388526v.8

which the speaker proactively promoted off-label uses of Seroquel IR or Seroquel XR, many of them attended by her manager as well, neither Relator nor her manager reported that any of these events had included off-label promotion.  Rather, the purported requirement that sales personnel report off-label promotion by a paid speaker served as yet another guise of compliance, which AstraZeneca expected its employees to ignore, as they subsequently did.

334.    One of AstraZeneca's most notorious off-label promoters of Seroquel IR and Seroquel XR was Dr. Gordon Robinson, a child psychiatrist from St. Louis, Missouri, who regularly served as a speaker in Relator's territory.  During his speaker programs, Dr. Robinson invariably discussed and recommended off-label uses of Seroquel IR and Seroquel XR, including treatment of behavioral symptoms, anxiety, borderline personality disorder, and sleep disorders, all with respect to pediatric patients.  He did so both proactively and in response to questions from attendees, who were for the most part pediatric specialists as well.

335.    At one point, AstraZeneca removed Dr. Robinson from the speakers' bureau after a family practice sales representative made an official report to the Company that Dr. Robinson refused to use a Company-approved slide deck and had engaged in off-label promotion.  After a year-long hiatus, Dr. Robinson was allowed to return and agreed to use a slide deck; however, he continued to diverge substantially from that slide deck in his presentations, during which he continued to promote Seroquel XR for the same off-label uses he had before.  Indicative of AstraZeneca's calculated concealment of its off-label promotional scheme, the sales representative in whose territory Dr. Robinson was based told Relator that her regional manager, Steve Levandowski, had instructed her to be careful where she allowed Dr. Robinson to speak in order to ensure that he was not again reported and removed from the speakers' bureau.

112

336.    On April 8, 2009, Dr. Robinson conducted a speaker program at Broadlawns Hospital, *see infra*, where he promoted Seroquel XR for off-label use in adolescent and pediatric patients.

337.    On October 5, 2009, Dr. Robinson gave a presentation entitled "Assessment and Management of Bipolar Depression" at a dinner program held at Sam & Gabe's Italian Bistro in Des Moines.   During his presentation, he promoted Seroquel XR off-label for the treatment of children.   Dr. Devi Mikkilineni, a child psychiatrist, among others, attended this presentation. Dr. Robinson was paid a fee of $1,500 for this presentation, in addition to expenses of $429.85. Also on October 5, 2009, Dr. Robinson gave the same speaker program at the Behavioral Health Center of Southern Iowa, in Leon, Iowa.

338.    Another paid speaker who regularly recommended Seroquel XR for off-label pediatric use was Dr. Michael Ishii.   On October 14, 2009, Dr. Ishii gave a speaker program with several psychiatrists at Mercy Psychiatric Services, Des Moines, Iowa, and later that day gave a talk at Freedom House, in Iowa Falls, Iowa (a mental health and substance abuse hospital, treating a large volume of Medicaid patients), both with respect to Seroquel XR.   Without prompting or in response to any questions from the audience, Dr. Ishii promoted Seroquel XR for the treatment of bipolar depression in adolescent girls.   Minimizing Seroquel XR's risk of adverse events, Dr. Ishii also asserted that Seroquel XR possessed a "25% less intense sedation effect" than Seroquel IR, despite the total lack of evidence for this claim.

339.    District Manager Yarbrough also insisted that the Relator and her sales partner retain Dr. Sasha F. Khosravi, a child psychiatrist in West Des Moines, Iowa, as a speaker to promote off-label use of Seroquel XR to treat children and adolescents.   Relator was specifically instructed by Yarbrough to retain Dr. Khosravi as a speaker due to his experience treating

children.   Yarbrough expressed his hope that Khosravi's serving as a speaker would not only increase Seroquel XR prescribing for pediatric use among the attendees to Khosravi's programs, but also in Khosravi's own practice.

340.    On April 16, 2007, AstraZeneca sent Dr. Khosravi a PIR regarding use of Seroquel IR in adolescents and children.   Dr. Khosravi specifically requested this information and AstraZeneca sent it to him so that he could use it to promote Seroquel IR during his paid speaker programs.   The PIR recommended Seroquel IR for off-label treatment of psychotic disorders, developmental disorders, conduct disorders, Tourette's disorder, and posttraumatic stress disorder, all with respect to children and adolescents.   As AstraZeneca knew and intended when it sent the response, Dr. Khosravi subsequently used this information in speaker programs to promote Seroquel IR for the forenamed off-label uses.

341.    On June 25, 2008, Dr. Khosravi served as a "visiting professor" at a meeting with a group of health care professionals in Fort Dodge, Iowa, where he recommended the use of Seroquel XR for the off-label treatment of treatment of children and adolescents.   Dr. Khosravi gave case examples of two children he had successfully treated with the drug. AstraZeneca paid Dr. Khosravi $2,400 plus expenses to give this presentation.   Michael C. Corsberg, a physician's assistant in Manson, Iowa, and Joan Kitten, an Advanced Registered Nurse Practitioner at Berryhill Mental Health Center, attended this program.   Their use of Seroquel XR for the treatment of children increased thereafter.

342.    On July 30, 2008, Dr. Khosravi conducted another visiting professorship with health care professionals in Leon, Iowa, where he recommended the off-label use of Seroquel XR to treat children.

114

343.    On April 13, 2009, Dr. Azfar Malik made a visiting professorship presentation to Child Psychiatry Associates, in West Des Moines, Iowa, for which AstraZeneca paid him $2,400.  The program was titled "Importance of Early Recognition and Appropriate Treatment of Bipolar Depression," and Dr. Malik recommended the off-label use of Seroquel XR to treat children, including for MDD and GAD.  A child psychiatrist, Dr. Kent Kunze, attended this presentation.  Approximately 55% of Dr. Kunze's patients are covered by Medicaid, and approximately 25% are covered by Medicare Part D.

344.    Another paid speaker, Dr. John Luehr from Apple Valley, Minnesota spoke frequently on behalf of AstraZeneca in Minnesota and Iowa regarding his off-label use of Seroquel XR to treat children.   AstraZeneca paid Dr. Luehr approximately $1,500 per presentation.   During 2007, Dr. Luehr received at least $43,270 for 28 different speaker programs where he touted Seroquel and Seroquel XR off-label for the treatment of children and adolescents.

345.    In June 2009, Dr. Luehr gave a speaker program to health care professionals where he included unsolicited information about his use of Seroquel XR to treat children.

346.    Reliable indicia that false claims were actually submitted from this AstraZeneca off-label promotion is confirmed by FDA analyses of increased Seroquel IR and XR prescriptions dispensed for pediatric use.  A *Pediatric Post Marketing Drug Utilization Review* prepared by the FDA and dated December 5, 2011, estimated that between December 2009 and July 2011, 6.6% of Seroquel IR and 7% of Seroquel XR prescriptions dispensed by retail pharmacies had been prescribed for children and adolescents.   Based on physician surveys summarized in this same FDA review, a substantial portion of these prescriptions were written for off-label conduct and behavioral disturbances, including "OTH[ER] EMOTIONAL

133568.00601/36388526v.8

DIS[TURBANCE] CHILD" (Seroquel IR, 10.9%), "ATTENTION DEFICIT DIS[ORDER]" (Seroquel IR, 8.0%), "OTHER CONDUCT DISTURB[ANCE]" (Seroquel XR, 30.6%), and "EARLY CH[I]LD PSYCHOSIS [NOT OTHERWISE SPECIFIED]" (Seroquel XR 24.4%).

347.    Mary Segreto, D.O., is a psychiatrist practicing at a health clinic in Spencer, Iowa. Dr. Segreto treated patients of all ages, approximately 25 to 33 percent of whom were children and adolescents.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner engaged in off-label marketing of Seroquel IR and Seroquel XR, including the provision of low-dose samples and peer-to-peer sessions, including at least one one-on-one session with Dr. Jennisch in 2009, at which he instructed Dr. Segreto on the off-label uses of Seroquel IR and Seroquel XR for children.  As a result of AstraZeneca's off-label promotion, Dr. Segreto's prescribing of Seroquel IR and Seroquel XR grew significantly from 2007 to 2010.  Much of this prescribing was for off-label uses, including treatment for depression and anxiety in children.  Relator observed an increase in Dr. Segreto's off-label prescribing of Seroquel IR and Seroquel XR as a result of off-label marketing of Seroquel IR and Seroquel XR.  During 2011, Medicare Part D paid 406 claims for Seroquel IR and 109 claims for Seroquel XR resulting from prescriptions written by Dr. Segreto, many of which were for off-label uses.

348.    Kent Kunze, M.D., is a child and adolescent psychiatrist practicing in West Des Moines, Iowa.  Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner engaged in off-label marketing of Seroquel IR and Seroquel XR for use in children and adolescents.  As a result of AstraZeneca's off-label promotion, Dr. Kunze's prescribing of Seroquel IR and Seroquel XR grew significantly from 2007 to 2010.  Much of this prescribing was for off-label uses, including treatment for anxiety and depression in children.

Relator observed an increase in Dr. Kunze's off-label prescribing of Seroquel IR and Seroquel XR as a result of off-label marketing. During 2011, Medicare Part D paid 205 claims for Seroquel IR, most of which were for off-label uses.

349.    Diana Prokupek is an advanced registered nurse practitioner practicing at a clinic in Atlantic, Iowa. Ms. Prokupek's practice focused on mental health. Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner engaged in off-label marketing of Seroquel IR and Seroquel XR, including for use in children and adolescents. These off-label marketing techniques included invitations to Ms. Prokupek to attend dinners in Omaha and arranging speakers to visit the clinic on a quarterly basis to discuss off-label uses of Seroquel IR and Seroquel XR, including uses in children and adolescents, and for anxiety and depression. Relator observed an increase in Ms. Prokupek's off-label prescribing of Seroquel IR and Seroquel XR following these dinners and speaker programs. During 2011, Medicare Part D paid 145 claims for Seroquel IR for prescriptions written by Ms. Prokupek, many of which were for off-label uses.

350.    Ivan Delgado-Ramos, M.D., is a psychiatrist practicing at a mental health clinic in Atlantic, Iowa. Dr. Delgado-Ramos' practice focused on children and adolescents. Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner engaged in off-label marketing of Seroquel IR and Seroquel XR, including for use in children and adolescents. These off-label marketing techniques included invitations to Dr. Delgado-Ramos to attend dinners in Omaha and arranging speakers to visit the clinic on a quarterly basis to discuss off-label uses of Seroquel IR and Seroquel XR, including uses in children and adolescents, and for anxiety and depression. Relator observed an increase in Dr. Delgado-Ramos' off-label prescribing of Seroquel IR and Seroquel XR following these dinners and

117

speaker programs.   During 2011, Medicare Part D paid 97 claims for Seroquel IR, for prescriptions written by Dr. Delgado-Ramos, many of which were for off-label uses.

351.   These off-label prescriptions, written as a result of AstraZeneca's off-label promotion, caused the submission of false claims to government health care programs, as described in ¶¶ 510-537, *infra*.

### 5.   Post Traumatic Stress Disorder ("PTSD")

352.   AstraZeneca heavily promoted Seroquel IR and Seroquel XR off-label for the treatment of PTSD, while concealing evidence that quetiapine is neither safe nor effective for this use.   In doing so, AstraZeneca specifically targeted U.S. Department of Veteran's Administration ("VA") hospitals and physicians, on whom sales representatives, including Relator, called and promoted Seroquel IR and Seroquel XR for the treatment of PTSD in veterans returning from the wars in Iraq and Afghanistan.

353.   The VA defines PTSD as "the development of characteristic and persistent symptoms along with difficulty functioning after exposure to a life-threatening experience or to an event that either involves a threat to life or serious injury."   *See* Department of Veterans Affairs, *VA/DoD Clinical Practice Guideline: Management of Post-traumatic Stress* (2010), *available at* www.healthquality.va.gov/PTSD-FULL-2010c.pdf (last accessed July 6, 2013).

354.   The FDA has approved two drugs—Zoloft (Pfizer) and Paxil (GlaxoSmithKline), both of which are SSRIs—as safe and effective for the treatment of PTSD.   No other drugs, and no antipsychotics, have been approved for the treatment of PTSD.

355.   Thus, despite the availability of two drugs demonstrated as safe and effective for treatment of PTSD, both of which are widely regarded as safer than antipsychotics such as Seroquel IR and Seroquel XR, AstraZeneca promoted Seroquel IR and Seroquel XR as both adjunctive and monotherapy treatment for PTSD by concealing both adverse efficacy and safety

data.  *See* ¶¶ 148-172, *supra*, with respect to AstraZeneca's misleading minimization of the safety risks associated with use of Seroquel IR and Seroquel XR.

356.    Proactively solicited PIRs, *see* ¶¶ 223, *supra*, played a central role in AstraZeneca's promotion of Seroquel IR, and later Seroquel XR, for the treatment of PTSD.  As part of their promotion of both drugs for treatment of PTSD, at the Company's direction, sales representatives solicited PIRs in response to which AstraZeneca sent physicians employed by the VA information regarding a small, twenty-patient clinical trial conducted by a paid consultant for the Company.  The study, Mark Hamner et al., *Quetiapine treatment in patients with posttraumatic stress disorder: An open trial of adjunctive therapy*, 23 J. Clinical Psychopharmacology 15 (2003), concluded that "quetiapine is well tolerated and may have efficacy in reducing PTSD symptoms in patients who have not had an adequate response to other medications."  The Hamner study purported to examine the effect of Seroquel IR when administered adjunctively with an SSRI, following stabilization of the patient on an SSRI alone.  Because it lacked a placebo comparator, however, the study could only conclude that patients had improved from baseline to study end, but not that that improvement was the result of quetiapine rather than the co-administered SSRI.  As these patients would be expected to continue improvement even without the addition of Seroquel IR, the study's "successful" result nonetheless provided no meaningful support for the effectiveness of Seroquel IR for treatment of PTSD, despite AstraZeneca's widespread promotion to the contrary.

357.    A subsequent, more robust, but never published study sponsored by AstraZeneca confirmed just that, and showed that Seroquel IR was no more effective than placebo when added to an SSRI for treatment of PTSD.  The clinical trial, which was randomized and double-blinded, concluded that while patients in both the Seroquel IR and placebo arms experienced

improvement over the course of the study, the improvement in the Seroquel IR group was no greater than that in the placebo group. *See* Study Report Summary, *A multicentre, parallel group, randomized, double-blind, placebo controlled study to evaluate the efficacy and safety of quetiapine fumarate as add-on therapy in patients with Post-Traumatic Stress Disorder*, Study ID AU-SEA-0006, *available at* http://www.astrazenecaclinicaltrials.com (last accessed on July 6, 2013). The study also raised concerns regarding the safety of Seroquel IR's use for treatment of PTSD, finding that 65% of patients experienced an adverse event deemed by the clinician to be in some way related to the study drug.

358. AstraZeneca knew of the negative results of the AU-SEA-0006 study as early as September 2007, when the final data for the primary outcome measure were collected, and no later than August 2008, when the remainder of the data was collected. The Company, however, concealed the negative results from its own sales representatives, who continued to promote Seroquel IR and Seroquel XR to VA physicians as safe and effective for treatment of PTSD. AstraZeneca also concealed the negative results from the medical community treating PTSD patients by refusing to publish the trial, as it had its earlier successful Hamner trial. The only records of the negative trial are on www.ClinicalTrials.gov, *see* http://clinicaltrials.gov /show/NCT00306540 (last visited July 9, 2013), which contains no reference to the study's negative results, and hidden on AstraZeneca's website, where a PDF summarizing the results is miscategorized under the disease state "schizophrenia." *See* Study ID AU-SEA-0006, *supra*.

359. AstraZeneca's promotion of Seroquel IR and later Seroquel XR for the off-label treatment of PTSD was wildly successful. A 2009 review of the use of off-label antipsychotic medications in the VA health care system found that 60.2% of patients who received an antipsychotic drug had no record of a diagnosis for which these drugs are approved.

120

Prescriptions for off-label antipsychotic agents were most often written for PTSD (41.8% of patients). Quetiapine had the greatest off-label use (42.9%). *See* Leslie DL et al., *Off-label use of antipsychotic medications in the department of Veterans Affairs health care system*, 60 Psychiatric Serv. 1175 (2009).

360.    In 2009, Seroquel IR and Seroquel XR had become the VA's second largest pharmaceutical expenditure, reaching $125.4 million, up from $14.4 million in 2001.  And by 2011, the armed services had issued more than 54,500 prescriptions for Seroquel IR and Seroquel XR alone, which was, by far, the most for any antipsychotic.

361.    This off-label use occurred even though VA clinical guidelines issued in 2004 stated that "there is insufficient evidence to recommend atypical antipsychotics for the treatment of PTSD."  By 2010, though, the VA guidelines were recommending atypical antipsychotics, including Seroquel IR and Seroquel XR, for adjunctive therapy, reflecting various small studies, including Hamner, that indicated the pills were useful in treating the symptoms of PTSD.  *See VA/DoD Clinical Practice Guideline, supra*.

362.    The VA PTSD Guidelines cite only the Hamner study in support of the adjunctive use of quetiapine for treatment of PTSD.  *Id.*, 152, 158.  But for AstraZeneca's fraudulent concealment of the AU-SEA-0006 study, and illegal and off-label promotion of Seroquel IR and Seroquel XR as effective for treatment of PTSD, the VA would not have recommended and paid reimbursements of Seroquel IR and Seroquel XR for the off-label treatment of PTSD.

### 6.    Sleep Disturbances

363.    AstraZeneca promoted Seroquel IR and Seroquel XR off-label as effective for the treatment of sleep disturbances, despite the lack of evidence demonstrating that either drug is safe or effective for this use.  During an August 2008 district teleconference for which Relator

took the minutes, sales representatives categorized "Sleep" as one of the areas that "Seroquel owns."

364.   At a district sales meeting held in or around March 2009, which was attended by the sales representatives in Relator's district and District Manager Doug Yarbrough, sales representative Mike Doran made a presentation regarding promotion of Seroquel XR for a number of off-label uses, including sleep disturbances.  With the understanding that sales representatives were promoting these off-label uses to physicians, and that physicians needed to know what doses to prescribe for them, Doran displayed a line graph that showed the purportedly correct doses to prescribe for both on- and off-label uses of Seroquel XR, including sleep.  Doran told sales representatives to instruct physicians that the proper dose for Seroquel XR as monotherapy for off-label treatment of sleep disturbances was 0 to 25 mg.  Yarbrough witnessed this presentation and did not object.

365.   On the contrary, District Manager Yarbrough regularly instructed sales representatives to promote Seroquel XR for off-label treatment of sleep disturbances, and also trained sales representatives to combine their off-label promotion of Seroquel XR for sleep with their off-label promotions for other uses.  During a district meeting in 2008 or 2009, sales representatives in Relator's district discussed the recommendation of psychiatrist Stephen M. Stahl that "[i]n some cases, sedation is a desired therapeutic effect, particularly early in treatment, during hospitalization, and when patients are aggressive, agitated, or needing sleep induction."   *Stahl's Essential Psychopharmacology: Neuroscientific Basis and Practical Applications* 398 (3d ed. 2008).  Yarbrough instructed sales representatives to incorporate this recommendation of therapeutic sedation into their other off-label promotional messages for treatment of aggression, hostility, and dementia-associated conduct disorders, as further evidence

of Seroquel XR's effectiveness for those off-label uses.  For example, sales representatives practiced asking physicians as part of mock promotional details: 'That irritable patient who is not sleeping, is that someone you would prescribe Seroquel for?'

366.    AstraZeneca trained sales representatives to, and they subsequently did, omit discussion from Stahl's following paragraph, which stated that "particularly for long-term treatment, sedation is generally a side effect to be avoided," and that "sedation is one of the most common reasons for a patient to discontinue treatment with an antipsychotic drug." *Id.* at 399. "Furthermore," he wrote, "diminished arousal, sedation, and somnolence can lead to cognitive impairment, since cognitive functioning is mediated by these same pathways," resulting in "functional outcomes [being] compromised." *Id.*

367.    In addition to broadening the patient base for which Seroquel IR and Seroquel XR were being prescribed, AstraZeneca's off-label promotion of the drugs for sleep was also an attempt to minimize physicians' concerns of Seroquel IR and Seroquel XR's high risk of somnolence, which was a frequent objection to prescribing them.  To do so, AstraZeneca sought to mischaracterize Seroquel IR and Seroquel XR's high incidence of sedation as an ancillary effect of the drugs' purported efficacy in restoring patients' natural sleep patterns—its argument being that, once that restoration of the normal sleep pattern was complete, any sedation would abate.  Indeed, a Statement-Response handout sent to Central Region sales representatives by Wendy Romano on November 5, 2006, advised sales representatives to spin the adverse event to physicians by telling them: "Some low-energy feelings are not uncommon in a patient where you are recalibrating their circadian rhythm."

368.    Likewise, the minutes that Relator took during an August 2008 conference call show that sales representatives discussed how to respond to a physician who objected that

"Seroquel 'keeps [patients] in bed,'" and he therefore would not "consider it for the lethargic patient or patient with lassitude."  "How do we reposition Seroquel in this patient?"  As they were trained, Relator's district responded by promoting Seroquel XR as "[r]estor[ing] their sleep patterns."  Asking "how would the patient on the couch look if the patient got a good night['] s sleep," AstraZeneca misleadingly represented that somnolence observed among patients taking Seroquel XR was only the result of their underlying disease, and not a true side effect of Seroquel XR.

369.   A slide deck used to train sales representatives during a May 2006 regional sales meeting and subsequently forwarded to members of Relator's district describes AstraZeneca's promotion of Seroquel IR's risk of somnolence as a positive attribute: "Some physicians view this as a good thing for their patients in the manic phase as it may restore their patients' normal sleep patterns for those patients that are struggling with too little sleep."

370.   Despite AstraZeneca's promotions, however, there is no evidence to support that Seroquel IR or Seroquel XR is effective in restoring natural sleep patterns, let alone that it is safe for this use.  AstraZeneca, however, continued to make this claim until it ceased promotion of Seroquel IR, and made the same claim with respect to Seroquel XR following its launch in July 2007.  Sales representatives also frequently promoted Seroquel IR and Seroquel XR as an adjunct to Ambien for the treatment of sleep disturbances, which raised additional safety concerns, as the effect of this combination remains largely unstudied.

371.   On October 6, 2008, AstraZeneca sent a response to a PIR to Susan Muhlbauer, APRN, of Carroll, Iowa, regarding "what effect Seroquel has on sleep architecture and/or nightmares."  Although pharmaceutical manufacturers may permissibly send responses to PIRs that are unsolicited, Muhlbauer's request was submitted as the result of unsolicited off-label

124

promotion by AstraZeneca.  It therefore constituted illegal off-label promotion of Seroquel IR for the treatment of sleep disturbances.

372.    AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR for sleep was effective.  A "Perceptual Map," a visual depiction of attributes that physicians closely associated with Seroquel IR and Seroquel XR, showed that physicians closely identified both drugs with "[i]mproves quality of sleep," and a December 2007 survey of Seroquel XR adopters found that "sleep" was among the uses for which they prescribed Seroquel XR.

373.    Sales representatives recognized that, when they promoted Seroquel IR and Seroquel XR for sleep in conjunction with their other off-label promotions, physicians' prescribing of the drugs increased accordingly.

### E.    Promotion of Seroquel XR Based on Unsubstantiated Superiority Claims

374.    AstraZeneca furthered the effectiveness of its off-label promotional claims at driving sales for Seroquel IR and Seroquel XR by supplementing these off-label promotional claims with unsubstantiated superiority claims.   AstraZeneca's unsubstantiated promotion of Seroquel XR as superior to SSRIs and SNRIs is described *supra*, in the context of its off-label promotion of Seroquel XR for MDD and GAD.  The two most frequent targets of AstraZeneca's unsubstantiated promotion of Seroquel XR, however, were Seroquel IR and Abilify.

### 1.    Unsubstantiated Superiority Claims Versus Seroquel IR

375.    AstraZeneca's strategy to grow sales of Seroquel XR  centered, in large part, on the conversion of patients from Seroquel IR to Seroquel XR, which AstraZeneca sought to accomplish both because of Seroquel XR's higher relative price and profitability, and because of Seroquel IR's looming patent expiration.  From the launch of Seroquel XR forward, AstraZeneca sought to increase sales of Seroquel XR by converting as many Seroquel IR prescriptions as possible to Seroquel XR, including those prescriptions that had been written for off-label uses as

125

a result of AstraZeneca's prior illegal promotion of Seroquel IR.  To do so, AstraZeneca promoted Seroquel XR as the successor of Seroquel IR, possessing the same effectiveness as its predecessor, including for off-label uses, but unhampered by many of the adverse events that accompanied use of Seroquel IR.  In short, AstraZeneca promoted Seroquel XR as possessing equal efficacy but superior tolerability to Seroquel IR.  This assertion of superior tolerability, however, was entirely unfounded, and the claims that AstraZeneca's sales representatives made were speculation masquerading as truth.  As a result, AstraZeneca's misrepresentation of Seroquel XR's safety profile exceeded even its grievous misrepresentation of Seroquel IR's.  *See* ¶¶ 148-172, *supra*.

376.    The success of AstraZeneca's promotion of Seroquel XR relied on its past off-label promotion of Seroquel IR. The "XR Immersion Day" slide deck, dated July 8, 2008, describes Seroquel "XR use and applicability [as] haloed by Seroquel [IR] perceptions – Bipolar, anxiety, MDD with anxiety.  A 'sweet' spot in terms of calming – provides sedation, but not as immediate."  A later slide, citing two qualitative research surveys of physicians, stated the same proposition as "Seroquel XR's position is a <u>Derivative</u> of Seroquel IR rather than its own entity…."

377.    AstraZeneca sought to preserve physicians' perceptions of the effectiveness of Seroquel IR, including for the off-label uses for which AstraZeneca had long promoted it, while simultaneously building on those perceptions the belief that Seroquel XR possessed greater tolerability than Seroquel IR.   Under the heading "'Natural' XR Position 2009," the aforementioned slide deck affirmed that "the most natural fit for XR is largely within HCP's current comfort zone of SEROQUEL, with key differences based on MOA, QD dosing and tolerability."  The same slide displayed a diagram centered on the boxed statement, "XR in 2009

is a form of Seroquel [IR], with" benefits that include the "[s]ame efficacy and applicability by symptoms[;] Great fit for bipolar, anxiety and depression with anxiety/psychosis"; "A 'calming' atypical"; and "[l]ess sedation," among others.   In the "XR Immersion Day" slide deck, AstraZeneca described Seroquel XR as "Seroquel Once A Day" and as providing "[l]ess sedation for patients who find Seroquel causes too much somnolence."   "The market is positioning XR as a derivative of Seroquel that can be dosed once daily and is less sedating for use in Bipolar, anxiety, MDD with anxiety/sleep issues, and for calming without immediate sedation."

378.   In furtherance of this scheme, AstraZeneca's sales force told health care professionals that Seroquel XR resulted in a better tolerability and "patient experience" than Seroquel IR, because Seroquel XR, among other things, caused less carbohydrate cravings, less sedation, lower triglycerides, less weight gain, and less orthostatic hypertension.

379.   All these benefits purportedly stemmed from Seroquel XR's extended release profile and the resulting "softer" peak in the level of quetiapine in the blood over the course of a day.   AstraZeneca, however, possessed no actual evidence to support these highly speculative propositions.   No head-to-head studies compared the relative adverse event profiles of the two formulations, and the Prescribing Information for Seroquel XR showed that Seroquel XR had significant incidences of all of the same adverse events as did Seroquel IR.   To the extent that the incidences of certain adverse events are lower in the Seroquel XR Prescribing Information than they are in the Seroquel IR Prescribing Information, so are many of the incidences of adverse events in the placebo groups of the Seroquel XR clinical trials, emphasizing the impossibility of making head-to-head comparisons between non-head-to-head trials.

380.   In addition to using superiority claims to convert patients who were already taking Seroquel IR to Seroquel XR, AstraZeneca leveraged superiority claims to convince physicians to

prescribe Seroquel XR for patients for whom they would *not* have prescribed Seroquel IR because they regarded Seroquel IR as insufficiently safe for those patients.   AstraZeneca recognized that while Seroquel IR's legacy supported, on the one hand, the foundation for AstraZeneca's promotion of Seroquel XR, Seroquel IR also carried, on the other, a negative association with a significant risk of adverse events.   By falsely promoting Seroquel XR as possessing superior tolerability to Seroquel IR, AstraZeneca sought to maintain Seroquel XR's association with the efficacy profile of Seroquel IR, while simultaneously distancing Seroquel XR from many of Seroquel IR's risks.   AstraZeneca positioned Seroquel XR, as summarized in the "XR Immersion Day" slide deck, "[f]or those patients who were not current SEROQUEL [IR] candidates due to safety/tolerability profile of SEROQUEL and atypicals in general – particularly around sedation and weight gain."

381.   In promoting Seroquel XR as superior to Seroquel IR, AstraZeneca's sales representatives made no distinction between the uses for which Seroquel IR had been approved and Seroquel XR had not.   Rather, they promoted Seroquel XR as superior without heed to indication, including for the treatment of bipolar disorder and pediatric use prior to its approval for those indications.

382.   AstraZeneca's promotion of Seroquel XR as superior to Seroquel IR succeeded in converting physicians' prescriptions of Seroquel XR to Seroquel IR.   The "XR Immersion Day" slide deck, *see supra*, states that "[o]verall, use of XR mimics IR.   The majority of XR's gains are from switch/add with ~ 3/4's of those gains sourced from IR."   More precisely, the accompanying graphs show that 58% of all Seroquel XR prescriptions for the first half of 2008 derived from conversions from Seroquel IR.   The allocation among uses of Seroquel XR also

128

mirrored that of Seroquel IR, with off-label uses accounting for 64% and 73% of Seroquel XR and Seroquel IR prescriptions, respectively.

383.    The Company's representations that Seroquel XR was simply an improved version of Seroquel IR—and safe and effective for all uses for which Seroquel IR had purportedly been shown to be safe and effective—caused the submission of false claims for payment to Government Programs.  By promoting Seroquel XR as superior to Seroquel IR, AstraZeneca caused physicians to prescribe Seroquel XR for off-label, non-medically accepted uses for which those physicians had previously prescribed Seroquel IR as the result of AstraZeneca's off-label promotions.  These non-medically accepted uses included uses for which neither Seroquel XR nor Seroquel IR were approved, such as anxiety, generalized depression, and behavioral symptoms, as well as uses for which Seroquel IR was approved but Seroquel XR was not, such as bipolar depression (from Seroquel XR's launch until October 8, 2008) and pediatric use (from Seroquel XR's launch until April 30, 2013).

## 2.    Unsubstantiated Superiority Claims Versus Abilify

384.    Beginning with the launch of Seroquel XR in July 2007, AstraZeneca also instructed its sales force to make unsubstantiated comparisons that promoted Seroquel XR as safer and more effective than Abilify, which was promoted by Bristol-Myers Squibb and Otsuka America.

385.    When Seroquel XR launched in July 2007, Abilify was approved for the treatment of manic and mixed episodes as well as maintenance treatment of bipolar disorder; schizophrenia in adolescents aged 13 to 17; and MDD as an adjunct to an SSRI in patients who had an inadequate response to an SSRI alone.  Its approvals were thus far broader than Seroquel XR's, which was initially approved only for schizophrenia, and not for bipolar disorder (October 8,

2008), second-line MDD (December 2, 2009), and pediatric use (April 30, 2013) until much later.

386.     Abilify had entered the atypical antipsychotic market relatively late, in 2002, five years after Seroquel IR had launched.  It proved a formidable competitor, however, and between 2004 and May 2008 more than doubled its share in the highly competitive market from around 5% to 12%.  (Over the same period, Seroquel IR's market share increased from 22% to 31%.)

387.     Abilify's approval in November 2007 for adjunctive treatment of MDD posed a substantial threat to AstraZeneca's existing foothold in the depression market, which AstraZeneca had secured through years of off-label promotion of Seroquel IR for generalized depression.  It now risked losing that foothold to the only atypical antipsychotic, at the time, to achieve approval for treatment of MDD.  Even though the scope of Abilify's approval for second-line adjunctive use was relatively narrow compared to the depression population for which AstraZeneca had promoted Seroquel IR, AstraZeneca recognized, as an experienced off-label promoter, that Abilify's indication offered a compelling jumping off point from which to promote it for depression more broadly, and from which to take Seroquel IR and Seroquel XR's market share.

388.     In response, AstraZeneca initiated a campaign of unsubstantiated superiority claims to convince physicians that Seroquel XR was both more effective and safer for the treatment of MDD and generalized depression than was Abilify.  With respect to efficacy, AstraZeneca's unsubstantiated claims intensified shortly before Seroquel XR's approval for bipolar depression in October 2008.  Contending that bipolar depression was a more difficult-to-treat disease than MDD, AstraZeneca promoted Seroquel XR's bipolar depression indication as evidence that Seroquel XR could treat even the most recalcitrant forms of depression, including

133568.00601/36388526v.8

bipolar depression.  In contrast, Abilify, they pointed out, had conducted a clinical trial in bipolar depression, but had failed to show a clear benefit.  During an August 2008 teleconference for which Relator took notes, Relator's district manager discussed using this message to promote Seroquel XR for depression:  "Another way to differentiate is to position us as the only atypical with indication for bipolar depression-others have tried and failed-we are different."

389.    AstraZeneca also relied on misleading head-to-head comparisons between MADRS scores from Seroquel IR and Abilify's bipolar depression and MDD trials, respectively.  Although head-to-head comparisons of non-head-to-head studies are always unreliable due to inevitable systematic differences in study design and among the patients enrolled, the unreliability and deception of AstraZeneca's comparisons was compounded by the fact that the patients whose MADRS scores AstraZeneca was comparing had different diseases.  Of course, a head-to-head comparison of MADRS scores from two separate trials, one of MDD and the other of bipolar depression, is essentially meaningless, but AstraZeneca trained sales representatives to make it nonetheless.  AstraZeneca's sales representatives used this comparison to promote Seroquel XR as superior to Abilify for the treatment of MDD, despite Seroquel XR's lack of approval for this use.

390.    In addition to its unsubstantiated and misleading claims of superior efficacy, AstraZeneca also made unsubstantiated claims of Seroquel XR's purportedly superior safety, which had been a long-running part of its promotion of Seroquel IR.  During a regional sales meeting held in St. Louis on May 24, 2006, AstraZeneca trained sales representatives to "build the Differentiation picture of Akathisia" by positioning akathisia as an adverse event associated with use of Abilify, but not Seroquel IR.  "[B]uild the Differentiation picture of Akathisia that demonstrates how debilitating and humiliating this side effect of Abilify can be" (emphasis

133568.00601/36388526v.8

added), District Sales Manager Tom Dusterhoft directed the sales force.  AstraZeneca continued to make this unsubstantiated superiority claim as part of its promotion of Seroquel XR.

391.    AstraZeneca also falsely promoted that Seroquel XR caused less weight gain than Abilify, despite the total lack of evidence to support his claim.  During a district teleconference in August 2008, *see* ¶ 163, *supra*, Relator's district discussed their promotion of Seroquel XR as possessing less risk of weight gain than Abilify.  Sales representatives supported this promotion by asserting that a number of physicians had anecdotally observed that patients experiencing weight gain on Abilify who subsequently switched to Seroquel XR had ceased gaining weight following their switch.

392.    AstraZeneca's paid promotional speakers echoed the unsubstantiated superiority claims of its sales representatives.  One such speaker was M. Michael Ishii of Madison, Wisconsin, who regularly included misleading head-to-head comparisons of MADRS scores from separate trials of Seroquel XR and Abilify to promote Seroquel XR as more effective for the treatment of MDD.  AstraZeneca sales managers approved of Dr. Ishii's presentations. AstraZeneca paid Dr. Ishii approximately $1,500 for each presentation.

393.    Paid speaker Dr. Charles Scott Jennisch of Des Moines, Iowa, also made misleading head-to-head comparisons between Seroquel XR and Abilify to promote Seroquel XR as more effective than Abilify for the treatment of MDD.  For example, Dr. Jennisch proactively—i.e., not in response to a question from the audience—made such claims in a presentation to health care professionals in Fort Dodge, Iowa, on February 8, 2008. Dr. Jennisch made the same claims in a paid presentation on May 5, 2008, to a group of health care professionals in Fort Dodge, Iowa.

394.    By promoting Seroquel XR as superior to Abilify for the treatment of MDD and generalized depression, which were not medically accepted uses for Seroquel XR, AstraZeneca caused physicians to prescribe Seroquel XR for these off-label, non-medically accepted uses, which in turn caused the submission of false claims to Government Programs.  *See* ¶¶ 510-537, *infra*.   That AstraZeneca's unsubstantiated superiority claims would cause physicians to prescribe and Government Programs to reimburse for non-medically accepted uses of Seroquel XR was foreseeable, because it was AstraZeneca's very purpose in making these unsubstantiated superiority claims.

**F.    Off-Label Promotion of Seroquel XR Caused Physicians to Prescribe Seroquel IR**

395.    Even as AstraZeneca's off-label promotion of Seroquel XR pulled heavily from its past promotion of Seroquel IR, conversely, AstraZeneca's off-label promotion of Seroquel XR regularly caused physicians to prescribe Seroquel IR for off-label use, largely due to the difficulty of obtaining reimbursement for Seroquel XR.

396.    AstraZeneca's strategy to rely on its past promotion of Seroquel IR as the basis for its promotion of Seroquel XR meant that, when AstraZeneca promoted Seroquel XR, it was first promoting Seroquel IR and Seroquel XR's shared active ingredient, quetiapine, and only subsequently promoting Seroquel XR as the formulation of quetiapine that purportedly ensured superior tolerability.   As such, even when AstraZeneca discontinued its explicit promotion of Seroquel IR to focus exclusively on Seroquel XR, the foundation of its promotion of Seroquel XR in quetiapine and past promotions of Seroquel IR meant that AstraZeneca nonetheless continued to promote Seroquel IR for the same uses for which it promoted Seroquel XR.

397.    In Relator's experience, physicians followed an analogous logic to AstraZeneca's promotion when making their prescribing decisions, first deciding whether and for what use to

prescribe quetiapine, then subsequently deciding which formulation of quetiapine to prescribe. In the "XR Immersion Day" slide deck, AstraZeneca stated, "The choice to use XR results only after a physician has chosen to a) treat with an atypical <u>AND</u> b) treat with quetiapine" (emphasis in original).

398.    In many instances, however, AstraZeneca's off-label promotion and concomitant minimization of safety concerns succeeded in convincing physicians to prescribe quetiapine, but failed to convince them to prescribe Seroquel XR—either because those physicians did not believe that Seroquel XR was superior to Seroquel IR at all, or because they believed that any superiority benefit was outweighed by the difficulties stemming from Seroquel XR's unfavorable formulary status.

399.    As such, AstraZeneca's off-label promotion of Seroquel XR caused many physicians to prescribe Seroquel IR.  Some physicians prescribed Seroquel IR initially (i.e., never having tried to prescribe Seroquel XR in the first place); others did so after receiving a pharmacy call back or experiencing reimbursement difficulties with past patients for whom they had prescribed Seroquel XR.  The "XR Immersion Day" slide deck dated July 8, 2008, summarized the reaction of non-adopters (i.e., non-prescribers of Seroquel XR) to AstraZeneca's messaging for Seroquel XR, stating they "[s]aw XR as no different than Seroquel [IR] – wanted data on what is different?"

400.    That AstraZeneca's off-label promotion of Seroquel XR caused physicians to prescribe Seroquel IR for non-medically accepted uses was reasonably foreseeable, and indeed AstraZeneca knew that this occurred regularly and regarded it as a problem.  During district meetings following the launch of Seroquel XR, sales representatives in Relator's district discussed their trouble with physicians who, as a result of AstraZeneca's off-label promotion,

133568.00601/36388526v.8

had agreed to prescribe Seroquel XR, but when confronted with the necessity of handling frequent prior authorizations for Seroquel XR, prescribed Seroquel IR instead, still on the basis of AstraZeneca's sales representatives' off-label promotions.  As a result, AstraZeneca's off-label promotion of Seroquel XR caused the submission of false claims for Seroquel IR to Government Programs, as described in ¶¶ 510-548, *infra.*

### G. Use of Paid Speakers to Promote Seroquel XR Off-Label

401.  Promotional speaker programs funded and conducted by pharmaceutical companies must be on-label, presenting only information about FDA-approved uses. Promotional talks must also contain "fair balance"—i.e., a discussion of not only the benefits but also the risks of the drug, including adverse events and warnings.  Above all, promotional programs must be truthful and not misleading.

402.  A narrow exception to the on-label rule exists that allows paid promotional speakers to answer questions from the audience about unapproved uses, so long as those questions are unsolicited.  Speakers must clearly advise the audience that the answer is outside the scope of approved labeling and that they are speaking from independent medical judgment. Questions should be answered briefly, to avoid unnecessary off-label discussion.

403.  As described above, *see* ¶¶ 229-241, 270-271, 292-295, 331-345, 392-393, *supra,* AstraZeneca routinely used paid promotional programs to promote Seroquel IR and Seroquel XR for off-label uses, despite its knowledge that doing so constituted impermissible off-label promotion.

404.  In echoing AstraZeneca's off-label promotional message, paid speakers not only promoted the effectiveness of Seroquel IR and Seroquel XR for off-label uses but also minimized both drugs' safety risks, which served as the primary impediment to physicians' prescribing for off-label use.  In an e-mail sent to sales representatives in his district on

135

March 14, 2007, District Manager Yarbrough recommended a number of regional speakers who had "proven to be worth their time."  Among them were Dr. Michael S. Sokol of Overland Park, Kansas, who Yarbrough recommended as "position[ing] Seroquel in good light regarding metabolic" safety issues, and Dr. Kevin Mays of Leawood, Kansas, who Yarbrough recommended as "put[ting] side effects in a positive light."

405.    The cultivation of thought leaders or "Key Opinion Leaders"—physicians capable of influencing their peers' prescribing decisions—constituted a part of AstraZeneca's "Customer Engagement Career Ladder" by which the Company evaluated sales representatives.  That off-label messaging of AstraZeneca's paid promotional speakers mimicked that of AstraZeneca's sales representatives stemmed in part from the rungs of the Customer Engagement Career Ladder, which required, *inter alia*, that a sales representative:

- Uses "experts" (e.g., local thought leaders) to effectively influence physicians' prescribing habits; and

- Develops physicians and healthcare professionals to become speakers-cultivating advocates for AstraZeneca.

406.    AstraZeneca recruited a nationwide network of paid speakers to promote Seroquel XR, maintained lists of these speakers, tracked each speaker's effectiveness, including each speaker's success in growing off-label use of Seroquel XR, and provided these lists to its sales force to track the success.

407.    At all times material hereto, although it was AstraZeneca's official policy that paid promotional speakers could not promote off-label uses of its drugs, AstraZeneca knowingly used these speakers proactively to promote off-label uses of Seroquel IR and Seroquel XR.

408.   AstraZeneca purchased from third-party vendors detailed records of prescriptions for atypical antipsychotics, as well as SSRIs and SNRIs, written by each of the thousands of health care providers on its call lists.  Using this information, AstraZeneca generated monthly reports of the number of new and total prescriptions of Seroquel IR, Seroquel XR, and their competitors written by each health care provider.  In this way, AstraZeneca determined the effect of its off-label promotional programs on sales of Seroquel IR and Seroquel XR.

409.   By comparing this information with the dates of and attendees at its off-label speaker programs, AstraZeneca tracked the return on its investment associated with its speaker programs by measuring increases in new prescriptions written and market share relative to competing therapies.

410.   For example, of the 21 speaking engagements in 2009 tracked by the Relator, AstraZeneca's average increase in market share was 5.49%.  The most significant increases in market share included:

- Dr. Mikkilineni, of Iowa Lutheran Hospital, who attended an off-label lunch presentation by Dr. Jennisch on March 27, 2009, and an off-label dinner presentation by Dr. Robinson on April 9, 2009, and whose use of Seroquel XR increased from 18% prior to these presentations to 35.46% after.   Dr. Mikkilineni's prescriptions included off-label treatment for depression.  As of March 2010, approximately 56% of Dr. Mikkilineni's patients received Medicare Part D benefits and another 22% were on Medicaid.  In 2008, Iowa Lutheran Hospital provided $35.3 million of uncompensated Medicare benefits, and another $21.4 million of uncompensated Medicaid benefits;

- Jana Simmons, an Advanced Registered Nurse Practitioner, who attended an off-label program with Dr. Robinson on April 9, 2009, and whose use of Seroquel XR increased from 8.67% to 23.93%; and

- Dr. Scott Eastin, who attended an off-label program given by Dr. Ishii on October 14, 2009, and whose use of Seroquel XR increased from 6.43% to 18.94%.

411.   At least six prescribers who attended AstraZeneca-sponsored off-label speaker programs had not used Seroquel XR prior to the presentations, but did so after.  These physicians included:

- Judith G. Benson, an Advanced Registered Nurse Practitioner in Missouri Valley, Iowa, who participated in a teleconference with Dr. Jennisch on November 6, 2009, and whose market share increased from 0% to 5.69%.

- Monte Bernhagen, M.D., a psychiatrist who has practiced in, among other places, Broadlawns Hospital and Fort Dodge, Iowa, and whose specialties include geriatric psychiatry, attended a speaker program with Dr. Malik on April 14, 2009, and whose market share increased to 1.81%.

- Kelli Green, M.D., a faculty psychiatrist at Broadlawns Hospital, who attended a speaker program with Dr. Robinson on April 9, 2009, and whose market share increased to 2.99%.

- John Rice, an Advanced Registered Nurse Practitioner at Broadlawns Hospital, who attended a speaker program presented by Dr. Robinson on April 9, 2009, and whose market share increased to 6.41%.

133568.00601/36388526v.8

- Julie Schneider, an Advanced Registered Nurse Practitioner in Fort Dodge, Iowa, who attended a speaker program with Dr. Jennisch on May 5, 2009, and whose market share increased to 10.47%.

- Shaad Swim, M.D., a psychiatrist at Mercy Behavioral Health Clinics in Des Moines, who attended a program by Dr. Ishii on October 14, 2009, and whose market share increased to 9.09%.

412.    Joan Kitten is an advanced registered nurse practitioner in Fort Dodge, Iowa. Ms. Kitten treated patients of all ages.  Approximately one-third to one-half of her practice consisted of children and adolescents and approximately 10 percent of her patients were classified as elderly.  Between 2008 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner invited Ms. Kitten to attend speaker programs and teleconferences, at which the speakers included child psychiatrists (including Dr. Khosravi and Dr. Jennisch) to speak about off-label uses of Seroquel IR and Seroquel XR, including use of Seroquel IR and Seroquel XR in children and in treating symptoms.  As a result of AstraZeneca's off-label promotion, Ms. Kitten's prescribing of Seroquel IR and Seroquel XR grew significantly from 2008 to 2010.  Much of this prescribing was for off-label uses, including treatment for depression in children and anxiety in the elderly.  Relator observed an increase in Ms. Kitten's prescribing of Seroquel IR and Seroquel XR for off-label uses after she attended one of these programs or participated in one of these teleconferences.  During 2011, Medicare Part D paid 119 claims for Seroquel IR and 131 claims for Seroquel XR resulting from prescriptions written by Ms. Kitten, many of which were for off-label uses.

413.    Leonard S. Richards, D.O., is a psychiatrist practicing in Des Moines, Iowa.  His patients consisted primarily of adults, including the elderly.  Between 2007 and 2010, as they had

been directed to do by AstraZeneca, Relator and her sales partner invited Dr. Richards to attend speaker programs and set up peer-to-peer sessions at which the speakers and peers described off-label uses of Seroquel IR and Seroquel XR. They also provided Dr. Richards with low-dose samples of Seroquel IR and Seroquel XR. As a result of AstraZeneca's off-label promotion, Dr. Richards' prescribing of Seroquel IR and Seroquel XR grew significantly from 2007 to 2010. Much of this prescribing was for off-label uses, including use of Seroquel IR and Seroquel XR for anxiety and depression, and use in the elderly. Relator observed an increase in Dr. Richards' prescribing of Seroquel IR and Seroquel XR for off-label uses after he attended a speaker program or a peer-to-peer session. During 2011, Medicare Part D paid 274 claims for Seroquel IR and 105 claims for Seroquel XR resulting from prescriptions written by Dr. Richards, many of which were for off-label uses.

414.   B.P. Makkapati, M.D., is a psychiatrist at Iowa Lutheran Hospital. Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner invited Dr. Makkapati to attend speaker programs at which the speakers described off-label uses of Seroquel IR and Seroquel XR. They also provided Dr. Makkapati with low-dose samples of Seroquel IR and Seroquel XR. As a result of AstraZeneca's off-label promotion, Dr. Makkapati's prescribing of Seroquel IR and Seroquel XR grew significantly from 2007 through 2010. Much of this prescribing was for off-label uses. Relator observed an increase in Dr. Makkapati's prescribing of Seroquel IR and Seroquel XR for off-label uses after he attended a speaker program. During 2011, Medicare Part D paid 184 claims for Seroquel IR and 57 claims for Seroquel XR resulting from prescriptions written by Dr. Makkapati, approximately 70 percent of which were for off-label uses.

133568.00601/36388526v.8

415.   Kisik Kim, M.D., is a psychiatrist who became the medical director of St. Anthony's Hospital in Carroll, Iowa (after having worked at Broadlawns in Des Moines). Between 2007 and 2010, as they had been directed to do by AstraZeneca, Relator and her sales partner met with Dr. Kim regularly and invited him to numerous speaker programs at which the speakers described off-label uses of Seroquel IR and Seroquel XR, particularly in elderly patients.  They also provided Dr. Kim with low-dose samples of Seroquel IR and Seroquel XR. As a result of AstraZeneca's off-label promotion, Dr. Kim's prescribing of Seroquel IR and Seroquel XR grew significantly from 2007 through 2010.  Much of this prescribing was for off-label uses.  Relator observed an increase in Dr. Kim's prescribing of Seroquel IR and Seroquel XR for off-label uses after he attended a speaker program.  During 2011, Medicare Part D paid 92 claims for Seroquel IR resulting from prescriptions written by Dr. Kim, many of which were for off-label uses.

416.   A significant portion of the patients treated by each of the above-listed health care providers whose prescribing increased following attendance at an AstraZeneca-sponsored off-label speaker program consisted of Medicaid or Medicare beneficiaries.   AstraZeneca's prescribing records demonstrate that its off-label promotional programs effectively caused these health care professionals to prescribe Seroquel XR, including for off-label uses, as a result of which false claims were submitted to and paid by Government Programs.  *See* ¶¶ 510-537, *infra*.

**H.     Co-Opting CME Programs as Tools for Off-Label Promotion**

417.   Another key source of drug information for doctors is continuing medical education ("CME"), which may take the form of either lectures or written articles.  The content of CME programs is required to be free of drug company influence, and guidelines specify that responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belong *solely* to the CME provider.  *See* Accreditation Council for

133568.00601/36388526v.8

Continuing Medical Education, *Standards for Commercial Support* (Sept. 2004), *available at* www.accme.org; FDA CDER, *Research Guidance for Industry:  Industry-Supported Scientific and Educational Activities* (Nov 1997), *available at* www.fda.gov/cder/guidance/isse.htm.

418.    With the increasing prevalence of for-profit CME providers, however, a strong tension exists between CME providers' obligation to maintain the independence of their content, and the reality that their continued receipt of the educational grants necessary to fund their programs, and profits, is contingent on developing CME programs favorable to pharmaceutical manufacturers, who provide the vast majority of CME funding.   The large increase in commercial CME supports that this tension has resolved to the detriment of the independence of CME programs' content.   ACCME survey data show that industry CME funding increased by more than 300% between 1998 and 2007, while profit margins for commercial CME providers increased from 5.5% in 1998 to 31% in 2006.

419.    AstraZeneca's official policies recognize that it is prohibited from interfering with the content of the CME programs that it sponsors, and as such, that it may not co-opt those programs as promotional tools for its products.   Its "Global Policy" on "Providing Information About our Products" states:   "Engagements of Healthcare Professionals and Organisations for services must not be disguised promotion," and "Where the Company is providing support for third party programmes, we must … not exert any inappropriate influence over the content of presentations made by any speakers, whether or not the Company has sponsored the event at which the presentation is made."

420.    AstraZeneca's actual conduct, however, belies its official policies.   AstraZeneca regularly violated the FDA guidance and its own policies governing CME events by manipulating CME programs into promotional events for off-label uses of Seroquel XR.   Even

though these recommendations for off-label uses of Seroquel XR appeared as the recommendations of an independent CME provider, they were, in fact, simply a disguised, illegal off-label promotional message from AstraZeneca.

421. One such CME was released online on December 24, 2008, by Medscape CME, Inc., entitled *Managing Mood and Anxiety Disorders in Primary Care Practice: A Focus on Complex and Difficult to Treat Patients*.  *See* http://cme.medscape.com/viewarticle/585333.  The program was facilitated by Dr. Larry Culpepper, a consultant for AstraZeneca, and was also funded by AstraZeneca. The CME program was in actuality an off-label promotion, by AstraZeneca, of Seroquel XR for the treatment of GAD.  During the program, Dr. Culpepper presented the case of Ms. S, a 43-year-old woman with a history of GAD who had been treated unsuccessfully with SSRIs and SNRIs.  Dr. Culpepper then recommended the off-label use of Seroquel XR, which "may be effective for the treatment of anxiety and depressive symptoms."

422. Another AstraZeneca-funded CME was released online on November 3, 2008, by Medscape CME, Inc., and entitled *New Evidence in the Management of Major Mental Illness: Major Depressive Disorder and Generalized Anxiety Disorder.  See* http://cme.medscape .com/viewarticle/582811.  The CME consisted of a video presentation, during which a panel including Drs. Mark H. Rapaport, Mark H. Pollack, and J. Craig Nelson recommended Seroquel XR for the off-label treatment of MDD and GAD.  Both Drs. Rapaport and Pollack served as paid consultants for AstraZeneca, and the CME was additionally funded by AstraZeneca.  The CME plainly served as an off-label promotion by AstraZeneca of Seroquel XR for the treatment of MDD and GAD.

423. Another CME was released online on March 31, 2008, by Medscape CME, Inc., and entitled *Bipolar Disorder in the Child and Adolescent.  See* http://cme.medscape

143

.com/viewarticle/572159.   The CME was led by Christopher U. Cornell, a paid speaker for AstraZeneca.  The CME was orchestrated by AstraZeneca as an off-label promotion of Seroquel XR to treat behavioral symptoms and bipolar disorder in children and adolescents.   During the online CME, Dr. Cornell presented the case of a 12-year-old girl with a history of ADHD and oppositional defiant disorder that had been treated with methylphenidate, without improvement in her symptoms.  Dr. Cornell then described the girl as having pediatric bipolar disorder and recommended off-label use of Seroquel XR in combination with Depakote, based on the DelBello studies, discussed *supra*.

## I.     Kickbacks to Prescribe Seroquel IR and Seroquel XR

424.    AstraZeneca knows that it is not permitted to pay doctors in order to encourage them to prescribe Seroquel IR and Seroquel XR.   Thus, AstraZeneca's corporate policy on "Marketing to healthcare professionals" states:

> In the US, we only provide [to doctors] items that are educational and will benefit patient care such as medical textbooks.  We do not provide diagnostic equipment, reminder items or gifts that provide personal benefits.

> We don't give gifts anywhere in the world in exchange for prescribing a medicine.

> * * * * *

> We will not pay any healthcare professional for prescriptions for any of our medicines.

425.    This written policy was honored only in its breach, however.   The explicit direction that AstraZeneca sales personnel could, should, and did "buy" doctors' loyalty to Seroquel IR and Seroquel XR was pervasive within the Company.   As described below, AstraZeneca perpetuated a fraudulent kickback scheme under the guise of a policy that stated:

We do pay certain healthcare professionals to undertake a variety of services for AstraZeneca. These include:

- Speaking at, chairing or moderating scientific or educational meetings

- Providing consultancy services and advice

- Running training for our sales representatives and other employees to help them understand the impact that diseases such as asthma and diabetes have on patients' lives.

* * * * *

Any food provided is secondary to the purpose of the meeting and is of modest value. It is only provided to people attending the meeting in a professional capacity.

426.    In fact, however, this written policy was a ruse intended to disguise AstraZeneca's deliberate misconduct, as AstraZeneca routinely, and intentionally, violated the substance and spirit of its written policy by using a variety of gratuities and financial incentives to induce health care providers to prescribe Seroquel IR and Seroquel XR.

427.    To increase further sales of Seroquel IR and Seroquel XR, AstraZeneca paid kickbacks to health care professionals in exchange for their agreement to prescribe Seroquel IR and Seroquel XR, and for their agreement to recommend that other health care professionals prescribe Seroquel IR and Seroquel XR for off-label uses. Although AstraZeneca disguised these kickbacks as fees and honoraria paid to health care professionals in exchange for legitimate business services, AstraZeneca's true purpose in paying these fees was to illegally induce the recipients to prescribe Seroquel IR and Seroquel XR.

428.    The plan succeeded, for both individually and collectively, the various kickback schemes described below – speaking fees, tutorials, preceptorships, visiting professorships, and

lavish meals – induced physicians to prescribe (and Government Programs to wrongly reimburse) Seroquel IR and Seroquel XR.

## 1.      Speaker Fees

429.   AstraZeneca routinely paid preferred speakers thousands of dollars to prescribe and promote off-label uses of Seroquel IR and Seroquel XR in lecture-style presentations to other doctors.    AstraZeneca selected these speakers based, at least in part, on the recommendations of its sales specialists, who were instructed to recommend speaking assignments as inducements and rewards for doctors who were thought to have the potential either to write high numbers of prescriptions for Seroquel IR and Seroquel XR, or to persuade others to prescribe Seroquel IR and Seroquel XR for off-label uses.  As a further inducement, doctors who were selected for speaking assignments were treated to "training" meetings that typically were conducted at warm-weather, resort-style locations.

430.   AstraZeneca also implicitly compensated the doctors who attended these presentations – many of whom attended the same presentation multiple times – with lavish dinners that their spouses were permitted to attend free of charge.  AstraZeneca's goal in doing so was to influence the doctors who attended these presentations to prescribe Seroquel IR and Seroquel XR, including for the off-label uses discussed at those presentations.

431.   These speaking honoraria and personal benefits served as one of the primary kickbacks that AstraZeneca used to buy doctors' loyalty to (*i.e.*, decision to prescribe) Seroquel IR and Seroquel XR, and to recommend that their colleagues prescribe the drugs for off-label uses.  In exchange for honoraria, AstraZeneca's nationwide network of influential physicians promoted Seroquel IR and Seroquel XR for off-label, non-medically accepted uses, which in turn caused audience members to prescribe Seroquel IR and Seroquel XR for those off-label uses. *See* ¶¶ 229-241, 270-271, 292-295, 331-345, 372-373, 392-393, *supra*.

432.    In addition, AstraZeneca leveraged speaking fees to induce the speakers themselves to prescribe Seroquel IR and Seroquel XR in greater numbers, which they did.  As such, high market share served as a key criterion for choosing paid speakers.

2.    Kickbacks Paid to Dr. Manmohan Singh

433.    One specific prescriber who AstraZeneca influenced through a *quid pro quo* exchange of speaker fees for prescriptions was Dr. Manmohan Singh, Chief of the Psychiatry Section at Broadlawns Medical Center – a publicly owned medical facility in Des Moines.  Dr. Singh has been employed by Broadlawns for more than 20 years, and AstraZeneca knew he was important in influencing prescribing decisions at both Broadlawns and Eyerly Ball Mental Health Clinic (which is affiliated with Broadlawns and utilizes the Broadlawns pharmacy).  AstraZeneca knew this because Dr. Singh was a member of the Broadlawns P&T Committee, and in that role he exerted considerable influence over the medications included on the Broadlawns formulary.

434.    AstraZeneca paid Dr. Singh – generally $1,500 per presentation – to promote Seroquel IR and Seroquel XR to his colleagues, and to prescribe Seroquel IR and Seroquel XR himself.  The exchange of speaking fees for prescriptions and recommendations was a *quid pro quo*, and the amount of Seroquel IR and Seroquel XR that Dr. Singh prescribed was highly dependent on the amount of speaking fees that he received from AstraZeneca.  Indeed, during periods when Dr. Singh had not recently been given a paid speaking engagement, AstraZeneca sales representatives observed that his prescribing of Seroquel IR and Seroquel XR dropped precipitously.

435.    Dr. Singh was at times explicit in his demands that AstraZeneca pay him speaking fees in exchange for prescribing of Seroquel IR and Seroquel XR, telling Relator Miksell-Branch on at least one occasion, "I can help you," which the Relator Miksell-Branch understood as a clear message that if AstraZeneca employed him as a speaker, he would reciprocate by writing

147

prescriptions for Seroquel XR and encouraging other prescribers to do likewise.   As discussed *supra*, his prescribing history confirms the *quid pro quo* nature of the arrangement.

436.    Dr. Singh did not give compelling presentations, and he frequently deferred to Relator Miksell-Branch to answer questions asked by attendees, so there was no reason for AstraZeneca to pay him except as an inducement for him to prescribe Seroquel IR and Seroquel XR, which is precisely what AstraZeneca did.   The Company met Dr. Singh's demand for additional speaking engagements, and during 2009, Relator Miksell-Branch scheduled Dr. Singh to give three presentations.   He gave a presentation at the office of Loren Olson, M.D., a psychiatrist in Des Moines affiliated with six hospitals, including Iowa Lutheran and Mercy Psychiatric Services, on February 26, 2009, and he gave a presentation to Krishna Murthy, M.D. at Crossroads Mental Health Center on March 18, 2009.   Although AstraZeneca routinely had difficulty locating persons to attend Dr. Singh's presentations, District Manager Yarbrough ordered the Relator Miksell-Branch to schedule an additional program for him prior to the end of 2009 so that he would not be dropped from AstraZeneca's speaker bureau.   This confirmed AstraZeneca's commitment to retaining Dr. Singh's patronage through personal financial inducements.

437.    AstraZeneca paid Dr. Singh to give five speaker presentations promoting Seroquel XR during 2009.   AstraZeneca also paid Dr. Singh to lead evening programs for his colleagues at Broadlawns, and at community clinics such as Mercy Psychiatric Services.

438.    A focal point of the *quid pro quo* arrangement between AstraZeneca and Dr. Singh was the use of cash to induce Dr. Singh to prescribe Seroquel XR, but it went further than that.   Before the Broadlawns in-patient formulary added Seroquel XR to its list of regularly stocked prescription medications in August 2009, Dr. Singh was in charge of approving all prior

authorization requests for the use of Seroquel XR.  The speaking fees that AstraZeneca paid Dr. Singh were intended to, and they did, ensure that in the period before Seroquel XR was added to the formulary, he would approve all prior authorizations for the more expensive drug, and not convert those prescriptions to the less expensive Seroquel IR.  In exchange for the financial inducements it provided to Dr. Singh, AstraZeneca knew it could count on him to approve prior authorizations for Seroquel XR, typically in less than 24 hours, effectively directing the pharmacy to fill those prescriptions despite their non-formulary status and the fact that the pharmacy did not regularly stock the drug.

439.    Dr. Singh's relentless pursuit of speaking fees in exchange for writing prescriptions for Seroquel XR continued during 2010, when in March he confronted Rick Peterson, an AstraZeneca hospital sales representative, and demanded increased speaking engagements and a corresponding increase in speaker fees as compensation for his efforts in getting Seroquel XR onto the Broadlawns formulary.  *See* ¶¶ 465, 470, 476-482, *infra*.  In making this demand, Dr. Singh specifically took credit for influencing Raymoncito Ocampo, M.D., another psychiatrist who began employment at Broadlawns in May 2009, to also push to have Seroquel XR added to the hospital's in-patient formulary.  Moreover, he confirmed the true purpose of the speaker fees from inception.

440.    Many of the prescriptions that these kickbacks induced Dr. Singh to write, and to encourage and facilitate others to write, were paid for by Government Programs.

3.    Tutorials, Preceptorships, and Visiting Professorships

441.    AstraZeneca used other methods to simultaneously promote Seroquel IR and Seroquel XR to health care professionals while funneling fees to them as part of a *quid pro quo* exchange for their agreement to prescribe Seroquel IR and Seroquel XR.  For example, AstraZeneca paid to health care professionals to participate in tutorials, preceptorships, and

professorships that appeared on the surface to be legitimate, but were no such thing. AstraZeneca received little to no value from these programs – other than the value provided by the participants' agreement to prescribe Seroquel IR and Seroquel XR in exchange for their participation fees. These were simply kickbacks by another name.

442. A "tutorial" was a presentation of approximately one hour in duration, given by a physician to an AstraZeneca sales representative, generally on the topic of an AstraZeneca-sponsored clinical trial about an off-label use of Seroquel IR or Seroquel XR. However, AstraZeneca's sales representatives did not need to be educated on these subjects, because the Company already had trained them on their details. Thus, there was no legitimate need for the tutorials. Instead, the real purposes of the tutorials were to educate *the physicians* on the details of the off-label clinical trials involving Seroquel IR or Seroquel XR, and to *pay the physicians* ($150 or more) for the privilege. AstraZeneca received no value from the tutorials (other than the opportunity to induce a physician to prescribe its drugs off-label).

443. For example, Dr. Jennisch conducted two such tutorials with sales representatives regarding the off-label use of Seroquel XR to treat MDD long before that use was approved by the FDA. Dr. Jennisch conducted one of these tutorials for at least eight AstraZeneca sales representatives on December 16, 2008, and he was paid $1,500 for his presentation. The sales representatives in attendance already had been trained on the material, and the tutorial provided no benefit to AstraZeneca – apart from the benefit it received from buying the loyalty of a prescribing physician. Many of the prescriptions that this kickback induced Dr. Jennisch to write were paid for by Government Programs.

444. Preceptorships were another means by which AstraZeneca concealed its payment of kickbacks to health care professionals. In a preceptorship, an AstraZeneca sales

133568.00601/36388526v.8

representative paid a high-volume prescriber – *i.e.*, a doctor who prescribed a large quantity of atypical antipsychotics, but not enough Seroquel XR—at least $250 to permit the sales representative to follow him or her during patient examinations for all or part of a day.  In theory, preceptorships provided sales representatives with insight into how physicians decided which drugs to prescribe.  In practice, however, sales representatives rarely stayed with the physicians for more than a short time, and thus the preceptorships were a thinly veiled means of funneling cash to physicians who AstraZeneca expected to reciprocate by writing more prescriptions for Seroquel IR and Seroquel XR, including for off-label uses.

445.   Preceptorships were a ruse to disguise the payment of cash as a *quid pro quo* exchange for prescriptions.   Indeed, until recently, AstraZeneca required each sales representative to conduct at least three preceptorships per year with high-volume physicians who (in AstraZeneca's opinion) did not write a sufficiently large number of Seroquel IR and Seroquel XR prescriptions.  Preceptorships were not about educating AstraZeneca's sales representatives, they were about buying physicians' brand loyalty.

446.   Visiting professorships were essentially one-on-one promotional speaker programs between an AstraZeneca-hired speaker and a doctor that the Company wanted to influence to prescribe Seroquel XR.  On paper, the "professor" (generally a key opinion leader and regular paid speaker for AstraZeneca) was supposed to speak about an on-label use of Seroquel IR or Seroquel XR using AstraZeneca-approved slides.  By design and in practice, however, these "visiting professors" almost never used slides, and their programs were among AstraZeneca's most effective means of off-label promotion of Seroquel IR and Seroquel XR. These informal meetings, generally held in a participating physician's office, addressed any topic of interest, but the "professor" always promoted Seroquel XR for off-label use.  Recognizing that

its true purpose in funding these events – off-label promotion – may have been too obvious, AstraZeneca directed its sales representatives in July 2009 to provide the "professors" with printed copies of slides ostensibly to be used during the programs.

447.   Perhaps emboldened by this perfunctory effort to create a veil of legal compliance for its "visiting professors" program, AstraZeneca continued to use the program as a  key tool for off-label promotion. For example, in approximately August 2009, Dr. Sasha Khosravi conducted a visiting professorship focused exclusively on the off-label use of Seroquel XR for the treatment of children.  Relator Miksell-Branch arranged the program because District Manager Yarbrough specifically pressured her to retain Dr. Khosravi so that he would be an advocate for off-label pediatric use.  However, Yarbrough later told Miksell-Branch to warn Dr. Khosravi that he still was not prescribing enough Seroquel XR to remain a paid speaker.  Thereafter, Dr. Khosravi refused to serve as a paid speaker for AstraZeneca because he recognized the substance of the *quid pro quo* arrangement, and he objected to AstraZeneca's pressure to prescribe more Seroquel XR.

### 4.   Lavish Meals

448.   AstraZeneca also sought to disguise its illegal payment of kickbacks to physicians by providing them with extravagant meals as part of a *quid pro quo* exchange for their prescribing loyalty.

449.   For example, Dr. Sarfraz S. Khan was a physician at Shenandoah Medical Center in Shenandoah, Iowa, who specifically demanded of Relator Miksell-Branch that AstraZeneca provide him with extravagant lunches – going so far as to specify particular restaurants – in exchange for continuing to prescribe Seroquel (both on- and off-label) for his patients. AstraZeneca met Dr. Khan's demands, and observed a direct correlation between the provision of lavish meals and the number of prescriptions that Dr. Khan had been induced to write.  Many

152

of these prescriptions were for Government Program beneficiaries. In 2011, for example, Medicare Part D paid 74 claims for Seroquel IR and 141 claims for Seroquel XR resulting from prescriptions written by Dr. Khan.

**J.      Falsification of Prior Authorization Requests and Evasion of Step-Edit Controls**

450.      In order to control costs, state Medicaid programs and Medicare Prescription Drug Plans utilize formularies, which are lists of drugs approved for reimbursement, designed to direct physicians and patients to choose economical options within a given therapeutic category. Generally programs only reimburse for drugs that are listed on that program's formulary, although if a particular patient's circumstances warrant use of an off-formulary medication, that patient's physician may submit a "prior authorization request" attesting to the patient's special circumstances and requesting an exception.

451.      Because Seroquel XR was more expensive than Seroquel IR, but had not demonstrated a clear benefit over it, when Seroquel XR was launched, many prescription drug plans, including the Iowa Medicaid program, excluded Seroquel XR from their formularies and implemented a prior authorization requirement as a prerequisite to providing reimbursement. This requirement served as a substantial obstacle to health care professionals' willingness to prescribe Seroquel XR, because submitting prior authorizations necessitates a considerable time commitment from physicians and their staff. As a result, when faced with a prior authorization requirement for one drug, they generally prefer to prescribe an on-formulary therapeutic alternative. In this case, health care professionals prescribed Seroquel IR, for which there was no prior authorization requirement, instead of Seroquel XR.

452.      In order to increase sales of Seroquel XR, AstraZeneca trained sales representatives to coach health care professionals to fill out prior authorization requests

fraudulently, attesting to the necessity of Seroquel XR and unsuitability of Seroquel IR.  District Manager Yarbrough trained sales representatives in his district to instruct health care professionals to state on prior authorization requests that Seroquel IR had side effects that the patient could not tolerate, or that once-daily dosing with Seroquel XR was necessary to ensure the patient's compliance.  These statements were doubly fraudulent: not only is there no evidence that Seroquel XR is better tolerated than Seroquel IR or results in better patient compliance, but at AstraZeneca's direction, physicians made these statements with respect to patients who had not even tried Seroquel IR.

453.    Nonetheless, at the instruction of Yarbrough and as she had been trained to do, Relator trained a number of office managers in her territory to use these statements on prior authorization requests to ensure the requests' approval.  In an e-mail sent July 30, 2008, Yarbrough directed Relator and her sales partner to assist doctor's offices in what amounted to falsifying prior authorization requests: "As we discussed, your ability to help these top prescribers navigate through the initial phases of the PA [prior authorization] will be critical to their support of extended release Seroquel utilization."  Further emphasizing the importance of AstraZeneca's prior authorization involvement to driving sales of Seroquel XR, this work is listed in Relator's "Performance Review for Year 2008," which states: "Difficulties with state [M]edicaid (prior auth)[.] [W]orked on pull-through by providing education to office staff and doctors for the PA [prior auth]."

454.    Reflecting AstraZeneca's success at causing health care professionals to submit these fraudulent prior authorizations, the Iowa Medicaid program learned of AstraZeneca's scheme and implemented a step-edit requirement, whereby Iowa Medicaid began to reject all

133568.00601/36388526v.8

prior authorizations requests for Seroquel XR unless the patient had first tried and failed on Seroquel IR.

455.     Undeterred, AstraZeneca sales representatives began instructing Iowa health care professionals to prescribe Seroquel IR for one month for each patient, and to then switch that patient to Seroquel XR.

456.     For example, at AstraZeneca's direction, Dr. Devi Mikkilineni, a pediatric psychiatrist who treats a substantial number of patients covered by Medicaid, followed this practice and prescribed her patients Seroquel IR for one month, then switched them to Seroquel XR.   The reason Dr. Mikkilineni did so was to evade the Iowa Medicaid programs prior authorization requirement, at which, she told Relator, she had achieved success.

457.     By instructing health care providers how to evade formulary restrictions through the fraudulent submission of prior authorization requests and step-edit controls, AstraZeneca caused Government Programs, including the Iowa Medicaid program, to make reimbursements for Seroquel XR that they otherwise would not have.  The fraudulent statements contained on the prior authorization requests were material to the health care programs' decisions to pay the associated claims.  Had those statements been truthful, the programs would not have paid the claims.  Because Seroquel XR was more expensive than Seroquel IR, particularly following the release of generic Seroquel IR in March 2012, AstraZeneca's fraudulent conduct increased costs to federal health care programs and the Medicaid programs of *Qui Tam* States.

### K.     Off-Label Marketing and Kickbacks Caused Broadlawns Hospital to Adopt Seroquel XR on Its In-Patient Formulary

458.     AstraZeneca's relentless campaign to convince Broadlawns Hospital to add Seroquel XR to its in-patient formulary in 2009 vividly illustrates the manner in which AstraZeneca's illegal, off-label marketing of Seroquel XR corrupts the prescription and delivery

133568.00601/36388526v.8

of prescription medications to the public.  This campaign included improper influence of members of the P&T Committee, *quid pro quo*, speaker programs, off-label uses, and unsubstantiated superiority claims.

459.  Broadlawns is a publicly owned, acute care community hospital located in Des Moines, Iowa.  Broadlawns is supported by several specialty clinics that serve the medical, surgical, mental health and primary health care needs of the residents of Polk County.  Broadlawns also provides pharmacy services for the Eyerly Ball Mental Health Clinic, which serves low-income residents of Des Moines and the surrounding area.

460.  Broadlawns provides services to a large number of patients covered by federal and state health care programs.  Broadlawns' revenues attributed to Medicaid amounted to $16.1 million, or 16.37% of its revenues, in the 2008-2009 fiscal year.  Its revenues from Medicare amounted to approximately $7.4 million, or 7.46% of its revenues.  Broadlawns' inpatient discharges by payor included 27% covered by Medicaid, 14% covered by Medicare, 6% covered by Polk County, Iowa and other government sources, while 44% were uninsured. Outpatient visits by payer included 22% on Medicaid, 10% on Medicare, 1% Polk County and other government sources, while 57% were uninsured.

461.  Moreover, Broadlawns is a federally designated 340B disproportionate share hospital ("DSH") under HRSA guidelines.  In 1992, Congress enacted Section 340B of the Public Health Service ("PHS") Act, known as the "340B Program," to provide drug price protection for certain PHS entities that receive federal funds.  42 U.S.C. § 256b.  PHS entities include such safety net programs as black lung clinics, state-operated AIDS drug purchasing assistance programs, hemophilia diagnostic treatment centers, urban Indian organizations, and DSHs, all as further defined in the Drug Pricing Program.  42 U.S.C. § 256b(a)(4).

133568.00601/36388526v.8

462.    From the launch of Seroquel XR in 2007 until the middle of 2009, Broadlawns did not have Seroquel XR on its in-patient formulary and any Seroquel XR prescription that was written was therefore converted back to Seroquel IR by the hospital pharmacy.  Any physician or other prescriber desiring to prescribe Seroquel XR needed a prior authorization in order to have that prescription filled.  Once the prior authorization had been signed, the pharmacy would order Seroquel XR from a wholesaler, and the drug would be dispensed at the out-patient window.

463.    AstraZeneca relied on Dr. Singh, a psychiatrist at Broadlawns and a proponent of Seroquel XR (as described in ¶¶ 433-439, *supra*), to approve the prior authorizations.

464.    AstraZeneca had attempted unsuccessfully to have Seroquel XR added to the in-patient formulary at Broadlawns in 2008 but failed, primarily because AstraZeneca hospital sales representative Korey Dodd, whose sales revenues were derived primarily from sales of Seroquel IR, had not sufficiently encouraged prescribers to pressure the pharmacy to substitute Seroquel XR for Seroquel IR.

465.    In February 2009, however, AstraZeneca instituted an aggressive scheme designed to have Seroquel XR added to the in-patient formulary at Broadlawns.  This scheme consisted of relentless detail visits with Broadlawns health care providers, an orchestrated letter-writing campaign to those in charge of the in-patient formulary, and efforts to influence Dr. Singh (described *supra*) and other health care professionals at Broadlawns to have Seroquel XR added to the formulary.

466.    In early 2009, AstraZeneca prepared to launch Seroquel XR for the treatment of MDD and GAD.  Promotion of Seroquel XR to treat these conditions at that time was off-label.

467.    As part of its launch of Seroquel XR to treat MDD and GAD, AstraZeneca targeted the in-patient formulary at Broadlawns.

157

468.    On February 10, 2009, District Manager Yarbrough contacted the Hospital and CNS Sales representatives on his team to transmit a series of follow up questions concerning the sales representatives' strategic planning ideas for the marketing of Seroquel XR to Broadlawns, Iowa Lutheran, and Mercy Franklin Medical Center.  Yarbrough noted the importance of having a "comprehensive plans in place for each institution," and added that "a few institutional accounts are essential for XR success and Broadlawns is definitely one of them – Broadlawns is my # 1 account too."

469.    Rick Peterson, a hospital sales representative, replied in a detailed e-mail on February 11, 2009.  Peterson reported that he would take the lead in this effort.  Peterson stated that, in his view, a "[s]uccessful launch is getting XR on formulary at Broadlawns." Although Peterson noted that, "ideally," the sales representatives would do "as many inservices and displays as we can," he warned that "discussions of non-formulary products in Broadlawns is strictly prohibited."

470.    Fortunately, AstraZeneca had someone on the inside to endorse Seroquel XR even though it was not on formulary:  "we do have a KOL (Singh) who is sharing information with colleagues, and we are able to address XR when questioned unsolicited."

471.    In an e-mail to his sales team partners, with a copy to Yarbrough, dated February 25, 2009, Peterson outlined his strategy for getting Seroquel XR added to the Broadlawns in-patient formulary by June 30, 2009.  Peterson proposed to obtain a letter signed by Broadlawns psychiatrists, mid-level providers, and by one of the hospital's pharmacists, requesting that Seroquel XR be added to the formulary.  Peterson stated that one letter signed by many providers would be more effective than multiple letters, since "[a] flurry of letters will alert pharmacy and potentially undermine our current XR strategy."  Peterson also proposed to ask the

133568.00601/36388526v.8

mid-level providers (nurses and nurse practitioners) to ask the patients to "bring their meds to each appointment to ensure compliance, and more importantly, reaffirm XR being filled and allowing for discussion about the difference between IR/XR."

472.    In his e-mail, Peterson issued the following "IMPORTANT" warning to those about to embark on the scheme to have Seroquel XR added to the in-patient formulary that they should be wary of being caught off-label promoting the drug:

> Keep XR conversations at a reduced volume.  Know who is around and within earshot … including Abilify reps … It's not paranoia, per se, but strategy to further amplify our chances of getting XR on [formulary].  **Any reported infarction [sic] to pharmacy could derail any formulary attempts as it gives the appearance that we are overstepping pharmacy and prematurely promoting an off-label product:  Not good.** … An obvious opportunity exists to discuss XR, and what patients should expect.  It also serves as a potential "get out of jail free" card (not a punch card, though) or a toe hold in pharmacy to discuss XR.  Again though:  Know your surroundings and who is near.   I understand that prior conversations regarding XR have and will continue to take place.  However, it is also important to understand that we are on the verge of entering into a very sensitive period where any shift in leverage could cause disaster or success.

473.    Thus, the sales representatives would have to conceal their off-label promotional efforts or risk damaging their chances of having Seroquel XR being added to the Broadlawns formulary.

474.    In an E-Mail sent on May 22, 2009, Peterson noted that Broadlawns' status as a 340B DSH hospital pursuant to HRSA guidelines provided additional pitfalls as AstraZeneca sought to have Seroquel XR added to the in-patient formulary.  "DSH pricing and 340B designation are very sensitive topics, and can blur the lines between lawful and unlawful promotional efforts."

133568.00601/36388526v.8

475.    District Manager Yarbrough promptly responded to Mr. Peterson's e-mail by calling Broadlawns a "must win" account, noting that "it's tied so tightly to Eyerly Ball, which is Polk County's biggest community mental health center."   Yarbrough noted that "[t]he current XR formulary situation at Broadlawns is not working in our favor because it is causing all XR prescriptions coming from Eyerly Ball to be denied."   Yarbrough clearly communicated AstraZeneca's "win at all cost" directive to his sales force by informing them that "CNS senior leadership recently communicated the following.  My mission is winning in 2009, regardless of the circumstance …."

476.    AstraZeneca's efforts to have Seroquel XR added to the in-patient formulary at Broadlawns received a significant boost when Ramoncito Ocampo, M.D., a psychiatrist with a special interest in geriatric patients who had been previously employed at Gundersen Lutheran Medical Center in Lacrosse, Wisconsin, joined the Broadlawns staff.  Dr. Ocampo proved to be a crucial ally in AstraZeneca's quest to have its extended-release product included in the in-patient formulary.  Dr. Ocampo attended a speaker program presented by Dr. Singh at which Dr. Singh extolled the virtues of Seroquel XR and was otherwise influenced by Dr. Singh to become an advocate for this drug.

477.    AstraZeneca aggressively pursued its strategy of seeking to have Seroquel XR added to the in-patient formulary at Broadlawns through the summer of 2009.

478.    Eventually, Broadlawns decided to add Seroquel XR to its in-patient formulary at a meeting on August 24, 2009.  Although Dr. Singh had previously informed Emily Jensen (the Relator's sales partner) and Peterson that Seroquel XR would not be considered until September, Dr. Ocampo had, apparently, contacted those in charge of the pharmacy and specifically requested that they consider adding Seroquel XR to the formulary in August.

133568.00601/36388526v.8

479.     Thereafter, Peterson informed Jim Franz, his supervisor, of the hospital's decision to add Seroquel XR to its in-patient formulary in a triumphant e-mail sent on August 24, 2009. "GREAT NEWS.   Broadlawns voted today on a full XR conversion on outpatient and full XR conversion + 25 mg IR on in patient."   Peterson added "[a]fter numerous delays this year for XR to reach review, and a tentative date of September for full review, pharmacy opted to accelerate the review today, based on our strategic work with Dr. Ocampo.  Broadlawns does approximately $60,000 per month in Seroquel IR ... soon to be XR."

480.     District Manager Franz then forwarded Peterson's news to various individuals in AstraZeneca, noting that Broadlawns is "our second largest account in the District [with $]1.8 million a year in Market sales …."  Franz acknowledged Dr. Ocampo's efforts, noting that "Dr. Ocampo was instrumental in making this happen not to mention the numerous discussions over the last 6 months with the pharmacy directors."  He added that, "[e]xcept for the [Veterans Administration], XR is in full conversion in every hospital in the Des Moines area.  And 85% of the Hospitals in Rick Peterson and Korey Dodd's area XR is available on formulary !!!"

481.     In forwarding this news of the scheme's success to his sales team, District Manager Yarbrough noted that the "[s]pill over potential could be tremendous in Des Moines at Broadlawns outpatient clinic and especially at Eyerly Ball CMHC (Relator and her sales partner's accounts).  With an account this size, surrounding counties should be impacted as well."

482.     AstraZeneca immediately took steps to implement the change from Seroquel to Seroquel XR at Broadlawns.  As part of these efforts, the Relator and her partner conducted weekly in-service meetings with all of the Broadlawns departments informing them of the

161

change.  Relator and her sales partner were also asked to set up some "round table" meetings with Dr. Singh.

483.    Mr. Peterson, one of AstraZeneca's Hospital Sales Representatives who spearheaded the effort to have Seroquel XR included on formulary at Broadlawns, acknowledged that "[a]ll patients filling RX's in the out-patient pharmacy are indigent.  Cost of paying for the medications are shouldered on the taxpayers of Polk [C]ounty."

484.    As of May 2009, over 11.75% of Broadlawns patients had no medical funding. Broadlawns treats substantial numbers of patients covered by Medicaid, Medicare, Polk County, and other government funds, and derives substantial revenues annually from federal programs and state funds.  AstraZeneca's extensive off-label marketing directed at Broadlawns and many of its providers, including its success in having Seroquel XR added to the Broadlawns' in-patient formulary, caused the submission of false claims for payment to federal and state programs as a result of fraud.

## VIII.   ASTRAZENECA VIOLATED ITS CORPORATE INTEGRITY AGREEMENT

485.    In order to execute its off-label promotion and kickback scheme for Seroquel IR and Seroquel XR, AstraZeneca needed to conceal its illegal conduct from Government oversight, particularly because it was operating under a Corporate Integrity Agreement ("CIA" or "Agreement").

486.    Accordingly, AstraZeneca engaged in a deliberate plan knowingly to submit false reports to the OIG—as required per the terms of the CIA—that either materially misrepresented the facts concerning its illegal conduct or concealed such conduct altogether.  As a result, AstraZeneca knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly

133568.00601/36388526v.8

concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

### A.   The CIA Established AstraZeneca's Monitoring and Reporting Obligations

487.   As part of the April 2010 Settlement Agreement with the Federal Government and various *Qui Tam* States, AstraZeneca was required to enter into a five-year CIA that expressly incorporates measures aimed at prohibiting the Company from engaging in any further off-label promotion or payment of kickbacks.

488.   The Agreement states that AstraZeneca "hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements)."

489.   The CIA is an express contract between AstraZeneca and the United States Government.

490.   All of AstraZeneca's employees were aware of the CIA, as the CIA required a written Code of Conduct be distributed to all Covered Persons, and each Covered Person was required to certify, in writing, that he or she had received, read, understood, and would abide by AstraZeneca's Code of Conduct.   CIA pg. 8, III.B.1 (defining "Code of Conduct").   Pursuant to the CIA, the Code of Conduct was to specify that all Covered Persons shall be expected to comply with the requirements of the CIA.   *Id*.   Per the CIA, a "Covered Person" includes officers, directors, and United States-based employees of AstraZeneca.   CIA, pg. 2, II.C.1.a.

133568.00601/36388526v.8

491.    The CIA contains an express contractual agreement that all AstraZeneca employees "shall be expected to report to the Chief Compliance Officer, or other individual designated by AstraZeneca, suspected violations of any Federal health care program and FDA requirements or of AstraZeneca's own Policies and Procedures."

492.    The CIA requires AstraZeneca to notify the Government of any "reportable events," defined to include any "matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program, and/or applicable to any FDA requirements relating to the promotion of AstraZeneca products for which penalties or exclusion may be authorized."  AstraZeneca has intentionally ignored that requirement.

493.    The CIA also requires that AstraZeneca's Board of Directors and top management regularly certify that the Company has an effective compliance program and is in compliance with all applicable requirements.  AstraZeneca intentionally has ignored that requirement or has filed knowingly false certifications.

494.    AstraZeneca, through its Compliance Department, (1) falsely certified in its quarterly reports that the company had fully complied with its CIA obligations; (2) manipulated off-label data obtained via third-party audits to minimize the true extent of the Company's off-label promotion; and (3) concealed from the Government reportable events that were brought to the Company's attention by employees who were fulfilling their obligation to report violations of federal and state laws.

495.    Rather than comply with the CIA, AstraZeneca has ignored both its letter and its spirit.  From the highest levels of the Company, AstraZeneca has done all it can to subvert the

133568.00601/36388526v.8

intentions of federal law, regulations, and the CIA in order to maximize corporate profits while still participating in Federal and State healthcare reimbursement programs.

### B.     AstraZeneca Continued Its Illegal Conduct Even While Negotiating the Terms of Its Corporate Integrity Agreement

496.     AstraZeneca had entered into an agreement-in-principle with the Government in October 2009, and finalized the Settlement Agreement on or about April 2010.  The Company signed its CIA on April 26, 2010.  Even after entering into the agreement-in-principle with the United States in 2009 and signing the Settlement Agreement and CIA in 2010, AstraZeneca continued its off-label promotion and payment of kickbacks as if neither event had occurred.

### C.     AstraZeneca Concealed Its Off-Label Promotion of Seroquel IR and Seroquel XR and Thus Made False and Misleading Statements In Its Reports To the OIG

497.     AstraZeneca's promotion of Seroquel IR and Seroquel XR for off-label uses, as alleged herein, constituted a violation of the Company's CIA and is a remarkable admission that the Company does not take seriously its obligations under the prior plea agreement.

498.     AstraZeneca violated the terms of the CIA each time it failed to report properly to OIG its promotion of Seroquel IR and Seroquel XR for non-medically accepted uses.

### D.     AstraZeneca Violated Its CIA By Not Reporting to the Government the Illegal Kickbacks It Paid To Physicians

499.     Similar to its failure to report off-label promotional activities to OIG, AstraZeneca likewise violated the terms of the CIA by not including in its reports the illegal kickbacks that it paid to induce physicians to prescribe Seroquel IR and Seroquel XR.

500.     The Federal Anti-Kickback Act, 42 U.S.C. § 1320a-7b(b), is specifically cited in the CIA and otherwise referenced as a law "applicable to any Federal health care program and/or applicable to any FDA requirements relating to the promotion of AstraZeneca products for which penalties or exclusion may be authorized."

501.    AstraZeneca violated the express terms of the CIA each time it failed to report to OIG the financial inducements it paid to physicians to prescribe its Seroquel IR and Seroquel XR and to promote both drugs for off-label, non-medically accepted uses.   AstraZeneca's active concealment of these illegal activities furthered its off-label promotional scheme.

**E.      AstraZeneca's Violation of the Terms of the CIA Caused It to Submit False Records and/or Statements Material to An Obligation to Pay or Transmit Money or Property to the Government**

502.    Pursuant to the Seroquel CIA, the parties stipulated that AstraZeneca would be obligated to pay certain monetary penalties resulting from its breach and/or default of any obligations.  *See* CIA, p. 52, *et seq.*

503.    At all times relevant to this Third Amended Complaint, AstraZeneca knew that it was prohibited from (i) initiating any promotion of Seroquel IR and Seroquel XR for an off-label use, (ii) promoting Seroquel IR and Seroquel XR through improper comparative marketing techniques, including unsubstantiated superiority claims, and (iii) compensating doctors in exchange for their decisions to prescribe Seroquel IR and Seroquel XR for their patients.

504.    There is no doubt that, following the Seroquel criminal plea, settlement, and CIA, AstraZeneca and its sales representatives have been clearly aware of the legal risks the Company takes when it chooses illegally to market its drug products.

505.    AstraZeneca knowingly failed completely and truthfully to certify compliance with, and failed completely and truthfully to report "reportable events," all as required by the Seroquel CIA.  As a result, AstraZeneca has presented or caused to be presented to the United States a false certification or claim under 31 U.S.C. § 3729 *et seq.*

506.    AstraZeneca failed accurately and truthfully to report its improper Seroquel IR and Seroquel XR marketing as described above, as required by the Seroquel CIA.

166

507.     The failure by AstraZeneca truthfully and accurately to report, or the submission of a false report, to the United States, pursuant to the CIA, was done knowingly and deliberately, without just cause.

508.     Although AstraZeneca was clearly aware of its compliance obligations regarding sales and marketing of its products, AstraZeneca senior sales, marketing, and corporate executives knowingly took actions intended to circumvent those obligations in the sales and marketing of Seroquel IR and Seroquel XR.

509.     AstraZeneca's violation of the terms of the CIA caused it to submit false records and/or statements material to an obligation to pay or transmit money or property to the Government.

## IX.     ASTRAZENECA VIOLATED THE FALSE CLAIMS ACT

510.     AstraZeneca's off-label promotional schemes served their intended purpose by causing health care professionals to write off-label prescriptions for Seroquel IR and Seroquel XR for non-medically accepted uses, which in turn caused the submission of false claims for reimbursement, resulting in hundreds of millions of dollars in improper payments by Government Programs and the *Qui Tam* States.  The particularized details of the scheme to submit false claims is largely detailed in sections VII (A-K), and their subheadings.  In each section, Relator summarizes numerous elements of the scheme, and then provides specific examples and details of each, including, without limitation: (a) the misrepresentations and misleading information passed from sales representatives to physicians (regarding IR and XR safety risks, risks of weight gain, association of XR to diabetes, risks of akathisia and somnolence); (b) the off-label promotion of Seroquel IR and XR for non-medically accepted uses (such as off-label promotion for MDD and symptoms of depression and off-label promotion head-to-head versus SSRI and SNRI antidepressants); and (c) the improper methods employed to

167

promote off-label behind the façade of compliance (such as through encouraging physician PIRs to disclose studies for off-label uses, using paid speakers to promote off-label uses to physicians with low on-label-appropriate patient volumes, the provision of low-dose samples to facilitate off-label use, promotion for treatment of GAD and symptoms of anxiety, promotion off-label to treat behavioral symptoms in elderly patients with dementia, promotion to treat off-label behavioral disturbances and developmental disorders in children and adolescents, PTSD, and as an adjunctive MDD therapy superior to Abilify).

511.    Due in no small part to AstraZeneca's illegal conduct, Seroquel IR and Seroquel XR have been heavily used for non-medically accepted uses by Medicaid, Medicare Part D, and other Government Program participants and beneficiaries.  Thus, AstraZeneca's illegal conduct has caused Government Programs and *Qui Tam* States to pay hundreds of millions of dollars that they should not have paid, unjustly enriching AstraZeneca.

**A.    AstraZeneca's Off-Label Promotion Caused the Submission of False Claims and Making of Material False Statements to Government Programs**

512.    In order for a drug to be eligible for reimbursement by Medicare Part D, it must be, in relevant part, approved by the FDA and used for a "medically accepted indication."  42 U.S.C. § 1395w-102(d)(1) & (e)(4)(A)(ii).  A medically accepted indication is defined as any use that is FDA-approved or that is supported by one or more citations included or approved for inclusion in one of three specified drug compendia.  Specific coverage policies and decisions are generally made by sponsors who contract with CMS to provide such coverage and are responsible for making coverage determinations in accordance with statutes and regulations.

513.    In order for a drug to be eligible for reimbursement under the Medicaid program, the drug's manufacturer must first enter into a rebate agreement with HHS.  Once a manufacturer has entered into a drug rebate agreement a state is generally required to pay the covered

outpatient drugs of that manufacturer under the state plan unless "the prescribed used is not for a medically accepted indication."   42 U.S.C. § 1396r-8(d)(1)(B)(i).   A medically accepted indication is any FDA-approved use or a use that is "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the statute.   42 U.S.C. § 1396r-8(k)(6).  Thus, Medicaid does not cover off-label uses of drugs that are not supported by one or more citations included or approved for inclusion in the specified compendia.

514.    Other Government Programs adhere to similar rules in determining a drug's eligibility for reimbursement and generally require that, in order to be covered, a drug must be prescribed for an FDA-approved use or a use supported in one or more drug compendia.

515.    AstraZeneca promoted Seroquel IR and Seroquel XR for uses that were neither approved by the FDA nor supported in any one of the applicable drug compendia, and, as a result, were ineligible for reimbursement by Government Programs including Medicare and Medicaid.

516.    As a result of AstraZeneca's off-label promotion, health care professionals prescribed AstraZeneca's drugs for these uses.

517.    As a result of health care professionals' prescribing of AstraZeneca's drugs, pharmacies filled prescriptions and submitted claims to Government Programs for payment of AstraZeneca's drugs for these uses, as described in detail in ¶¶ 523-537, *infra*.

518.    Because claims for payment of AstraZeneca's drugs were ineligible for reimbursement by Government Programs, these claims were false within the meaning the federal False Claims Act and State *Qui Tam* statutes.

169

519.     AstraZeneca's off-label promotion of Seroquel IR and Seroquel XR therefore caused the submission of claims that were false and not eligible for reimbursement by Government Programs.

520.     AstraZeneca engaged in this off-label promotion knowingly and with the intent to cause the submission of false claims to Government Programs.

521.     Government Programs paid reimbursements for the resulting false claims and, as a result, have incurred and continue to incur significant damages due to AstraZeneca's off-label promotion of its drugs.

522.     By causing these claims that it knew were ineligible for reimbursement to be submitted to and paid for by Government Programs, AstraZeneca also knowingly and intentionally made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described in ¶¶ 523-537, *supra*.

1.     **Submission of False Claims to Medicaid**

523.     The institutions and pharmacies where AstraZeneca's drugs are filled agree to provide pharmaceuticals to the patients served by the *Qui Tam* States' Medicaid programs, and the *Qui Tam* States in turn reimburse these institutions and pharmacies for the cost of the AstraZeneca drugs, plus a fixed dispensing fee meant to provide the dispenser with a profit for providing services to Medicaid patients.

524.     The institutions and pharmacies submit their Medicaid claims for reimbursement by "batching them" daily, and submitting them electronically to the *Qui Tam* States.   These claims include the claims for off-label prescriptions for the AstraZeneca drugs, as well as claims tainted by illegal kickbacks.   In instances in which claims were for off-label prescriptions or tainted by illegal kickbacks, the institutions and pharmacies made false representations and false claims concerning Medicaid reimbursement directly to the *Qui Tam* States on a daily basis.

170

525.    As part of each electronic claim, the institutions and pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable federal and state laws.

526.    The institutions and pharmacies are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

527.    The *Qui Tam* States are not financially responsible for paying 100% of the institutions' and pharmacies' claims for reimbursement.  Medicaid is a joint federal-state program that provides healthcare benefits for certain groups, primarily low-income and disabled persons.  The federal government provides matching funds and ensures that the states comply with minimum standards in the administration of the program.  The federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average.  Among the states, the FMAP is at least 50%, and in some instances, as high as 77%.  For example, for fiscal year 2009, the federal share in Delaware was 50%; the federal share in Iowa was 62.62%.  *See* Office of the Assistance Secretary for Planning and Evaluation, *Federal Medical Assistance Percentages or Federal Financial Participation in State Assistance Expenditures FMAP*, *available at* http://aspe.hhs.gov/health/fmap.htm (last visited June 23, 2013).

528.    Through the FMAP process, State Medicaid administrators obtain the Federal Government's share of the pharmacies' reimbursements by submitting a quarterly Form 64 to CMS.  For this reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the Federal Government within the meaning of the FCA.

529.    The Federal Government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the state payee.  42 C.F.R. § 430.30(d)(3),

(4).  The Federal Government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements."  42 C.F.R. § 430.30(d)(3).  The state can draw down on those funds only to pay the Medicaid claims of healthcare providers.  42 C.F.R. § 430.30(d).

530.  The funds made available to the state thus remain federal funds, in a Federal Reserve account, until they are drawn by the state and used to pay the institutions or pharmacies' claims.

531.  The Federal Government also "approves" within the meaning of the FCA the claims submitted and paid through the Medicaid program.  When a state presents its Form 64 (i.e., the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports.  Based on the information in the reports, CMS determines and approves whether the claims that the state paid with federal funds were appropriate.  If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

532.  Because the Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the state, these reports overstated the amount of federal funds to which the state was entitled by the amount fraudulently paid as a result of off-label prescriptions for the AstraZeneca drugs, as well as claims tainted by illegal kickbacks. They were, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

533.  The claims for reimbursement submitted by the physicians' offices and pharmacies to the *Qui Tam* States, which in turn caused the *Qui Tam* States to submit these claims for reimbursement to the Federal Government pursuant to FMAP, constituted false claims

133568.00601/36388526v.8

as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

### 2.   Submission of False Claims to Medicare Part D

534.   The pharmacies where the AstraZeneca drugs are filled agree to provide pharmaceuticals to Medicare Part D Plans ("PDPs") for Medicare patients that they serve, and the PDPs in turn reimburse these pharmacies for the cost of the AstraZeneca drugs, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicare patients.  PDPs (or MA-PDPs) are administered under contract with CMS by private entities such as Blue Cross Blue Shield plans, large commercial insurers such as Humana, and pharmacy benefit managers.

535.   Every time a beneficiary fills a prescription covered under Part D, PDPs must submit a summary called the prescription drug event, or PDE record. The PDE record contains drug cost and payment data, which enable CMS to administer the Part D benefit.  CMS uses the PDE record to calculate reimbursement to PDPs for the cost of the AstraZeneca drugs, plus an amount meant to provide the PDPs with a profit for administering the PDP.

536.   CMS reimbursement to PDPs pursuant to the PDE overstated the amount of federal funds to which PDPs were entitled by the amount fraudulently paid as a result of off-label prescriptions for the AstraZeneca drugs, as well as claims tainted by illegal kickbacks.  They were, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

537.   The claims for reimbursement submitted by the pharmacies to PDPs, which, in turn, caused the PDPs to submit these claims for reimbursement to the Federal Government, constituted false claims as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

133568.00601/36388526v.8

**B.** **AstraZeneca's Payment of Kickbacks Caused the Submission of False Claims and Making of Material False Statements to Government Programs**

538.    AstraZeneca provided health care professionals and medical education contractors with remuneration related to promotional speaker programs, advisory boards, tutorials, preceptorships, professorships, and CME programs, all in return for or to induce purchasing, ordering, arranging for or recommending purchasing or ordering of goods or items for which payment was made by Government Programs, in violation of the federal Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), and State *Qui Tam* statutes. *See* ¶¶ VII.I-447, *supra*.

539.    These kickbacks caused health care professionals to prescribe or recommend that other healthcare professionals prescribe AstraZeneca's drugs.

540.    As described in detail in ¶¶ 523-537, *supra*, these actions in turn caused institutions and pharmacies to submit claims for reimbursement for AstraZeneca's drugs to Government Programs, including Medicare and Medicaid.

541.    Government Programs, including Medicare and Medicaid, do not cover claims for drugs when a kickback is involved in the underlying transaction—including claims that were submitted for payment of a drug as a result of a kickback given to a health care professional to prescribe that drug. Claims submitted to Government Programs when a kickback is involved in the underlying transaction are false within the meaning of the federal False Claims Act and State analogues.

542.    In order to enroll in and bill Medicare, providers must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's

174

compliance with all applicable conditions of participation in Medicare.

543.     Similarly, any provider who submits claims to Medicaid must sign a provider agreement with each Medicaid program to which it submits claims.   The Iowa Provider Agreement, for example, requires that, in order to be eligible to receive payment under the Iowa Medicaid Program, providers must certify that they will "[c]omply with all applicable Federal and State laws, administrative rules and written policies of the Iowa Medicaid program, including but not limited to Title XIX of the Social Security Act (as amended), the Code of Federal Regulations, [and] the Federal anti-kickback statute…."   Iowa Medicaid Provider Agreement General Terms § 1.4.  The Agreement further requires that "[a]ll such goods and/or services [paid for by the Iowa Medicaid program] must have been rendered by Provider in accordance with Federal and State law and the State policies and procedures set forth in the Iowa Medicaid Provider Manual. Financial obligations of the State of Iowa are contingent upon funds for that purpose being appropriated."  *Id.* § 2.1.

544.     Claims that were submitted to Government Programs that were tainted, in part or in whole, by kickbacks provided by AstraZeneca were therefore false within the meaning of the federal False Claims Act and State *Qui Tam* statutes.

545.     AstraZeneca's payment of kickbacks therefore caused the submission of claims that were false and not eligible for reimbursement to Government Programs.

546.     AstraZeneca's payment and offers of payment of kickbacks were made knowingly and with the intent to cause the submission of false claims to Government Programs.

547.     Government Programs paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to AstraZeneca's illegal payment of kickbacks.

133568.00601/36388526v.8

548.     By causing these claims that it knew were ineligible for reimbursement to be submitted to and paid for by Government Programs, AstraZeneca also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described in ¶¶ 523-537, *supra*.

X.     ASTRAZENECA RETALIATED AGAINST RELATOR FOR BLOWING THE WHISTLE

549.     AstraZeneca retaliated against Relator in violation of 31 U.S.C. § 3730(h), as amended by the Fraud and Recovery Act of 2009 ("FERA"), which provided that

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

550.     On July 21, 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") further amended 31 U.S.C. § 3730(h)(1) to provide that

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

551.     AstraZeneca's retaliation against Relator also violated 31 U.S.C. § 3730(h)(1), as amended by Dodd-Frank.

552.     Relator reasonably believed that by reporting AstraZeneca's illegal conduct to the Company there was a reasonable likelihood that this would succeed in stopping that illegal conduct, because the procedures set forth in the AstraZeneca's Code of Conduct are ostensibly

133568.00601/36388526v.8

designed to identify illegal conduct in order to stop it.  The Code states, *inter alia*, that all employees must "promptly report any known, suspected, or observed violations of laws, regulations, this Code or supporting policies of which you become aware."  Code at 2.

553.    AstraZeneca's Code of Conduct further provides:

> ANYONE WHO RAISES A CONCERN ABOUT A POSSIBLE COMPLIANCE BREACH IN GOOD FAITH WILL BE SUPPORTED BY MANAGEMENT, AND WILL NOT BE SUBJECT TO RETALIATION.  ANY ACT OR THREAT OF RETALIATION WILL IN ITSELF BE CONSIDERED A SERIOUS VIOLATION OF THIS CODE.

Code of Conduct at 3.

554.    Relator suffered threats, harassment and other discrimination as the direct result of her lawful reporting to AstraZeneca that the Company continued to engage in illegal marketing of Seroquel XR and that the illegal marketing caused false claims to be submitted and reimbursed by Federal Health Care Programs.

555.    In or around March 2008, Relator along with her sales team partner, Emily Jensen, reported that the Company was and had been engaged in illegal conduct, which included false and misleading off-label promotion, false and misleading superiority claims, and other illegal conduct that violated or led to a violation of the False Claims Act.  Relator specifically informed Ms. Sharon Belnap in Human Relations that: (i) AstraZeneca's sales representatives continued to illegally promote Seroquel XR for off-label uses, including pediatric use; (ii) District Manager Yarbrough had instructed Jensen and Relator to use a clinical trial to illegally promote Seroquel XR for off-label pediatric use; (iii) Yarbrough had directed Relator to contact another sales representative in Minnesota to obtain guidance on how to use the article to illegally promote Seroquel XR for off-label pediatric use; (iv) Relator and her sales partner had participated in a meeting where AstraZeneca instructed sales representatives to illegally promote

177

Seroquel XR off-label; (v) Yarbrough directed sales representatives in his district to emulate the illegal, off-label promotional methods of AstraZeneca's sales representatives in Minnesota, who continued successfully to illegally promote Seroquel XR off-label; (vi) Yarbrough criticized Relator for being "too conservative" in her promotional activities because she refused to illegally market Seroquel XR off-label; and (vii) AstraZeneca made misleading presentations to state Medicaid committees, which caused Medicaid to reimburse Seroquel for certain uses it otherwise would not have reimbursed.

556.    Relator's reporting to AstraZeneca included allegations set forth in this Third Amended Complaint and such reporting was made in furtherance of an action under 31 U.S.C. § 3730.  Her reporting was additionally made in order to stop one or more violations of 31 U.S.C. § 3730, including the illegal conduct described herein.

557.    Although AstraZeneca assured Relator that her reporting would be confidential, Yarbrough and the sales representatives in Relator's district learned of her reporting and retaliated against her.  Their retaliation included refusing to speak to Relator and, in another instance, threatening her.  During a "team building" meeting for Relator's district, held in Minneapolis on September 24, 2009, Relator listed her self-perceived strengths as part of a group exercise.  In response, sales representative Mike Doran, slammed his fist down and stated that "he was ready to kill someone," a threat that was clearly directed at Relator.  Doran then hastily left the room.  Although this incident occurred in the presence of District Manager Yarbrough—who served as Relator and Doran's supervisor—no action was taken to reprimand Doran as a result of his threats against Relator.

558.    AstraZeneca also retaliated against Relator by providing her with a below-average performance review for the year of 2009.  The review, which Relator received on or about

March 19, 2010, assigned Relator a rating of "partially meets requirements" and, as a result, she was denied a raise that, absent the Company's illegal retaliation, she had earned and would have received. In fact, it was the first time in nine years at AstraZeneca that Relator did not receive a pay raise. Relator's performance had been in keeping with Company standards and consistent with her performance over past years, in recognition of which she was given a promotion only three months prior to the below-average review. In addition, Relator received multiple awards for her sales performance in the period immediately preceding her compliance reporting. As such, the only reason for the negative performance review was in retaliation for her reporting of AstraZeneca's illegal conduct.

559.     During the March 2010 performance review, District Manager Yarbrough exhibited open hostility toward Relator. Yarbrough fabricated numerous explanations for Relator's negative performance review and moved from one to another as Relator pointed out why each example was untrue. For example, Yarbrough claimed that the negative review was the result of Relator's unsafe driving; however, Relator pointed out that she had been given a "Road Scholar" award in specific recognition of the safety of her driving.

560.     Yarbrough also attempted to have Relator fired by scrutinizing her expense reports for violations. When he did not find any actual violations, he fabricated one by identifying a speaker event held 6 to 12 months earlier, which had been attended by a physician who had been excluded from Relator's call list. Although Yarbrough had approved the original expense report, he now contended this was a serious violation. Relator's sales partner called a compliance representative, who confirmed that it did not constitute a serious violation.

561.     Relator subsequently was assigned a new district manager, Mike Walje, who continued to retaliate against her by acting hostilely and attempting to fire her. During ride-

179

alongs, Walje refused to speak to Relator.  In other instances, he accused her of engaging in off-label promotion, when she in fact had not.  Around March or April 2010, Walje instructed Relator that she needed to increase her sales by 10%—an unrealistically high figure—or she would be placed on a "Performance Improvement Plan," which is a precursor to being fired.

562.   As a direct result of the pervasive threats, harassment and other discrimination she suffered in response to her lawful reporting of AstraZeneca's illegal marketing activities, Relator suffered severe emotional distress.

563.   Relator was constructively discharged on May 10, 2010, as the direct result of the threats, harassment and other discrimination she was forced to endure because of her lawful reporting of AstraZeneca's illegal marketing activities.

564.   In derogation of both the Code and False Claim Act, 31 U.S.C. § 3730(h), Relator was subject to harassment and retaliation as a result of raising good-faith concerns that AstraZeneca continued to illegally promote Seroquel XR for off-label uses.

565.   Relator's reporting was protected conduct under 31 U.S.C. § 3730(h) at all relevant times hereto, including both pre- and post-dating the FERA amendments and pre- and post-dating the Dodd-Frank amendments.

566.   AstraZeneca's retaliation against Relator also violated 31 U.S.C. § 3730(h)(1), as amended by Dodd-Frank.

COUNT I
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))**[1]

567.   Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

---

[1] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

568.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

569.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

COUNT II
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))**[2]

570.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

571.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

572.    The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Seroquel XR prescribed to patients enrolled in federal programs.

573.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

---

[2] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

133568.00601/36388526v.8

COUNT III
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))** [3]

574.   Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

575.   As detailed above, Defendants knowingly conspired, and may still be conspiring, with health care professionals identified and described herein to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B).   Defendants and these health care professionals committed overt acts in furtherance of the conspiracy as described above.

576.   As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

COUNT IV
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G)** [4]

577.   Relator incorporates herein by reference the preceding paragraphs of the Third Amended Complaint as though fully set forth herein.

578.   As detailed herein, Defendants, through its agents and employees, knowingly or reckless submitted or caused to be submitted to the United States government knowingly false records or statements material to an obligation to pay or transmit money or property to the Government.   Defendants knew that its agents and employees had submitted knowingly false records or statements material related to the CIA, and as such, Defendants were required to disclose those facts to the Government, and specifically to the OIG.   By way of example, Defendants were required to, but failed to, report to OIG its promotion of Seroquel IR and

---

[3] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

[4] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

133568.00601/36388526v.8

Seroquel XR for non-medically accepted uses, illegal kickbacks that it paid to induce physicians to prescribing Seroquel IR and Seroquel XR, and the financial inducements it paid to physicians to prescribe its Seroquel IR and Seroquel XR.

579.    Instead, however, AstraZeneca concealed its wrongdoing and the wrongdoing of its employees and agents, by, among other things, failing to report these issues and falsely certifying in its quarterly reports that the company had fully complied with its CIA obligations. Thereby, Defendants knowingly avoided or decreased its obligation to pay or transmit money to the Government.

580.    Specifically, Defendants (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

581.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

## COUNT V
## (Violation of False Claims Act, 31 U.S.C. § 3730(h))

582.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

583.    As a result of Relator's lawful acts in furtherance of protected activities in the investigation and reporting of fraud, Defendants retaliated against Relator.

584.    Relator's termination of employment was a direct result of Defendants' retaliatory acts, causing Relator to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

133568.00601/36388526v.8

COUNT VI
**(Violation of California False Claims Act)**

585.    Relator incorporates herein by reference the preceding paragraphs of this Third

Amended Complaint as though fully set forth herein.

586.    This is a civil action brought by Relator, on behalf of the State of California,

against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

587.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't

Code § 12651(a)(1).

588.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements material to false or fraudulent claims, in violation

of Cal. Gov't Code § 12651(a)(2).

589.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to the State of California, or its political subdivisions, in violation of Cal.

Gov't Code § 12651(a)(7).

590.    The State of California, or its political subdivisions, unaware of the falsity of the

claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

133568.00601/36388526v.8

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

591.    As a result of Defendants' actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT VII
**(Violation of Colorado Medicaid False Claims Act)**

592.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

593.    This is a civil action brought by Relator, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

594.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

595.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

185

596.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

597.     The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state and state subdivision funded health insurance programs.

598.     As a result of Defendants' actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### (Violation of Connecticut False Claims Act for Medical Assistance Programs)

599.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

600.     This is a civil action brought by Relator, on behalf of the State of Connecticut, against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

601.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political

133568.00601/36388526v.8

subdivisions, false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

602.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

603.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

604.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state and state subdivision funded health insurance programs.

605.     As a result of Defendants' actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT IX
**(Violation of Delaware False Claims and Reporting Act)**

606.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

607.     This is a civil action brought by Relator, on behalf of the State of Delaware, against Defendants under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

608.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

609.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

610.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing

188

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

611.   The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of healthcare programs funded by the State of Delaware.

612.   As a result of Defendants' actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
### (Violation of District of Columbia False Claims Act)

613.   Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

614.   This is a civil action brought by Relator, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

615.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

616.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing

189

to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

617.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

618.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

619.    As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
## (Violation of Florida False Claims Act)

620.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

621.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

622.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

623.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

624.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

625.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

626.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

COUNT XII
**(Violation of Georgia False Medicaid Claims Act)**

627.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

191

628.    This is a civil action brought by Relator, on behalf of the State of Georgia, against Defendants pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

629.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

630.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

631.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

632.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

133568.00601/36388526v.8

633.    As a result of Defendants' actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

COUNT XIII
**(Violation of Hawaii False Claims Act)**

634.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

635.    This is a civil action brought by Relator, on behalf of the State of Hawaii, against Defendants under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

636.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

637.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

638.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

193

or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

639.    The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

640.    As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XIV
**(Violation of Illinois False Claims Act)**

641.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

642.    This is a civil action brought by Relator, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

643.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

644.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid

194

or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

645.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

646.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

647.    As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XV
**(Violation of Indiana False Claims and Whistleblower Protection Act)**

648.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

649.    This is a civil action brought by Relator, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

650.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting

195

or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

651.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

652.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

653.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

654.    As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XVI<br>
<strong><u>(Violation of Iowa False Claims Act)</u></strong>

655.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

196

656.    This is a civil action brought by Relator, on behalf of the State of Iowa, against Defendants under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

657.    Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

658.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

659.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

660.    The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

661.    As a result of Defendants' actions, as set forth above, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVII
### (Violation of Louisiana Medical Assistance Programs Integrity Law)

662.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

663.    This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against Defendants under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

664.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

665.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

666.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

133568.00601/36388526v.8

667.     The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

668.     As a result of Defendants' actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

## COUNT XVIII
### (Violation of Massachusetts False Claims Act)

669.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

670.     This is a civil action brought by Relator, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

671.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

672.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

673.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

674.     The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

675.     As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XIX
**(Violation of Michigan Medicaid False Claims Act)**

676.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

677.     This is a civil action brought by Relator, on behalf of the State of Michigan, against Defendants under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

200

678.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

679.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

680.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants were not entitled or in an amount greater than that to which Defendants were entitled, in violation of Mich. Comp. Laws § 400.603(3).

681.     Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan,

or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

682.   The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

683.   As a result of Defendants' actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XX
**(Violation of Minnesota False Claims Act)**

684.   Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

685.   This is a civil action brought by Relator, on behalf of the State of Minnesota, against Defendants under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

686.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

687.   Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

688.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

689.    The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

690.    As a result of Defendants' actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI
### (Violation of Montana False Claims Act)

691.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

692.    This is a civil action brought by Relator, on behalf of the State of Montana against, Defendants under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

693.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions,

false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

694.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

695.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

696.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

697.    As a result of Defendants' actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

133568.00601/36388526v.8

COUNT XXII
**(Violation of Nevada False Claims Act)**

698.     Relator incorporates herein by reference the preceding paragraphs of this Third

Amended Complaint as though fully set forth herein.

699.     This is a civil action brought by Relator, on behalf of the State of Nevada, against

Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

700.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented or caused to be presented, and may still be presenting or causing to

be presented, false claims for payment or approval, in violation of Nev. Rev. Stat.

§ 357.040(1)(a).

701.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to obtain payment or approval of false claims,

in violation of Nev. Rev. Stat. § 357.040(1)(b).

702.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev.

Stat. § 357.040(1)(g).

703.     The State of Nevada, or its political subdivisions, unaware of the falsity of the

claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

704.    As a result of Defendants' actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXIII
**(Violation of New Jersey False Claims Act)**

705.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

706.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

707.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

708.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

206

709.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

710.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

711.    As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXIV
**(Violation of New York False Claims Act)**

712.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

713.    This is a civil action brought by Relator, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

714.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

207

715.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

716.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

717.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

718.    As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV
### (Violation of North Carolina False Claims Act)

719.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

720.    This is a civil action brought by Relator, on behalf of the State of North Carolina, against Defendants under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

133568.00601/36388526v.8

721.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

722.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

723.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

724.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

725.    As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

209

COUNT XXVI
**(Violation of Oklahoma Medicaid False Claims Act)**

726.     Relator incorporates herein by reference the preceding paragraphs of this Third

Amended Complaint as though fully set forth herein.

727.     This is a civil action brought by Relator, on behalf of the State of Oklahoma,

against Defendants pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63,

§ 5053.2(B)(1).

728.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions,

false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63,

§ 5053.1(B)(1).

729.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made or caused to be made, and may still be making or causing to be made, false

records or statements to get false or fraudulent claims paid or approved by the State

of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

730.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity

of the information involved, or with actual knowledge of the falsity of the information,

knowingly made, used, or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla.

Stat. tit. 63, § 5053.1(B)(7).

133568.00601/36388526v.8

731.     The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

732.     As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXVII
**(Violation of Rhode Island False Claims Act)**

733.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

734.     This is a civil action brought by Relator, on behalf of the State of Rhode Island, against Defendants pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

735.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

736.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

133568.00601/36388526v.8

737.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

738.     The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

739.     As a result of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII
### (Violation of Tennessee Medicaid False Claims Act)

740.     Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

741.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

742.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

212

743.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

744.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

745.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

746.    As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXIX
**(Violation of Virginia Fraud Against Taxpayers Act)**

747.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

213

748.     This is a civil action brought by Relator, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

749.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

750.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

751.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

752.     The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy

133568.00601/36388526v.8

of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

753.    As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXX
**(Violation of Washington Medicaid False Claims Act)**

754.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

755.    This is a civil action brought by Relator, on behalf of the State of Wisconsin, against Defendants under the Washington Medicaid False Claims Act, S. 5978, 2nd Cong. § 205.

756.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of S. 5978, 2nd Cong. § 202(1)(a).

757.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of S. 5978, 2nd Cong. § 202(1)(b).

758.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

215

knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Washington, or its political subdivisions, in violation of S. 5978, 2nd Cong. § 202(1)(g).

759.    The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

760.    As a result of Defendants' actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

COUNT XXXI
**(Violation of Wisconsin False Claims for Medical Assistance Law)**

761.    Relator incorporates herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

762.    This is a civil action brought by Relator, on behalf of the State of Wisconsin, against Defendants under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(5)(a).

763.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

133568.00601/36388526v.8

764.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

765.     The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

766.     As a result of Defendants' actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

767.     **WHEREFORE,** Relator prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 17b-301a *et seq.*; Del. Code Ann. tit. 6, § 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 49-4-168 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; Iowa Code § 685.1 *et seq.*; La. Rev. Stat. Ann. § 46:437.1 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; S. 5978, 2nd Cong. § 201 *et seq.*; and Wis. Stat. § 20.931 *et seq.*

B.    That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §§ 3730(d) and 3730(h), Cal. Gov't Code § 12652(g)(4), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e(e), Del. Code Ann. tit. 6, § 1205, D.C. Code § 2-308.15(f), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2(i), Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(d), Ind. Code § 5-11-5.5-6, Iowa Code § 685.3(4)(a)(1), La. Rev. Stat. Ann. § 439.4, Mass. Gen. Laws ch.12, § 5F, Mich. Comp. Laws § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.210, N.J. Stat. Ann. § 2A:32C-7, N.Y. State Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. tit. 63, § 5053.4, R.I. Gen. Laws § 9-1.1-4(d), Tenn. Code Ann. § 71-5-183(d), Va. Code Ann. § 8.01-216.7, S. 5978, 2nd Cong. § 207(1), and Wis. Stat. § 20.931(11), including without limitation (i) reinstatement of employment with no diminution of seniority, (ii) double back-pay for the period since her unlawful retaliatory termination, (iii) interest on such back-pay, and (iv) special damages, including reasonable attorneys' fees and litigation costs.

D.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand

218

dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      E.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      F.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

      G.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann.

219

tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as

133568.00601/36388526v.8

provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-

5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N.      That judgment be entered in Relator's favor and against Defendants in the amount of damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P.      That judgment be entered in Relator's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than five thousand dollars ($5,000) dollars and not more than ten thousand dollars ($10,000), plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

133568.00601/36388526v.8

R.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Minnesota and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand

224

dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the federal False Claims Act (31 U.S.C. § 3729 *et seq*.) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W.      That judgment be entered in Relator's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly

or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws §  9-1.1-3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws §  9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

133568.00601/36388526v.8

Z.     That judgment be entered in Relator's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in S. 5978, 62nd Cong. § 202(1), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per claim as provided by S. 5978, 62nd Cong. § 202(1), to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in Wis. Stat. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Wis. Stat. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

EE.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

FF.     That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated: September 15, 2014

*David A. Dorey*
_____
David A. Dorey (DE I.D. No. 5283)
Steven L. Caponi (DE I.D. No. 3484)
Elizabeth A. Sloan (DE I.D. No. 5045)
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400

133568.00601/36388526v.8

Facsimile:  (302) 425-6464
Dorey@BlankRome.com

W. Scott Simmer (*pro hac vice*)
Paul M. Honigberg (*pro hac vice*)
BLANK ROME LLP
600 New Hampshire Ave., NW
Washington DC 20037
Telephone:  (202) 772-5800
Facsimile:  (202) 572-8412
Simmer@BlankRome.com

*Counsel for Relator*

229